# EXHIBIT A

5/8/2023 1:29 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2023CH03446
Calendar, 9
22521237

## SANGAMON COUNTY SHERIFFS OFFICE
### "Keeping the Peace Since 1821"

**JACK CAMPBELL**
#1 Sheriff's Plaza
Springfield, IL 62701

Administration – (217) 753-6855
Civil Process/Records – (217) 753-6846

Investigations – (217) 753-6840
Corrections – (217) 753-6886

**SG TRACKING #23- 2491**

I, _DEP SMITH_ certify that I served this summons as follows:

☐ **Personal service on an individual**, by leaving a copy of the summons and complaint with the defendant personally

☐ **Abode service on an individual**, by leaving a copy of the summons and complaint with a member of the household thirteen (13) years or older, informing said person of the contents thereof, and also by sending a copy of the summons, in a sealed envelope, postage paid, to the individual listed in the summons.

☒ **Corporation service**, by leaving a copy of the summons and complaint with an agent or officer of the corporation listed in the summons.

Court Docket Number _23CH3446_

Name of defendant _Duly Health + Care_

Name of other person
Summons left with _Lyle Neenyam_

Sex: ( M F )  Race: _W_  Approx. Age: _____

Date of Service _4/20_ /2023  Time _12:00_

Date of Mailing _____

Address at which paper was served:
_801 Adlai Stevenson Dr_
_Springfield, IL 62703_

**Jack Campbell, Sheriff of Sangamon County Sheriff's Office**

By: _____, Deputy # _4975_

**IN PARTNERSHIP WITH THE COMMUNITY**

Hearing Date: 5/19/2023 9:00 AM - 9:00 AM
Location: <<CourtRoomNumber>>
Judge: Calendar, 9

5/19/2023 10:54 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2023CH03446
Calendar, 9
22236016

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| PATRICIA MAYER, *on behalf of herself and all others similarly situated*, <br><br> Plaintiff, <br><br> v. <br><br> MIDWEST PHYSICIAN ADMINISTRATIVE SERVICES, LLC d/b/a DULY HEALTH AND CARE, <br><br> Defendant. | Case No. 2023CH03446 <br><br><br> **<u>JURY TRIAL DEMANDED</u>** |

## <u>PLAINTIFF'S MOTION FOR CLASS CERTIFICATION AND REQUEST FOR DISCOVERY ON CERTIFICATION ISSUES</u>

Plaintiff Patricia Mayer ("Plaintiff") alleges that Defendant Midwest Physician Administrative Services LLC d/b/a Duly Health and Care ("Duly Health" or "Defendant") systematically violated various state laws by disclosing Plaintiff's and similarly situated Class Members' confidential health-related information to third parties including Meta Platforms, Inc. ("Facebook"). Plaintiff alleges that Defendant owns, controls, and maintains a Website, Web Portal, and App (collectively, "Web Properties") designed for patient use to book medical appointments, communicate health symptoms, access lab and test results, and more. Plaintiff further alleges that Defendant knowingly embedded several tools, including the "Facebook Pixel"

and Facebook's Conversions Application Programming Interface ("CAPI") on its Web Properties to collect and transmit patients' personally identifiable information ("PII") and protected health information ("PHI") to third parties including Facebook. Defendant did so without obtaining express consent, let alone informing patients of their data collection. Because Defendant programmed its Web Properties to act the same for each of the hundreds of thousands of people who used them, the injuries suffered by Plaintiff and the putative Class as a result of Defendant's conduct are identical. That is, all putative Class members had their PII and PHI transmitted to a third party without their consent, thus entitling all Class members to a nearly identical calculation of actual and statutory damages.

For these reasons, Plaintiff seeks to certify a class consisting of likely hundreds of thousands of similarly-situated individuals whose private information was disclosed to a third party without consent by Defendant through its Web Properties. As Plaintiff's claims and the claims of similarly-situated individuals all arise from Defendant's uniform policies and practices, they satisfy the requirement of 735 ILCS § 5/2-801 and should be certified.

Plaintiff moves for class certification to protect members of the proposed class, individuals whose private and legally-protected personal data were invaded by Defendant. Plaintiff believes that the evidence and argumentation submitted within this motion are sufficient to allow the class to be certified now. However, in the event the Court (or Defendant) wishes for the parties to undertake formal discovery prior to the Court's consideration of this motion, Plaintiff requests that the Court allow her to supplement this briefing and defer the response and reply deadlines.

## I.     <u>RELEVANT BACKGROUND</u>

### A.     <u>Factual Allegations</u>

Plaintiff filed this class action against Defendant on April 10th, 2023, alleging claims on behalf of herself and as a class of individuals seeking relief from Defendant's common-law, statutory, and regulatory violations in connection with Defendant's practice of knowingly disclosing sensitive health information to third parties without consent. In particular, Plaintiff brings causes of action for Defendant's violation of the Illinois Eavesdropping Statute, 720 ILCS 5/14-1, *et seq.*, the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*, The Illinois Uniform Deceptive Trade Practices Act, ILCS Sections 510/2, *et seq.*, as well as tort actions for Defendant's breach of confidence, invasion of privacy, and breach of implied contract. Comp. ¶ 34.

Defendant owns and operates a website, https://www.dulyhealthandcare.com/ (the "Website"), and encourages patients to use it for booking medical appointments, locating physicians and treatment facilities, communicating medical symptoms, searching medical conditions and treatment options, and more. Comp. ¶ 5. Defendant also maintains a web-based portal called MyChart (the "Portal") and a mobile application (the "App") where registered users access their account to, among other things, communicate with their doctors, access test results, manage prescriptions and refills, and manage appointments. *Id.* ¶ 6.

Defendant embedded a tool called the Facebook Tracking Pixel (the "Pixel" or "Facebook Pixel") on each of these Web Properties to collect and automatically transmit to Facebook every click, keystroke, and detail about their medical treatment. *Id.* ¶ 9. A pixel, such as this one, can collect all kinds of information about a user, including how long a person visits a web page, what they click on and view, and the text they enter into the website. *Id.* ¶ 11. The Pixel is customizable

by the website owner, here the Defendant, and allows the website owner to control which user events are tracked and transmitted to Facebook. *Id.* ¶ 12. In this case, Defendant's Pixel was used to collect and transmit information about users' health information, including, for example, the patient's status, type of medical treatment sought, health condition, and appointments. Comp. ¶ 20. Defendant utilized the Pixel, along with Facebook's CAPI, in order to boost its own marketing targets and profits. *Id.* ¶ 18. Plaintiff and similarly-situated users were never informed of Defendant's data collection practices. Comp. ¶¶ 24-25, 91. Nor were they asked to give consent to the collection and dissemination of their sensitive health information. *Id.* ¶¶ 23, 32, 40, 51, 91, 95, 125, 135-36. Instead, Defendant transmitted users' Private Identifiable Information and Private Health Information to Facebook. *Id.* ¶ 26, 90, 136.

Plaintiff Patricia Mayer accessed the Defendant's Website and Patient Portal on her phone, computer and tablet. Comp. ¶ 196. She used Defendant's Web Properties to research providers and specific health conditions, to schedule doctor's appointments, to refill prescriptions, to look at her bills and payments, and to see her test results. *Id.* ¶¶197-198. She reasonably expected that her communications with Defendant through its Web Properties would be kept confidential and would not be transmitted to third parties. *Id.* ¶¶ 200-201. Nevertheless, Defendant worked with third-party Facebook to intercept Plaintiff's communications and send her private information to Facebook. *Id.* ¶¶ 204. Defendant transmitted this information without the Plaintiff's knowledge, consent, or written authorization. *Id.* ¶ 203.

Accordingly, Defendant's practices violate several Illinois laws: the Illinois Eavesdropping Statute, 720 ILCS 5/14-1, *et seq.*, the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*, and the Illinois Uniform Deceptive Trade Practices Act, ILCS 510/2, *et seq.* Further, Plaintiff and all similarly-situated individuals suffered an invasion of privacy and

4

other harms. Plaintiff now seeks class certification for the following similarly-situated individuals, defined as:

> All individuals residing in the State of Illinois whose Private Information was disclosed to a third party without authorization or consent through the Pixel on Defendant's Web Properties.

Given Defendant's standard practices defined above, and the straightforward and common legal questions presented in this case, Plaintiff now moves for class certification. Notably, this motion is being filed shortly after the Complaint was filed and before Defendant has responded. The parties have not discussed settlement, neither settlement offers nor demands have been made, and a scheduling order has not been issued. For the reasons discussed herein, Plaintiff's request should be granted.

## II.    STANDARD FOR CLASS CERTIFICATION

"The basic purpose of a class action is the efficiency and economy of litigation." *CE Design Ltd. v. C & T Pizza, Inc.*, 2015 IL App (1st) 131465, ¶ 9 (citing *Miner v. Gillette Co.*, 87 Ill.2d 7, 14 (1981)). "In determining whether to certify a proposed class, the trial court accepts the allegations of the complaint as true and should err in favor of maintaining class certification." *CE Design Ltd.*, 2015 IL App (1st) 131465, ¶ 9 (citing *Ramirez v. Midway Moving & Storage, Inc.*, 378 Ill. App. 3d 51, 53 (1st Dist. 2007)). Under Section 2-801 of the Code of Civil Procedure, a class may be certified if the following four requirements are met:

(1)     the class is so numerous that a joinder of all members is impracticable;

(2)     there are questions of fact or law common to the class that predominate over any questions affecting only individual members;

(3)     the representative parties will fairly and adequately protect the interest of the class; and

(4)     the class action is an appropriate method for the fair and efficient adjudication of the controversy.

*See Smith v. Illinois Cent. R.R. Co.*, 223 Ill.2d 441, 447 (2006) (citing 735 ILCS § 5/2-801). Notably, "[a] trial court has broad discretion in determining whether a proposed class meets the requirements for class certification." *CE Design Ltd.*, 2015 IL App (1st) 131465, ¶ 9 (citing *Ramirez*, 378 Ill. App. 3d at 53). Here, the allegations and facts in this case amply demonstrate that the four certification factors are met.

## III.   ARGUMENT

Plaintiff's claims here are especially suited for class certification because Defendant treated individuals identically. All of the putative class members in this case were uniformly subjected to the same illegal and unlawful conduct of Defendant in that Defendant caused private information to be disclosed to third parties through Defendant's Web Properties. Plaintiff meets each of the statutory requirements for maintenance of this suit as a class action. Thus, the class action device is ideally suited and is far superior to burdening the Court with many individual lawsuits to address the same issues, undertake the same discovery, and rely on the same testimony.

### A.   The Class Is So Numerous That Joinder of All Members Is Impracticable.

Numerosity is not dependent on a plaintiff setting forth a precise number of class members or a listing of their names. *See Cruz v. Unilock Chicago*, 383 Ill. App. 3d 752, 771 (2d Dist. 2008) ("Of course, plaintiffs need not demonstrate a precise figure for the class size, because a good-faith, non-speculative estimate will suffice; rather, plaintiffs need demonstrate only that the class is sufficiently numerous to make joinder of all of the members impracticable.") (internal citations omitted); *Hayna v. Arby's, Inc.*, 99 Ill. App. 3d 700, 710-11 (1st Dist. 1981) ("It is not necessary that the class representative name the specific individuals who are possibly members of the class."). Courts in Illinois generally find numerosity when the class is comprised of at least 40

members. *See Wood River Area Dev. Corp. v. Germania Fed. Sav. Loan Ass'n*, 198 Ill. App. 3d 445, 450 (5th Dist. 1990).

In the present case, there can be no serious dispute that Plaintiff meets the numerosity requirement. The class of potential plaintiffs is sufficiently large to make joinder impracticable.[1] Plaintiff and all similarly-situated individuals were subjected to Defendant's common and uniform policies and practices that violated their privacy rights by the disclosure of their private information without their knowledge or consent. As a result of Defendant's unlawful actions, Plaintiff and all other similarly-situated individuals suffered an infringement of the rights afforded them under the law.

The precise number in the class cannot be determined until discovery records are obtained from Defendant. Nevertheless, class membership can be easily determined by reviewing Defendant's and non-party Facebook's records. A review of Defendant's files regarding the transmission and dissemination of Plaintiff's and Class Members' private information during the class period is all that is needed to determine membership in Plaintiff's proposed class. *See e.g., Chultem v. Ticor Title Ins. Co.*, 401 Ill. App. 3d 226, 233 (1st Dist. 2010) (reversing Circuit Court's denial of class certification and holding that class was certifiable over defendant's objection that "the proposed class was not ascertainable, because the process of reviewing defendant's transaction files to determine class membership would be burdensome"); *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 539-40 (6th Cir. 2012)[2] (rejecting the argument that manual review

---

[1] Upon information and belief, the total number of putative class members is well in the thousands. Comp. ¶ 215.

[2] "Section 2-801 is patterned after Rule 23 of the Federal Rules of Civil Procedure and, because of this close relationship between the state and federal provision, 'federal decisions interpreting Rule 23 are persuasive authority with regard to questions of class certification in Illinois.'" *Cruz*, 383 Ill. App. 3d at 761 (quoting *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill.2d 100, 125 (2005)).

of files should defeat certification, agreeing with district court's reasoning that, if manual review was a bar, "defendants against whom claims of wrongful conduct have been made could escape class-wide review due solely to the size of their businesses or the manner in which their business records were maintained," and citing numerous courts that are in agreement, including *Perez v. First Am. Title Ins. Co.*, 2009 WL 2486003, at *7 (D. Ariz. Aug. 12, 2009) ("Even if it takes a substantial amount of time to review files and determine who is eligible for the [denied] discount, that work can be done through discovery")). Once Defendant's records are obtained, the Court will know the precise number of persons affected. Accordingly, the proposed Class satisfies the numerosity requirement.

**B. <u>Common Questions Of Law And Fact Exist That Predominate Over Any Questions Solely Affecting Individual Members Of The Class.</u>**

Courts analyze commonality and predominance under Section 2-801 by identifying the substantive issues that will control the outcome of the case. *See Bemis v. Safeco Ins. Co. of Am.*, 407 Ill. App. 3d 1164, 1167 (5th Dist. 2011); *Cruz*, 383 Ill. App. 3d at 773. The question then becomes whether those issues will predominate and whether they are common to the class, meaning that "favorable adjudication of the claims of the named plaintiffs will establish a right of recovery in other class members." *Cruz*, 383 Ill. App. 3d at 773. As stated by the Court of Appeals, the question is will "common ... issues be the subject of the majority of the efforts of the litigants and the court[?]" *Bemis*, 407 Ill. App. 3d at 1168. The answer here is "yes."

At the heart of this litigation is Defendant's culpable conduct as it relates to privacy laws and protections. The issues are simple and straightforward legal questions that plainly lend themselves to class-wide resolution. Notwithstanding the clear and unequivocal requirements of the law, Defendant disregarded Plaintiff's and other similarly-situated individuals' privacy rights. The claims of Plaintiff and the Class in this case are based upon the same common violations: they

each used Defendant's Web Properties to communicate and access confidential about their health, were not informed that their information would be shared (and in fact were told that their information would be protected from disclosure), and had their personal information sent to Facebook. Defendant's actions affected Plaintiff and the Class members in a virtually identical manner (*i.e.,* their information was disclosed to Facebook without the Plaintiffs' knowledge or consent). These common practices create common issues of law and fact. In fact, the legality of Defendant's dissemination of Plaintiff and the putative class's personal information is the focus of this litigation.

Indeed, once this Court determines whether Defendant's practice of collecting and disseminating individuals' PII and PHI without informing them or obtaining written consent constitutes actionable violations, liability for the claims of class members will be determined in one stroke. The material facts and issues of law are substantially the same for the members of the class, and therefore these common issues could be tried such that proof as to one claimant could be proof as to all members of the class. Accordingly, a favorable adjudication of the Plaintiff's claims in this case will establish a right of recovery to all other class members, and thus the commonality and predominance requirements weigh in favor of certification of the class.

**C.**     <u>**The Named Plaintiff And Class Counsel Are Adequate Representatives Of The Class.**</u>

When evaluating adequacy, courts look to whether the named plaintiff has the same interests as those of the class and whether he or she will fairly represent them. *See CE Design Ltd.,* 2015 IL App (1st) 131465, ¶ 16. In this case, Plaintiff's interest arises from statute. The class representative, Patricia Mayer, is a member of the proposed class and will fairly and adequately protect the class's interests. Plaintiff utilized the Defendant's Web Properties to access and

communicate personal and health-related information and had this information disclosed to Facebook as a result of Defendant's uniform course of unlawful conduct.

Thus, Plaintiff was a victim of the same uniform policies and practices of Defendant as the individuals she seeks to represent and is not seeking any relief that is potentially antagonistic to other members of the class. What is more, Plaintiff has the interests of those class members in mind, as demonstrated by her willingness to sue on a class-wide basis and step forward as the class representative, which subjects her to discovery. (*See* Exhibit A – Affidavit of Patricia Mayer). This qualifies her as a conscientious representative plaintiff and satisfies the adequacy of representation requirement.

Proposed Class Counsel, Stephan Zouras, LLP and Almeida Law Group LLC will also fairly and adequately represent the class. Proposed Class Counsel are highly qualified and experienced attorneys. (*See* Exhibit B – Affidavit of James B. Zouras and the Firm Resume attached thereto as Exhibit B-1). Stephan Zouras, LLP, are recognized attorneys in class action lawsuits and have been designated as class counsel in numerous class actions in state and federal courts, including pioneering efforts on behalf of classes of employees whose rights under BIPA were violated. (*See* Exhibit B, Exhibit B-1). Thus, proposed Class Counsel, too, are adequate and have the ability and resources to manage this lawsuit.

### D. A Class Action Is The Appropriate Method For Fair And Efficient Adjudication Of This Controversy.

Finally, a class action is the most appropriate method for the fair and efficient adjudication of this controversy, rather than bringing individual suits which could result in inconsistent determinations and unjust results. "It is proper to allow a class action where a defendant is alleged to have acted wrongfully in the same basic manner toward an entire class." *P.J.'s Concrete Pumping Serv., Inc. v. Nextel West Corp.*, 345 Ill. App. 3d 992, 1003 (2d Dist. 2004). "The

purported class representative must establish that a successful adjudication of its individual claims will establish a right of recovery or resolve a central issue on behalf of the class members." *Id.*

Here, Plaintiff's claims stem from Defendant's common and uniform policies and practices, resulting in common privacy violations for all members of the class. Thus, class certification will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendant's practices. *Wenthold v. AT&T Technologies, Inc.*, 142 Ill. App. 3d 612 (1st Dist. 1986). Without a class, the Court would have to hear dozens, if not thousands, of additional individual cases raising identical questions of liability. Moreover, class members are better served by pooling resources rather than attempting to litigate individually. *CE Design Ltd.*, 2015 IL App (1st) 131465, ¶¶ 28-30 (certifying TCPA class where statutory damages were alleged and rejecting arguments that individual lawsuits would be superior). In the interests of justice and judicial efficiency, it is desirable to concentrate the litigation of all class members' claims in a single forum. For all these reasons, the class action is the most appropriate mechanism to adjudicate the claims in this case.

**E.** **In The Event The Court Or Defendant Seek More Factual Information Regarding This Motion, The Court Should Allow Supplemental And Deferred Briefing Following Discovery.**

There is no meaningful need for discovery for the Court to certify a class in this matter; Defendant's practices and policies are uniform. If, however, the Court wishes for the Parties to engage in discovery, the Court should keep the instant motion pending during the discovery period, allow Plaintiff a supplemental brief, and defer Defendant's response and Plaintiff's reply. Plaintiff is moving as early as possible for class certification in part to avoid the "buy-off problem," which occurs when a defendant seeks to settle with a class representative on individual terms in an effort to moot the class claims asserted by the class representative. Plaintiff is also moving for class

certification now because the class should be certified, and because no meaningful discovery is necessary to establish that fact. The instant motion is far more than a placeholder or barebones memorandum. Rather, Plaintiff's full arguments are set forth based on the facts alleged at this extremely early stage of litigation. Should the Court wish for more detailed factual information, the briefing schedule should be extended.

## IV.    **CONCLUSION**

For the reasons stated above, Plaintiff respectfully requests that the Court enter an Order: (1) certifying Plaintiff's claims as a class action; (2) appointing Plaintiff Patricia Mayer as Class Representative; (3) appointing Stephan Zouras, LLP and Almeida Law Group LLC as Class Counsel; and (4) authorizing court-facilitated notice of this class action to the class. In the alternative, this Court should allow discovery, allow Plaintiff to supplement this briefing, and defer response and reply briefs.

Dated: April 11, 2023                           Respectfully Submitted,

                                                /s/ James B. Zouras

                                                James B. Zouras
                                                Ryan F. Stephan
                                                **STEPHAN ZOURAS, LLP**
                                                222 W. Adams Street
                                                Suite 2020
                                                Chicago, Illinois 60606
                                                (312) 233-1550
                                                (312) 233-1560 *f*
                                                Firm ID: 43734
                                                jzouras@stephanzouras.com
                                                rstephan@stephanzouras.com

                                                **ALMEIDA LAW GROUP LLC**
                                                David S. Almeida
                                                849 W. Webster Avenue
                                                Chicago, IL 60614

(312) 576-3024
Firm ID: 100530
david@almeidalawgroup.com

**ATTORNEYS FOR PLAINTIFF
AND THE PUTATIVE CLASS**

## **CERTIFICATE OF SERVICE**

I, the attorney, hereby certify that on April 11, 2023, I filed the attached with the Clerk of the Court using the Court's electronic filing system, and will send such filing to all attorneys of record.

*/s/ James B. Zouras*

# EXHIBIT A

2023CH03446

FILED
4/11/2023 10:54 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2023CH03446
Calendar, 9
22236016

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

|  |  |
|---|---|
| PATRICIA MAYER, *on behalf of herself and all others similarly situated*,<br><br>        Plaintiff,<br><br>v.<br><br>MIDWEST PHYSICIAN ADMINISTRATIVE SERVICES, LLC d/b/a DULY HEALTH AND CARE,<br><br>        Defendant. | Case No.<br><br>**JURY TRIAL DEMANDED** |

## AFFIDAVIT OF PATRICIA MAYER

I, Patricia Mayer, being first duly cautioned, swear, and affirm as follows:

1. I am over the age of 18 and competent to testify.

2. I am the Named Plaintiff and proposed Class Representatives in this case.

3. I understand what it means to be a class representative. As a class representative, I am looking out for the interests of the other class members.

4. I do not have any conflicts with the class members because they were treated like I was with respect to this lawsuit. I have their interests in mind, as well as my own, in bringing this lawsuit.

FURTHER YOUR AFFIANT SAYETH NOT.

Date: 04 / 05 / 2023

*Patricia Mayer*
_____
Patricia Mayer

# EXHIBIT B

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| PATRICIA MAYER, *on behalf of herself and all others similarly situated*, | Case No. 2023CH03446 |
| Plaintiff, | **<u>JURY TRIAL DEMANDED</u>** |
| v. | |
| MIDWEST PHYSICIAN ADMINISTRATIVE SERVICES, LLC d/b/a DULY HEALTH AND CARE, | |
| Defendant. | |

<u>**AFFIDAVIT OF JAMES B. ZOURAS**</u>

I, James B. Zouras, being first duly cautioned, swears and affirms as follows:

1. I am one of Plaintiff's Counsel in the above-referenced matter.

2. I submit this Affidavit in support of Plaintiff's Motion for Class Certification and Request for Discovery on Certification Issues.

3. I am a Partner of the law firm of Stephan Zouras, LLP. Attached hereto as Exhibit B-1 is a true and correct copy of the firm's resume.


FURTHER YOUR AFFIANT SAYETH NOT.


Date: April 11, 2023

*/s/ James B. Zouras*
James B. Zouras

# EXHIBIT B-1

# FIRM RESUME

 **STEPHAN ZOURAS, LLP**

222 W. Adams Street, Suite 2020
Chicago, IL 60606
312-233-1550
stephanzouras.com

**Fighting for the Rights
of People.** Driven by Justice.
Dedicated to **You**.



# STEPHANZOURAS, LLP

222 W. Adams Street, Suite 2020
Chicago, IL 60606
312-233-1550
stephanzouras.com

## FIRM PROFILE

**STEPHAN ZOURAS, LLP** is a nationwide law firm that has helped recover more than **$500 million** for people in groundbreaking class and collective actions.



**Stephan Zouras, LLP** has "substantial class action experience [and] have secured multi-million-dollar class recoveries...."

*Bhattacharya v. Capgemini North America, Inc.*, 324 F.R.D. 353, 363 (N.D. Ill. 2018) (Kennelly, J.)



# STEPHANZOURAS, LLP

222 W. Adams Street, Suite 2020
Chicago, IL 60606
312-233-1550
stephanzouras.com

## FIRM PROFILE

**STEPHAN ZOURAS, LLP** is a national law firm representing plaintiffs in complex class and individual litigation matters. Our diverse team of professionals are widely recognized for their vigorous advocacy, skill, integrity and experience litigating wage and hour and other employment disputes, consumer protection, privacy, cybersecurity, mass torts and catastrophic personal injury products liability and other complex litigation.

Federal and state courts routinely appoint our attorneys as lead counsel in high-stakes, groundbreaking, rapidly-developing areas with far-reaching impact. We try cases to verdict. We help establish favorable precedent for employees and consumers on appeal. And outside the courtroom, our attorneys testify before legislative bodies and work on legislation designed to protect worker's rights.

Our Chicago-based firm is recognized for its leadership, its zealous, thorough and efficient prosecution of class actions, and for achieving outstanding results at both the trial and appellate levels throughout the United States.

We represent hard working people from all walks of life who deserve the protections our laws provide to prevent corporate abuse, injustice and greed.



# STEPHANZOURAS, LLP

222 W. Adams Street, Suite 2020
Chicago, IL 60600
312-233-1550
stephanzouras.com

## OUR STORY

When Ryan and Jim founded **Stephan Zouras, LLP**, in 2007, they had a vision. They wanted to create a law firm that *empowers* individuals to band together to take on wealthy and powerful corporations who shirk the law and take advantage of employees and consumers.

Today, that vision is a REALITY.

### EXPERIENCE

Not only are we passionate about what we do, we know what we are doing. Collectively, our firm has several decades of experience litigating in federal and state courts throughout the United States. We have established *groundbreaking* and precedent-setting court decisions, including securing a major decision for employees at the United States Supreme Court in 2022, and forced major corporations to change unlawful employment practices and make safer products.

### DEDICATION

Because we love what we do, we don't cut corners. We will review your claim (at n cost), provide prompt feedback and determine next steps. If we choose to pursue your case, we will drive your case to the best desirable outcome, all while keeping you informed at every step of the way. We don't get paid unless we win. And if we can't help, we will try to find you someone who can.

### REPUTATION

We are known throughout the legal community as among the most skilled and qualified practitioners in the field. But some of our proudest accolades come from our clients.



# STEPHANZOURAS, LLP

222 W. Adams Street, Suite 2020
Chicago, IL 60606
312-233-1550
stephanzouras.com

## PRINCIPAL ATTORNEYS



### JAMES B. ZOURAS

is a founding partner of Stephan Zouras, LLP. Dedicating his entire professional career to combating corporate abuse and injustice, Jim has helped recover hundreds of millions in individual and class actions arising under the federal and state wage and hour laws, biometric privacy and other complex litigation, along with wrongful death and other catastrophic personal injury actions.

He has successfully tried over a dozen major jury trials and argued approximately 20 appeals as lead appellate counsel before federal and state appellate courts, including the Illinois Supreme Court. Jim is frequently invited as a speaker at national class action and trial seminars. In addition to his admission to numerous trial and appellate courts, Jim is a member of the bar of the Supreme Court of the United States.

Jim and his cases have been profiled by numerous media outlets including the Chicago Tribune, the Chicago Sun-Times, WVON Radio, Bloomberg BNA, Billboard Magazine, TMZ and CBS Consumer Watch.

## PROFESSIONAL & COMMUNITY ACTIVITIES

- ESTABLISHED ENDOWED SCHOLARSHIP FUND AT UNIVERSITY OF ILLINOIS AT CHICAGO; 2021
- INVITED SPEAKER AT NATIONAL EMPLOYMENT LAWYERS ASSOCIATION (IL); 2021
- INVITED SPEAKER AT ILLINOIS INSTITUTE FOR CONTINUING LEGAL EDUCATION; 2018-2022
- INVITED SPEAKER AT ILLINOIS STATE BAR ASSOCIATION; 2018-2019
- INVITED SPEAKER AT ILLINOIS TRIAL LAWYERS ASSOCIATION; 2016
- INVITED SPEAKER AT THE CHICAGO BAR ASSOCIATION; 2008 AND 2016
- INVITED SPEAKER AT THE PRACTICING LAW INSTITUTE; 2012 AND 2015
- INVITED SPEAKER AT THE BRIDGEPORT CONTINUING EDUCATION WAGE AND HOUR SEMINAR; 2012 AND 2014
- EDITOR, ILLINOIS WAGE HOUR TREATISE; 2022
- CONTRIBUTING AUTHOR, AMERICAN BAR ASSOCIATION FEDERAL LABOR STANDARDS LEGISLATION SUBCOMMITTEE, MIDWINTER REPORT; 2016
- HELLENIC BAR ASSOCIATION OF ILLINOIS; 2001-PRESENT

 # STEPHANZOURAS, LLP

222 W. Adams Street, Suite 2020
Chicago, IL 60606
312-233-1550
stephanzouras.com

## PRINCIPAL ATTORNEYS

- ILLINOIS SUPER LAWYER; 2009-PRESENT
- ILLINOIS TRIAL LAWYERS ASSOCIATION; 1997-PRESENT
- ILLINOIS TRIAL LAWYERS ASSOCIATION, BOARD OF MANAGERS; 2022-2023
- ILLINOIS STATE BAR ASSOCIATION; 1997-PRESENT
- NATIONAL EMPLOYMENT LAWYERS ASSOCIATION; 2007-PRESENT
- PUBLIC JUSTICE FOUNDATION; 2018-PRESENT
- CHICAGO FOOD PANTRY VOLUNTEER
- SHIRLEY RYAN ABILITYLAB VOLUNTEER

## EDUCATION

- DEPAUL UNIVERSITY COLLEGE OF LAW, J.D. WITH HONOR, ORDER OF THE COIF, [1995]
- UNIVERSITY OF ILLINOIS CHICAGO, POLITICAL SCIENCE, WITH DISTINCTION [1992]



# STEPHANZOURAS, LLP

222 W. Adams Street, Suite 202
Chicago, IL 6060
312-233-155
stephanzouras.com

## PRINCIPAL ATTORNEYS



### RYAN F. STEPHAN

is a founding principal of Stephan Zouras, LLP. Throughout his career, Ryan has been a passionate advocate for worker and consumer rights, and has helped hundreds of thousan of everyday people recover damages in unpaid overtime, privacy claims, employment disputes, business litigation, products liability and personal injury cases. Ryan has successfully tried cases to verdict including obtaining a $9,000,000 verdict on behalf of 200 employees who were misclassified and denied overtime pay.

Ryan has also served as lead or co-lead counsel on hundreds of complex class and collectiv action cases involving privacy issues, wage and hour matters and consumer fraud claims, amongst others, and has helped recover over $250 Million for hundreds of thousands of people. In these cases, Ryan has helped establish precedent in both privacy and wage and hour law, forced major corporations to change unlawful employment practices and helped recover hundreds of millions of dollars for his clients.

Ryan and his cases have been profiled by numerous media outlets including Good Morning America, Fortune, ESPN, Fox News, The Guardian, The New York Times, Think Progress, USA Today and Vice Sports.

## PROFESSIONAL & COMMUNITY ACTIVITIES

- AMERICAN ASSOCIATION FOR JUSTICE; 2020-PRESENT
- AMERICAN BAR ASSOCIATION; 2007-PRESENT
- CHICAGO LIGHTS TUTOR; 2009-2010
- CHICAGO CARES TUTOR; 2008-2009
- FEED MY STARVING CHILDREN VOLUNTEER; 2014-2015
- ILLINOIS STATE BAR ASSOCIATION; 2000-PRESENT
- ILLINOIS TRIAL LAWYERS ASSOCIATION; 2021-PRESENT
- ILLINOIS TRIAL LAWYERS ASSOCIATION BOARD OF ADVOCATES; 2022-PRESENT
- PUBLIC JUSTICE FOUNDATION; 2018-PRESENT

## EDUCATION

- CHICAGO KENT COLLEGE OF LAW, J.D., [2000]
- UNIVERSITY OF ILLINOIS URBANA CHAMPAIGN, B.A., POLITICAL SCIENCE, [1996]



# STEPHANZOURAS, LLP

222 W. Adams Street, Suite 2020
Chicago, IL 60600
312-233-1550
stephanzouras.com

## PRINCIPAL ATTORNEYS

Ryan and Jim are admitted to the Supreme Court of the United States, the United States Court of Appeals for the First, Third and Seventh Circuits, and the Trial Bar of the United States District Court for the Northern District of Illinois. Ryan and Jim are admitted to practice in the Northern, Central and Southern Districts of Illinois, the United States Bankruptcy Court for the Northern District of Illinois, and are generally admitted to practice in the District Court of Colorado, the Eastern District of Michigan and the Eastern District of Wisconsin.

In addition, they have been admitted pro hac vice in the United States District Courts for the District of Alaska, the District of Arizona, the District of Columbia, the Northern, Central and Southern Districts of California, the Superior Court for the State of California, the District Court of Columbia, the Northern, Middle and Southern Districts of Florida, the Northern District of Georgia, the Southern District of Indiana, the Northern and Southern Districts of Iowa, the Western District of Kentucky, the District Court of Maryland, the District Court of Massachusetts, the District Court of Minnesota, the Eastern and Western Districts of Missouri, the District Court of New Mexico, the Southern and Eastern Districts of New York, the District Court of New Jersey, the Eastern and Middle Districts of Pennsylvania, the First Judicial District of Pennsylvania, the Eastern, Middle and Western Districts of North Carolina, the Southern District of Ohio, the District Court of Oregon, the Eastern and Middle Districts of Pennsylvania, the Middle District of Tennessee, the Northern and Southern Districts of Texas, and the Western District of Washington.

In every consecutive year since 2009, Chicago Magazine's Super Lawyer Section selected both Jim and Ryan as two of the top attorneys in Illinois, a distinction given to no more than 5% of the lawyers in the state.



# STEPHANZOURAS, LLP

222 W. Adams Street, Suite 2020
Chicago, IL 60606
312-233-1550
stephanzouras.com

## PARTNERS



### ANDREW C. FICZKO

A tireless fighter for working people, Andy has spent his entire professional career focusin on Employment Litigation and has represented thousands of employees in class, collective and individual actions nationwide and has recovered hundreds of thousands of dollars i unpaid minimum wages, overtime compensation, and other benefits.

Andy has been recognized by Chicago Magazine's Super Lawyers section as a Rising Star an Super Lawyer for eight consecutive years, a distinction given to no more than 5% of Illino lawyer. Andy served as the second chair in two major federal jury trials to verdict on behalf Plaintiffs in wage and hour matters and one state jury trial to verdict on behalf of Plaintiffs i a breach of contract matter.

Andy is admitted to the United States Supreme Court, the United States District Court for th Seventh Circuit, the United States Bankruptcy Court for the Northern District of Illinois, th Trial Bar of the United States District Court for the Northern District of Illinois, and generally admitted to the District Court of Colorado. Andy has been admitted pro hac vice t the District of Alaska, the Central and Northern Districts of California, the District Columbia, the Northern District of Georgia, the Southern District of Indiana, the Norther and Southern Districts of Iowa, the District of Massachusetts, the Western District Missouri, the Southern District of New York, the Middle and Western Districts of Nort Carolina, the Southern District of Ohio, the Eastern and Middle Districts of Pennsylvania, th Northern and Southern Districts of Texas, and the Western District of Washington.

## PROFESSIONAL & COMMUNITY ACTIVITIES

- CHICAGO BAR ASSOCIATION; 2009-PRESENT
- ILLINOIS STATE BAR ASSOCIATION; 2009-PRESENT
- ILLINOIS TRIAL LAWYERS ASSOCIATION; 2021-PRESENT
- NORTHERN DISTRICT OF ILLINOIS TRAIL BAR ASSOCIATION; 2010-PRESENT
- CHICAGO FOOD PANTRY VOLUNTEER; 2012

## EDUCATION

- DRAKE UNIVERSITY LAW SCHOOL, J.D., [2009]
- LAFAYETTE COLLEGE, B.S., PSYCHOLOGY, [2002]



# STEPHANZOURAS, LLP

222 W. Adams Street, Suite 2020
Chicago, IL 60606
312-233-1550
**stephanzouras.com**

## PARTNERS



### TERESA M. BECVAR

A steadfast advocate for individual rights, Teresa has helped thousands of clients ho corporations accountable in employment and consumer protection cases. Teresa ha extensive experience in a wide range of employment cases, including wage and hour clas and collective actions and employment discrimination.

Teresa is a 2013 graduate of Chicago-Kent College of Law, where she served as Editor of th Law Review. Since 2019, Teresa has served on the Advocacy Council Leadership Committe for Women Employed, an Illinois nonprofit that advocates for the advancement of workir women through fair workplaces and education opportunities. Every year since 2016, Teres has been recognized by Chicago Magazine's Super Lawyer section as a Rising Star, distinction given to no more than 2.5% of Illinois lawyers.

Teresa is admitted to the Trial Bar of the United States District Court for the Norther District of Illinois, the Northern District of Illinois, the United States Court of Appeals for th Third and Seventh Circuits, and is generally admitted to the District Court of Colorado. Sh has been admitted pro hac vice to the District Court of Arizona, the Northern District California, the Superior Court for the State of California, the Middle District of Florida, th District Court of New Mexico, the Eastern and Southern Districts of New York, the Wester District of North Carolina, the Northern District of Ohio, the Eastern and Middle Districts Pennsylvania, the Middle District of Tennessee, and the Western District of Washington.

## PROFESSIONAL & COMMUNITY ACTIVITIES

- ABA/BNA AGE DISCRIMINATION IN EMPLOYMENT LAW SUPPLEMENT, CHAPTER EDITOR; 2016-PRESENT
- AMERICAN ASSOCIATION FOR JUSTICE; 2019-PRESENT
- CHICAGO BAR ASSOCIATION; 2013-PRESENT
- FEDERAL BAR ASSOCIATION; 2012-PRESENT
- ILLINOIS STATE BAR ASSOCIATION; 2013-PRESENT
- ILLINOIS TRIAL LAWYER ASSOCIATION; 2017-PRESENT
- PUBLIC JUSTICE FOUNDATION; 2021-PRESENT

## EDUCATION

- CHICAGO-KENT COLLEGE OF LAW, J.D., CUM LAUDE, [2013]
- UNIVERSITY OF CHICAGO, B.A., CINEMA AND MEDIA STUDIES, [2002]



# STEPHANZOURAS, LLP

222 W. Adams Street, Suite 2020
Chicago, IL 60606
312-233-1550
stephanzouras.com

## PARTNERS



### CATHERINE T. MITCHELL

is a staunch advocate for individual rights, representing people in a wide-range of legal disputes, including unpaid wages, employee misclassification, improper wage deduction, Employee Retirement Income Security Act (ERISA) violations, antitrust, and consumer fraud. Katie is also a member of the legal team pursuing claims on behalf of employees and consumers for violations of the Illinois Biometric Privacy Act (BIPA). Her broad knowledge in such areas helps clients understand their rights and recover damages when laws are violated.

Katie is admitted to practice in Illinois, the United States District Courts for the Central, Northern and Southern Districts of Illinois, and is generally admitted to the District Court of Colorado and the Eastern District of Wisconsin. She has been admitted pro hac vice to the District of Arizona, the Northern District of California, the Southern District of Iowa, the Middle District of Florida, the District Court of Minnesota, the Fourth Judicial District for the State of Minnesota, the Eastern and Western Districts of North Carolina, the District of New Mexico, the Eastern and Southern Districts of New York, the Eastern District of Pennsylvania, and the United States Court of Appeals for the Seventh Circuit.

## PROFESSIONAL & COMMUNITY ACTIVITIES

- CHAPTER EDITOR, BUREAU OF NATIONAL AFFAIRS AGE DISCRIMINATION IN EMPLOYMENT ACT TREATISE, 2D ED.; 2016
- CHICAGO BAR ASSOCIATION; 2013-PRESENT
- ILLINOIS STATE BAR ASSOCIATION; 2015-PRESENT
- ILLINOIS TRIAL LAWYERS ASSOCIATION; 2021-PRESENT
- SAINT MARY'S COLLEGE CHICAGO EAST ALUMNAE CLUB MEMBER; 2012-PRESENT
- VICE CHAIR, YLS MOOT COURT COMPETITION COMMITTEE; 2016-2019
- WOMEN'S BAR ASSOCIATION OF ILLINOIS; 2015-PRESENT
- YOUNG LAWYERS SOCIETY OF THE CHICAGO BAR ASSOCIATION; 2014-PRESENT

## EDUCATION

- THE JOHN MARSHALL LAW SCHOOL, J.D., [2015]
- SAINT MARY'S COLLEGE, B.A., POLITICAL SCIENCE & PSYCHOLOGY, [2012]



# STEPHANZOURAS, LLP

222 W. Adams Street, Suite 2020
Chicago, IL 60606
312-233-1550
stephanzouras.com

## ASSOCIATES



### ANNA M. CERAGIOLI

started her career at Stephan Zouras in 2017 when she worked as a law clerk. Anna is skilled and dedicated advocate for individuals and groups of people who have been injure deprived of earned wages or otherwise mistreated by employers. She has worked tireless on an array of individual and class actions lawsuits involving unpaid wages, employe misclassification, tip-pool violations, retaliation, biometric privacy violations, and RIC violations. As the assisting attorney in one of the first in-person jury trials for unpaid wage following the COVID-19 pandemic, Anna obtained a verdict and corresponding six-figur damages award on behalf of one of her clients. Anna achieved the first ruling in the state Illinois awarding treble damages over and above liquidated damages for claims brougl under the Illinois Minimum Wage Law and the Fair Labor Standards Act – a landmark rulir for employee rights.

Anna has been recognized by Chicago Magazine's Super Lawyer section as a Rising Star, distinction given to no more than 2.5% of Illinois lawyers. She was one of only twelv graduating students inducted into the Chicago-Kent Bar & Gavel Society.

Anna is admitted to the Trial Bar of the United States District Court for the Northern Distri of Illinois, the Central and Southern Districts of Illinois, and the United States Court Appeals for the Seventh Circuit. She has also been admitted pro hac vice to the Norther District of California, the Eastern District of New York, the Northern District of Ohio, th Eastern District of Pennsylvania and Court of Common Pleas for the State of Ohio.

## PROFESSIONAL & COMMUNITY ACTIVITIES

- CHICAGO BAR ASSOCIATION YLS MOOT COURT COMMITTEE; 2019-2021
- CHICAGO BAR ASSOCIATION; 2018-PRESENT
- CHICAGO-KENT BAR AND GAVEL SOCIETY; 2018 INDUCTEE
- CHICAGO-KENT MOOT COURT HONOR SOCIETY, PRESIDENT AND MEMBER; 2016-2018
- CHICAGO-KENT JUSTINIAN SOCIETY, SECRETARY; 2016-2018
- ILLINOIS TRIAL LAWYERS ASSOCIATION; 2021-PRESENT
- NATIONAL EMPLOYMENT LAWYERS ASSOCIATION; 2022
- WOMEN'S BAR ASSOCIATION OF ILLINOIS; 2018-PRESENT

## EDUCATION

- CHICAGO-KENT COLLEGE OF LAW, J.D., [2018]
- MARQUETTE UNIVERSITY, B.A., CUM LAUDE, ENGLISH [2013]



# STEPHANZOURAS, LLP

222 W. Adams Street, Suite 2020
Chicago, IL 60606
312-233-1550
**stephanzouras.com**

## ASSOCIATES



### MOHAMMED RATHUR

joined the Stephan Zouras team in 2022 as an Associate Attorney, with a passion to advocat[e] for individual rights. Prior to joining the firm, Mohammed served as a judicial law clerk to th[e] Honorable Pamela McLean Meyerson in the Chancery Division of the Circuit Court of Coo[k] County where he gained in-depth knowledge of the Illinois Biometric Information Privacy A[ct,] complex class actions, insurance-coverage disputes, FOIA-actions, and employment dispute[s] under administrative review.

He earned a Bachelor's Degree from Michigan State University and his law degree from th[e] American University Washington College of Law. In law school, Mohammed served as [a] Student Attorney for the International Human Rights Law Clinic where he represented asylu[m] seekers in federal immigration court. Additionally, Mohammed interned at the U.[S.] Department of Justice – Civil Rights Division and for United States District Court Judge Georg[e] Caram Steeh III.

Mohammed is admitted to practice in Illinois and Washington, D.C., and the United State[s] District Court for the Northern District of Illinois.

## PROFESSIONAL & COMMUNITY ACTIVITIES

- SOUTH ASIAN BAR ASSOCIATION; 2016-PRESENT
- ILLINOIS STATE BAR ASSOCIATION; 2020-PRESENT
- MUSLIM BAR ASSOCIATION OF CHICAGO; 2022-PRESENT

## EDUCATION

- AMERICAN UNIVERSITY WASHINGTON COLLEGE OF LAW, J.D., [2019]
- MICHIGAN STATE UNIVERSITY, B.A., INTERNATIONAL RELATIONS [2016]



# STEPHANZOURAS, LLP

222 W. Adams Street, Suite 2020
Chicago, IL 60606
312-233-1550
**stephanzouras.com**

## ASSOCIATES



### MICHAEL CASAS

joined the Stephan Zouras team as a law clerk in 2020, with a passion and dedication for vindicating Illinois citizens' rights under the Illinois Biometric Information Privacy Act (BIPA). Since joining the Stephan Zouras legal team, Michael has assisted in trailblazing action involving BIPA, employee misclassification, breach of contract, unpaid wages, personal injury and employment discrimination claims.

Michael graduated cum laude from the University of Illinois – Chicago School of Law, where he was a member of the Dean's List, and a published member of the UIC Law Review. While in law school, Michael served as a Student Attorney for the Community Enterprise & Solidarity Economy Clinic where he consulted small business owners on corporate entity registration and regulatory compliance with Illinois cannabis license applications.

Michael earned his undergraduate degree from the University of Illinois Urbana/Champaign, where he graduated with a degree in Finance.

Michael is admitted to practice in Illinois and the United States District Court for the Northern District of Illinois.

## PROFESSIONAL & COMMUNITY ACTIVITIES

- CHICAGO BAR ASSOCIATION; 2022 – PRESENT
- AUXILIARY BOARD MEMBER – ONWARD NEIGHBORHOOD HOUSE; 2020 – PRESENT

## EDUCATION

- UNIVERSITY OF ILLINOIS - CHICAGO SCHOOL OF LAW, J.D., CUM LAUDE [2022]
- UNIVERSITY OF ILLINOIS - URBANA/CHAMPAIGN, B.S., FINANCE [2017]



# STEPHANZOURAS, LLP

222 W. Adams Street, Suite 2020
Chicago, IL 60606
312-233-1550
**stephanzouras.com**

## OF COUNSEL



### DAVID J. COHEN

is a highly skilled and successful class-action attorney who joined Stephan Zouras, LLP 2016. Dave manages our Philadelphia office and has spent his entire career fighting protect the rights of thousands of healthcare professionals, restaurant worker transportation workers, IT professionals, shareholders, union members and consumers.

Before joining the private sector, Dave completed a unique clerkship with the Hon. Stephen Levin in the Philadelphia Court of Common Pleas, during which he helped to develop respected and efficient system to resolve the Court's class action cases and contributed several well-regarded works on class actions.

Dave earned a J.D. from the Temple University School of Law in 1994. While attending la school, Dave was awarded the Barristers Award for excellence in trial advocacy and worke as a teaching assistant for Hon. Legrome Davis (E.D. Pa.) as part of Temple's award-winnir Integrated Trial Advocacy program.

Dave is a member of the Pennsylvania and New Jersey Bar Associations, and has bee admitted to practice in many courts nationwide, including: the United States Courts Appeals for the Third and Sixth Circuits and the District Courts of California, Florida, Illinoi Michigan, New Jersey, New York, Pennsylvania, Tennessee and the District of Columbia.

## PROFESSIONAL & COMMUNITY ACTIVITIES

- ILLINOIS STATE BAR ASSOCIATION; 2017-PRESENT
- UNIVERSITY OF CHICAGO ALUMNI INTERVIEWER; 1994-PRESENT
- PENNSYLVANIA BAR ASSOCIATION MEMBER; 1995-PRESENT
- PHILADELPHIA BAR ASSOCIATION MEMBER; 1995-PRESENT
- UNION LEAGUE OF PHILADELPHIA MEMBER; 2001-PRESENT
- STREET TAILS ANIMAL RESCUE FOSTER CARE SPONSOR; 2014-PRESENT
- UNIVERSITY OF CHICAGO "WISR" ALUMNI MENTORING NETWORK; 2017-PRESENT
- PHILADELPHIA BAR ASSOCIATION LEGAL-LINE VOLUNTEER; 2015-2020
- FOUNDATION FOR FIRST RESPONDERS AND FIREFIGHTERS SPONSOR; 1994-2020
- AMERICAN BAR ASSOCIATION MEMBER; 1994-2015
- HEAD HOUSE CONSERVANCY BOARD MEMBER; 2008-2015



# STEPHANZOURAS, LLP

222 W. Adams Street, Suite 2020
Chicago, IL 60606
312-233-1550
stephanzouras.com

## OF COUNSEL

- AIDS SERVICES IN ASIAN COMMUNITIES (ASAIC) SPONSOR; 1994-2014
- FRIENDS OF INGLIS HOUSE VOLUNTEER; 2001-2014
- OLD CITY CIVIC ASSOCIATION BOARD MEMBER, EXECUTIVE COMMITTEE MEMBER AND SECRETARY; 2002-2014
- TEMPLE UNIVERSITY BEASLEY SCHOOL OF LAW MOOT COURT HONOR SOCIETY JUDGE; 2002-2011

## EDUCATION

- TEMPLE UNIVERSITY SCHOOL OF LAW, J.D. [1994]
- UNIVERSITY OF CHICAGO, B.A. CUM LAUDE [1991]



# STEPHANZOURAS, LLP

222 W. Adams Street, Suite 2020
Chicago, IL 60606
312-233-1550
stephanzouras.com

## Representative Trials, Verdicts and Judgments

| CASE | COURT | JUDGMENT |
|------|-------|----------|
| Meadows v. NCR Corporation | Northern District of Illinois<br>No. 16-cv-06221 | 5/21/2021 - Jury Verdict (Plaintiff)<br>7/09/2021 - Trial Court Judgment<br>**$225,000** |
| Retaliation Arbitrations | American Arbitration Association<br>Redacted for Confidentiality | 2/2019 & 9/2020 - Arbitration<br>Judgment - **$400,0000** |
| Ray v. DISH Network | American Arbitration Association<br>No. 01-15-0003-4651 | 3/17/2019 – Arbitration Judgment<br>**$3.25 mil** |
| Franco v. Ideal Mortgage Bankers<br>d/b/a Lend America | Eastern District of New York<br>No. 07-cv-3956 | 12/14/2017 – Trial Court Judgment<br>**$15.2 mil** |
| Frisari v. DISH Network | American Arbitration Association<br>No. 18-160-001431-12 | 8/25/2016 - Arbitration Judgment<br>**$2.5 mil** |
| Huskey v . Ethicon, Inc. | Southern District of West Virginia<br>No. 2:12-cv-05201 | 9/10/2014 - Jury Verdict (Plaintiff)<br>**$3.27 mil** |
| Lee v. THR & Associates, Inc. | Central District of Illinois<br>No. 12-cv-3078 | 5/22/2014 - Trial Court Judgment<br>**$12.2 mil** |
| Vilches v. The Travelers Companies, Inc. | American Arbitration Association<br>No. 11-160-000355-11 | 12/12/2012 - Arbitration Judgment |
| Kyriakoulis v. DuPage Health Center | Northern District of Illinois<br>No. 10-cv-7902 | 11/16/2012 - Jury Verdict (Plaintiff) |
| Smith v. Safety-Kleen Systems, Inc. | Northern District of Illinois<br>No. 10-cv-6574 | 7/11/2012 - Jury Verdict (Plaintiff) |



# STEPHANZOURAS, LLP

222 W. Adams Street, Suite 2020
Chicago, IL 60606
312-233-1550
stephanzouras.com

| CASE | COURT | JUDGMENT |
|------|-------|----------|
| Wong v. Wice Logistics | Circuit Court of Cook County, IL No. 08-L-13380 | 1/30/2012 - Jury Verdict (Plaintiff) |
| Daniels v. Premium Capital Funding | Eastern District of New York No. 08-cv-4736 | 10/18/2011 - Jury Verdict (Plaintiff) **$9 mil** |



# STEPHANZOURAS, LLP

222 W. Adams Street, Suite 2020
Chicago, IL 60606
312-233-1550
stephanzouras.com

## Representative Resolved Class and Collective Actions

**Courts nationwide have appointed the firm as lead or co-lead counsel in numerous class and collective actions in which they have collectively secured over one hundred million dollars in verdicts and settlements including;**

| CASE | COURT | SETTLEMENT |
|---|---|---|
| Gniecki v. Columbia Sussex Management, LLC | Circuit Court of Cook County, IL No. 21-CH-00677 | 10/06/2022 - Final Approval **$500,000** |
| Brown v. Weathertech | Circuit Court of Cook County, IL No. 19-CH-00503 | 9/26/2022 - Final Approval **$1.375 mil** |
| Johnson v. Verizon Wireless | Northern District of Illinois No. 21-cv-00187 | 9/12/2022 - Final Approval |
| Bruhn v. Jewel-Osco | Circuit Court of Cook County, IL No. 18-CH-01737 | 9/08/2022 - Final Approval **$1.575 mil** |
| Meier v. Robert Rohrman, et al. | Circuit Court of Cook County, IL No. 14-CH-11513 | 5/31/2022 - Final Approval **$855,000** |
| Robertson v. Hostmark Hospitality Group, Inc., et al. | Circuit Court of Cook County, IL No. 18-CH-05194 | 4/14/2022 - Final Approval **$503,000** |
| Parsons v. Personnel Staffing Group | Circuit Court of Cook County, IL No. 20-CH-473 | 3/22/2022 - Final Approval **$4.68 mil** |
| Mosby v. The Ingalls Memorial Hospital, et al. | Circuit Court of Cook County, IL No. 18-CH-05031 | 3/14/2022 - Final Approval **$2.42 mil** |
| Bledsoe v. LHC Group, Inc. and; George v. LHC Group, Inc. | District Court of Arizona No. cv-18-02863, and; No. cv-21-01402 | 2/08/2022 - Final Approval |



# STEPHANZOURAS, LLP

222 W. Adams Street, Suite 2020
Chicago, IL 60606
312-233-1550
stephanzouras.com

| CASE | COURT | SETTLEMENT |
|---|---|---|
| Krzyzanowski v. Brunch Café | Northern District of Illinois<br>No. 19-cv-07427 | 2/02/2022 - Final Approval |
| Toor v. CoreCentric Solutions, Inc. | Circuit Court of DuPage County, IL<br>No. 2019-CH-000989 | 1/25/2022 - Final Approval |
| Peatry v. Bimbo Bakeries USA, Inc. | Northern District of Illinois<br>No. 19-cv-02942 | 1/12/2022 - Final Approval |
| Ripper v. Area Disposal Service, Inc. | Circuit Court of Peoria County, IL<br>No. 2020-CH-00124 | 11/16/2021 - Final Approval<br>**$577,000** |
| O'Sullivan v. All Star Management, Inc. | Circuit Court of Cook County, IL<br>No. 19-CH-11575 | 9/02/2021 - Final Approval<br>**$5.85 mil** |
| Sanchez v. Visual Pak | Circuit Court of Cook County, IL<br>No. 18-CH-02651 | 8/10/2021 - Final Approval<br>**$3.5 mil** |
| Ramos v. BOX Acquisitions, LLC | Circuit Court of Cook County, IL<br>No. 20-CH-03887 | 8/05/2021 - Final Approval<br>**$1.38 mil** |
| Civcon Services, Inc. v. Accesso Services, LLC | Northern District of Illinois<br>No. 20-cv-01821 | 7/08/2021 - Final Approval<br>**$500,000** |
| Van Jacobs v. New World Van Lines, Inc. | Circuit Court of Cook County, IL<br>No. 19-CH-02619 | 7/07/2021 - Final Approval |
| Liu v. Four Seasons Hotels, Ltd. | Circuit Court of Cook County, IL<br>No. 17-CH-14949 | 6/30/2021 - Final Approval<br>**$575,900** |
| Bedford v. Lifespace Communities, Inc. | Northern District of Illinois<br>No. 20-cv-04574 | 5/12/2021 - Final Approval<br>**$987,850** |



# STEPHANZOURAS, LLP

222 W. Adams Street, Suite 2020
Chicago, IL 60606
312-233-1550
stephanzouras.com

| CASE | COURT | SETTLEMENT |
| --- | --- | --- |
| Heard v. THC - Northshore, Inc. | Circuit Court of Cook County, IL No. 17-CH-16918 | 5/05/2021 - Final Approval **$2.25mil** |
| Thome v. Novatime Technology, Inc. | Northern District of Illinois No. 19-cv-06256 | 3/08/2021 - Final Approval **$14.1 mil** |
| Kusinski v. ADP, LLC | Circuit Court of Cook County, IL No. 17-CH-12364 | 2/10/2021 - Final Approval **$25 mil** |
| Trayes v. Mid-Con Hospitality Group, LLC | Circuit Court of Cook County, IL No. 19-CH-11117 | 2/03/2021 - Final Approval **$616,500** |
| Collier v. Pete's Fresh Market | Circuit Court of Cook County, IL No. 19-CH-05125 | 12/03/2020 - Final Approval **$4.2 mil** |
| Bryant v. Loews Chicago Hotel, Inc. | Northern District of Illinois No. 19-cv-03195 | 10/30/2020 - Final Approval **$1 mil** |
| Bigger v. Facebook, Inc. | Northern District of Illinois No. 17-cv-7753 | 10/22/2020 - Final Approval **$1.6 mil** |
| Johns v. Club Fitness of Alton, LLC | Circuit Court of Madison County, IL No. 18-L-000080 | 10/13/2020 - Final Approval **$750,000** |
| Bryski v. Nemera Buffalo Grove, LLC | Circuit Court of Cook County, IL No. 18-CH-07264 | 10/05/2020 - Final Approval |
| Thomas v. Kik Custom Products, Inc. | Circuit Court of Cook County, IL No. 19-CH-02471 | 9/30/2020 - Final Approval **$1 mil** |
| Gauzza v. Prospect Medical Holdings, Inc. | Eastern District of Pennsylvania No. 20-cv-03599 | 9/15/2020 - Final Approval **$1.9 mil** |
| Bradford v. Farmington Foods, Inc. | Circuit Court of Cook County, IL No. 19-CH-12888 | 8/17/2020 - Final Approval |



# STEPHANZOURAS, LLP

222 W. Adams Street, Suite 2020
Chicago, IL 60606
312-233-1550
stephanzouras.com

| CASE | COURT | SETTLEMENT |
|---|---|---|
| Trottier v. Summit Staffing | Circuit Court of Cook County, IL No. 19-CH-02731 | 8/04/2020 - Final Approval **$1mil** |
| Jackson v. A. Finkl & Sons, Co. | Circuit Court of Cook County, IL No. 2018-CH-07424 | 7/21/2020 - Final Approval |
| Thome v. Flexicorps. Inc. | Circuit Court of Cook County, IL No. 18-CH-01751 | 7/02/2020 - Final Approval **$1 mil** |
| Goings v. Applied Acoustics | Circuit Court of Cook County, IL No. 17-CH-14954 | 6/02/2020 - Final Approval |
| Jones v. Santa Rosa Consulting, Inc. | Southern District of New York No. 18-cv-11005 | 5/26/2020 - Final Approval |
| Jones v. Encore Health Resources, LLC | Southern District of Texas No. 19-cv-03298 | 2/19/2020 - Final Approval |
| Potoski v. Wyoming Valley Health Care System | Middle District of Pennsylvania No. 11-cv-00582 | 1/14/2020 - Final Approval |
| Stewart v. First Transit, Inc. | Eastern District of Pennsylvania No. 18-cv-03768 | 12/30/2019 - Final Approval **$1 mil** |
| Jordan v. Meridian Bank | Eastern District of Pennsylvania No. 17-cv-05251 | 12/19/2019 - Final Approval **$1 mil** |
| George v. Schulte Hospitality Group, Inc. | Circuit Court of Cook County, IL No. 18-CH-04413 | 12/16/2019 - Final Approval **$1 mil** |
| Edmond v. DPI Specialty Foods, Inc. | Circuit Court of Cook County, IL No. 18-CH-09573 | 11/18/2019 - Final Approval **$500,000** |
| Watts v. Chicago Lakeshore Hospital | Circuit Court of Cook County, IL No. 17-CH-12756 | 11/13/2019 - Final Approval **$858,000** |



# STEPHANZOURAS, LLP

222 W. Adams Street, Suite 2020
Chicago, IL 60606
312-233-1550
stephanzouras.com

| CASE | COURT | SETTLEMENT |
|---|---|---|
| Bey v. Walker HealthCare and; Pierce v. Encore Health Resources | Southern District of Texas No. 19-cv-00060 No. 18-cv-04736 | 9/19/2019 - Final Approval **$2.4 mil** |
| Kuck v. Planet Home Lending, LLC | Eastern District of New York No. 17-cv-04769 | 9/13/2019 - Final Approval |
| Dixon v. The Washington & Jane Smith Home | Northern District of Illinois No. 17-cv-08033 | 8/20/2019 - Final Approval **$1.35 mil** |
| Jones v. Chicago Bridge & Iron Company | Western District of North Carolina No. 17-cv-00424 | 8/06/2019 - Final Approval |
| Sharrieff v. Raymond Management Company | Circuit Court of Cook County, IL No. 18-CH-01496 | 8/01/2019 - Final Approval |
| Ostrander v. Customer Engineering Services, LLC | District Court of Colorado No. 15-cv-01476 | 3/25/2019 - Final Judgment |
| Davis v. Vanguard Home Care, LLC | Northern District of Illinois No. 16-cv-07277 | 3/22/19 – Final Approval |
| Goh v. NCR Corporation | American Arbitration Association No. 01-15-0004-0067 | 2/25/19 – Final Approval |
| Moseman v. U.S. Bank National Association | Western District of North Carolina No. 17-cv-00481 | 1/07/19 – Final Approval |
| Ivy v. Adventist Midwest Health | Northern District of Illinois No. 16-cv-7606 | 11/14/18 – Final Approval |
| Bhattacharya v. Capgemini | Northern District of Illinois No. 16-cv-07950 | 11/13/18 - Final Approval **$990,000** |



# STEPHANZOURAS, LLP

222 W. Adams Street, Suite 2020
Chicago, IL  60606
312-233-1550
stephanzouras.com

| CASE | COURT | SETTLEMENT |
| --- | --- | --- |
| Carver v. Presence Health Network | Northern District of Illinois No. 15-cv-02905 | 7/10/18 – Final Approval **$20mil** |
| Stapleton v. Advocate Health Care | Northern District of Illinois No. 14-cv-01873 | 6/27/18 – Final Approval |
| Brown v. Health Resource Solutions, Inc. | Northern District of Illinois No. 16-cv-10667 | 4/20/18 – Final Approval **$900,000** |
| Eggleston v. USCC Services, LLC | Northern District of Illinois No. 16-cv-06775 | 2/16/18 – Final Approval **$1.25mil** |
| Caison v. Sogeti USA, LLC | Northern District of Illinois No. 17-cv-2786 | 2/12/18 – Final Approval |
| Kaminski v. Bank of America, N.A. | Northern District of Illinois No. 16-cv-10844 | 2/15/18 – Final Approval **$850,000** |
| Byrne v. Centegra Health System | Northern District of Illinois No. 17-cv-00018 | 1/29/18 – Final Approval |
| Donoghue v. Verizon Communications, Inc. | Eastern District of Pennsylvania No. 16-cv-4742 | 11/16/17 – Final Approval **$800,000** |
| Tompkins v. Farmers Insurance Exchange | Eastern District of Pennsylvania No. 14-cv-3737 | 9/27/17 – Final Approval **$775,000** |
| In re Sears Holdings Corporation Stockholder and Derivative Litigation | Court of Chancery of the State of Delaware, No. 11081-VCL | 5/9/17 – Final Approval **$40mil** |
| Oaks v. Sears | Northern District of Illinois No. 1:15-cv-11318 | 4/12/17 – Final Approval |
| Hauser v. Alexian Brothers Home Health | Northern District of Illinois No. 15-cv-6462 | 4/06/17 – Final Approval **$1mil** |



# STEPHANZOURAS, LLP

222 W. Adams Street, Suite 2020
Chicago, IL 60606
312-233-1550
stephanzouras.com

| CASE | COURT | SETTLEMENT |
|------|-------|------------|
| Leiner v. Johnson & Johnson | Northern District of Illinois No. 15-cv-5876 | 1/31/17 – Final Approval **$5mil** |
| Reed v. Friendly's Ice Cream, LLC | Middle District of Pennsylvania No. 15-cv-00298 | 1/31/17 – Final Approval **$3.5 mil** |
| McPhearson v. 33 Management | Circuit Court of Cook County, IL No. 15-CH-17302 | 11/3/16 – Final Approval |
| Cook v. Bank of America | Northern District of Illinois No. 15-cv-07718 | 8/2/16 – Final Approval **$3.25 mil** |
| Lukas v. Advocate Health Care | Northern District of Illinois No. 14-cv-2740 | 6/29/16 – Final Approval **$4.75mil** |
| Kurgan v. Chiro One Wellness Centers, LLC | Northern District of Illinois No. 10-cv-1899 | 4/27/16 – Final Approval |
| Heba v. Comcast | First Judicial District of Pennsylvania Court of Common Pleas, No. 12-471 | 4/06/16 – Final Approval |
| Johnson v. Casey's General Stores, Inc. | Western District of Missouri No. 15-cv-3086 | 3/03/16 – Final Approval **$500,000** |
| Fields v. Bancsource, Inc. | Northern District of Illinois No. 14-cv-7202 | 2/03/16 – Final Approval |
| Elder v. Comcast Corporation | Northern District of Illinois No. 12-cv-1157 | 1/11/16 – Final Approval **$700,000** |
| Posada v. Continental Home Loans, Inc. | Eastern District of New York 15-cv-4203 | 1/13/16 - Final Approval |
| Struett v. Susquehanna Bank | Eastern District of Pennsylvania No. 15-cv-176 | 10/27/15 – Final Approval |



# STEPHANZOURAS, LLP

222 W. Adams Street, Suite 2020
Chicago, IL  60606
312-233-1550
**stephanzouras.com**

| CASE | COURT | SETTLEMENT |
|------|-------|------------|
| Faust v. Comcast Corporation | District Court of Maryland No. 10-cv-2336 | 10/11/15 - Final Approval |
| Butler v. DirectSat USA, LLC | District Court of Maryland No. 10-cv-02747 | 9/03/15 - Final Approval |
| Sosnicki v. Continental Home Loans, Inc. | Eastern District of New York No. 12-cv-1130 | 7/30/15 - Final Approval |
| Bordell v. Geisinger Medical Center | Northumberland Court of Common Pleas, No. 12-cv-1688 | 4/8/15 – Final Approval |
| Harvey v. AB Electrolux | Northern District of Iowa No. 11-cv-3036 | 3/23/15 – Final Approval |
| Price v. NCR Corporation | American Arbitration Association No. 51-610-908-12 | 3/18/15 – Final Approval **$2.95 mil** |
| Frebes v. Mask Restaurants, LLC | Northern District of Illinois No. 13-cv-3473 | 1/15/15 – Final Approval |
| Jones v. Judge Technical Services Inc. | Eastern District of Pennsylvania No. 11-cv-6910 | 12/15/14 – Final Approval **$1.22 mil** |
| Howard v. Securitas Security Services USA, Inc., and; Hawkins v. Securitas Security Services USA, Inc. | Northern District of Illinois No. 08-cv-2746 and; No. 09-cv-3633 | 5/7/14 – Final Approval |
| Thomas v. Matrix Corporation Services | Northern District of Illinois No. 10-cv-5093 | 2/12/14 – Final Approval |
| Sexton v. Franklin First Financial | Eastern District of New York No. 08-cv-04950 | 9/30/13 – Final Approval |



# STEPHANZOURAS, LLP

222 W. Adams Street, Suite 2020
Chicago, IL 60606
312-233-1550
stephanzouras.com

| CASE | COURT | SETTLEMENT |
|------|-------|------------|
| Outlaw v. Secure Health, L.P. | Eastern District of Pennsylvania No. 11-cv-602 | 9/24/13 – Final Approval |
| Robinson v. RCN Telecom Services, Inc. | Eastern District of Pennsylvania No. 10-cv-6841 | 8/5/13 – Final Approval |
| Holland v. Securitas Security Services USA, Inc. | Superior Court of California, County of Los Angeles, No. BC 394708 | 7/26/13- Final Approval |
| Ord v. First National Bank of Pennsylvania | Western District of Pennsylvania No. 12-cv-766 | 6/21/13 – Final Approval **$3mil** |
| Holley v. Erickson Living Management, LLC | Eastern District of Pennsylvania No. 11-cv-2444 | 6/13/13 – Final Approval |
| Hansen v. Per Mar Security Services | Southern District of Iowa No. 09-cv-459 | 5/15/13 – Final Approval |
| Pomphrett v. American Home Bank | Eastern District of Pennsylvania No. 12-cv-2511 | 3/14/13 – Final Approval **$2.4 mil** |
| Glatts v. Crozer-Keystone Health System | Philadelphia Court of Common Pleas, No. 0904-1314 | 2/06/13 – Final Approval **$1.2 mil** |
| Chambers v. Front Range Environmental, LLC | Northern District of Illinois No. 12-cv-891 | 1/23/13 - Final Approval |
| Searson v. Concord Mortgage Corporation | Eastern District of New York No. 07-cv-3909 | 11/19/12 - Final Approval |
| Ellenbecker v. North Star Cable Construction, Inc. | Northern District of Illinois No. 09-cv-7293 | 11/14/12 - Final Approval |
| Williams v. Securitas Security Services USA, Inc. | Eastern District of Pennsylvania No. 10-cv-7181 | 11/08/12 - Final Approval |



# STEPHANZOURAS, LLP

222 W. Adams Street, Suite 2020
Chicago, IL 60606
312-233-1550
stephanzouras.com

| CASE | COURT | SETTLEMENT |
|---|---|---|
| Molyneux v. Securitas Security Services USA, Inc. | Southern District of Iowa No. 10-cv-588 | 11/05/12 - Final Approval |
| Kernats v. Comcast Corporation | Northern District of Illinois No. 09-cv-3368 | 5/28/12 - Final Approval |
| Petersen v. Marsh USA, Inc. | Northern District of Illinois No. 10-cv-1506 | 9/21/11 - Final Approval |
| Thompson v. World Alliance Financial Corp. | Eastern District of New York No. 08-cv-4951 | 8/05/11 - Final Approval |
| Harris v. Cheddar's Casual Cafe, Inc. | American Arbitration Association No. 51 460 00557 10 | 6/1/11 - Final Approval |
| Turner v. Mercy Health System | Philadelphia Court of Common Pleas, No. 0801-3670 | 4/20/11 – Final Approval **$2.75 mil** |
| Cedeno v. Home Mortgage Desk, Corp. | Eastern District of New York No. 08-cv-1168 | 6/15/10 - Final Approval |
| Perkins v. Specialty Construction Brands, Inc. | Northern District of Illinois No. 09-cv-1678 | 11/15/09 - Final Approval |
| Wineland v. Casey's General Stores, Inc. | Southern District of Iowa No. 08-cv-00020 | 10/22/09 - Final Approval |
| Jones v. Casey's General Stores, Inc. | Southern District of Iowa No. 07-cv-400 | 10/22/09 - Final Approval |
| Stuart v. College Park | Circuit Court of Cook County, IL No. 05-CH-09699 | 12/11/07 - Final Approval |
| Huebner v. Graham C Stores | Circuit Court of Cook County, IL No. 06-CH-09695 | 11/15/07 - Final Approval |



# STEPHANZOURAS, LLP

222 W. Adams Street, Suite 2020
Chicago, IL 60606
312-233-1550
stephanzouras.com

| CASE | COURT | SETTLEMENT |
| --- | --- | --- |
| Perez v. RadioShack Corporation | Northern District of Illinois<br>No. 02-cv-7884 | 9/14/07 - Final Approval<br>**$9 mil** |
| Reinsmith v. Castlepoint Mortgage | District Court of Massachusetts<br>No. 05-cv-01168 | 4/3/07 - Final Approval |
| Kutcher v. B&A Associates | Circuit Court of Cook County, IL<br>No. 03-CH-07610 | 11/20/06 - Final Approval |
| Ciesla v. Lucent Technologies, Inc. | Northern District of Illinois<br>No. 05-cv-1641 | 7/31/06 - Final Approval |
| Casale v. Provident Bank | District Court of New Jersey<br>No. 04-cv-2009 | 7/25/05 - Final Approval |
| Corbin v. Barry Realty | Circuit Court of Cook County, IL<br>No. 02-CH-16003 | 3/22/05 - Final Approval |



# STEPHANZOURAS, LLP

222 W. Adams Street, Suite 2020
Chicago, IL 60606
312-233-1550
stephanzouras.com

## Biometric Information Privacy Class Action Lawsuits

**Our firm is at the forefront of BIPA litigation to protect the biometric data and privacy of employees and consumers. We have brought numerous class action lawsuits against employers and other retail businesses who have collected biometric data without consent and without instituting the proper safeguards including;**

| CASE | COURT |
|---|---|
| Ala v. U.S. Acrylic, LLC | Circuit Court of Lake County, Illinois, No. 2022-CH-0000069 |
| Alderman v. The Kroger Co. | Circuit Court of Williamson County, Illinois, No. 2021-L-21 |
| Alquero v. Grand Victoria Riverboat Casino | Circuit Court of Cook County, Illinois, No. 2019-CH-09603 |
| Andere v. Amita Health Adventist Medical Center Bolingbrook | Circuit Court of Will County, Illinois, No. 2021-L-000893 |
| Anthony v. Towneplace Suites | Circuit Court of Cook County, Illinois, No. 2021-CH-05389 |
| Arnold v. Roundy's Supermarkets, Inc. | Circuit Court of Cook County, Illinois, No. 2020-CH-05622 |
| Arroyo v. OTO Development, LLC | Circuit Court of Cook County, Illinois, No. 2020-CH-07170 |
| Ayala v. American Louver Company | Circuit Court of Cook County, Illinois, No. 2019-CH-04163 |
| Blunt v. G2K Logistics, LLC | Circuit Court of Cook County, Illinois, No. 2022-CH-01637 |
| Bowens v. SMASHotels | Circuit Court of Cook County, Illinois, No. 2022-CH-08312 |
| Boyd v. Lazer Spot, Inc. | Northern District of Illinois, No. 2021-cv-08173 |
| Brammer v. Ava Inc. | Circuit Court of Cook County, Illinois, No. 2019-CH-07379 |
| Bray v. Lathem Time Co. | Northern District of Georgia, 2022-cv-01748 |



# STEPHANZOURAS, LLP

222 W. Adams Street, Suite 2020
Chicago, IL 60606
312-233-1550
stephanzouras.com

| CASE | COURT |
|---|---|
| Buford v. GDI Services, Inc. | Circuit Court of Cook County, Illinois, No. 2020-CH-05007 |
| Burt v. Anixter Inc. | Circuit Court of Cook County, Illinois, No. 2019-CH-04569 |
| Cameron v. Polar Tech Industries, Inc. | Circuit Court of DeKalb County, Illinois, No. 2019-CH-000013 |
| Campos v. City View Multicare Center, LLC | Circuit Court of Cook County, Illinois, No. 2019-CH-07082 |
| Campos v. Midwest Time Recorder, Inc. | Circuit Court of Cook County, Illinois, No. 2019-CH-07229 |
| Cervantes v. Grant Park Packing Co., Inc. | Circuit Court of Cook County, Illinois, No. 2022-CH-07020 |
| Chatman v. Crate and Barrel | Circuit Court of Cook County, Illinois, No. 2018-CH-09277 |
| Clow v. Sygma Network Inc. | Circuit Court of Vermilion County, Illinois, No. 2022-LA-00000 |
| Coleman v. Greenwood Hospitality Management, LLC | Northern District of Illinois, No. 2021-cv-00806 |
| Cosenza v. DiNico's Pizza | Circuit Court of Cook County, Illinois, No. 2020-CH-00614 |
| Cothron v. White Castle | Northern District of Illinois, No. 2019-cv-00382 |
| Crowden v. Silver Cross Hospitals & Medical Centers | Circuit Court of Will County, Illinois, No. 2022-CH-0063 |
| Currie v. McDonald's | Circuit Court of Lake County, Illinois, 2020-CH-0467 |
| Davis v. Wirco, Inc. | Central District of Illinois, No. 2021-cv-02279 |
| Doporcyk v. Mariano's | Circuit Court of Cook County, Illinois, No. 2017-CH-08092 |
| Dowell v. Springfield Memorial Hospital, et al. | Circuit Court of Sangamon County, Illinois, No. 2022-LA-134 |



# STEPHANZOURAS, LLP

222 W. Adams Street, Suite 2020
Chicago, IL  60606
312-233-1550
stephanzouras.com

| CASE | COURT |
|---|---|
| Duarte v. Vanee Foods Company | Circuit Court of Cook County, Illinois, No. 2021-CH-01318 |
| Ebert v. Eclipse Advantage, LLC | Circuit Court of Grundy County, Illinois, No. 2020-L-53 |
| Ebert v. Total Staffing Solutions, Inc. | Circuit Court of Cook County, Illinois, No. 2021-CH-04338 |
| Fields v. Abra Auto Body & Glass | Circuit Court of Cook County, Illinois, No. 2017-CH-12271 |
| Figueroa v. Kronos, Inc. | Northern District of Illinois, No. 2019-cv-01306 |
| Figueroa v. Tony's Fresh Market | Circuit Court of Cook County, Illinois, No. 2018-CH-15728 |
| Finley v. Clark Manor | Circuit Court of Cook County, Illinois, No. 2020-CH-07265 |
| Fisher v. HP Property Management, LLC | Circuit Court of Cook County, Illinois, No. 2019-CH-14082 |
| Francois v. South Shore Hospital, Corp. | Circuit Court of Cook County, Illinois, No. 2021-CH-02564 |
| Francois v. Swipeclock, LLC | Circuit Court of Cook County, Illinois, No. 2022-CH-01041 |
| Fuentes v. Focal Point Exports, LTD | Circuit Court of Cook County, Illinois, No. 2019-CH-03890 |
| Fulton v. SCR Medical Transport, Inc. | Circuit Court of Cook County, Illinois, No. 2020-CH-00927 |
| Garriott v. Food Movers Two Limited Partnership | Circuit Court of Cook County, Illinois, No. 2020-CH-07030 |
| George v. Bricton 191 Associates, LLC | Circuit Court of Cook County, Illinois, No. 2019-CH-04014 |
| Goings v. UGN, Inc. | Circuit Court of Cook County, Illinois, No. 2017-CH-14954 |
| Gorgas v. Amazon.com, Inc. et al. | Northern District of Illinois, No. 2022-cv-05159 |



# STEPHANZOURAS, LLP

222 W. Adams Street, Suite 2020
Chicago, IL 60606
312-233-1550
stephanzouras.com

| CASE | COURT |
|---|---|
| Heard v. Becton, Dickinson & Company | Northern District of Illinois, No. 2019-cv-4158 |
| Heard v. Omnicell, Inc. | Circuit Court of Cook County, Illinois, No. 2019-CH-06817 |
| Heard v. St. Bernard Hospital | Circuit Court of Cook County, Illinois, No. 2017-CH-16828 |
| Heard v. Weiss Memorial Hospital Foundation | Circuit Court of Cook County, Illinois, No. 2019-CH-06763 |
| Hogan v. Amazon.com, Inc. | Northern District of Illinois, No. 2021-cv-3169 |
| Howe v. Speedway, LLC | Northern District of Illinois, No. 2019-cv-01374 |
| Ibarra v. Prospera, LLC | Northern District of Illinois, No. 2020-cv-07015 |
| Ingram v. LSL Healthcare | Circuit Court of Cook County, Illinois, No. 2021-CH-00220 |
| Johns v. Paycor, Inc. | Northern District of Illinois, No. 2020-cv-00264 |
| Johnson v. Gold Standard Baking, Inc. | Circuit Court of Cook County, Illinois, No. 2018-CH-09011 |
| Johnson v. Food 4 Less | Northern District of Illinois, No. 2022-cv-02409 |
| Johnson v. NCR | Circuit Court of Cook County, Illinois, No. 2022-CH-04265 |
| Johnson v. Thermoflex | Circuit Court of Cook County, Illinois, No. 2020-CH-00000479 |
| Kardos v. ABT Electronics, Inc. | Circuit Court of Cook County, Illinois, No. 2019-CH-01235 |
| Keene v. Plymouth Place, Inc. | Circuit Court of Cook County, Illinois, No. 2019-CH-01953 |
| Kelley v. Chicago Behavioral Hospital | Circuit Court of Cook County, Illinois, No. 2020-CH-03302 |



# STEPHANZOURAS, LLP

222 W. Adams Street, Suite 2020
Chicago, IL 60606
312-233-1550
stephanzouras.com

| CASE | COURT |
|---|---|
| King v. Garfield Park Hospital, LLC | Circuit Court of Cook County, Illinois, No. 2020-CH-00056 |
| Krause v. Caputo's New Farm Produce | Circuit Court of Cook County, Illinois, No. 2018-Ch-11660 |
| Landa v. Menasha Packaging Co., LLC | Circuit Court of Cook County, Illinois, No. 2020-CH-05251 |
| Landa v. MJ Holding Company, LLC | Circuit Court of Cook County, Illinois, No. 2020-CH-05247 |
| Lawrence v. McLane/Midwest, Inc. | Circuit Court of Vermilion County, Illinois, No. 2021-L-000061 |
| Lopez v. Metraflex | Circuit Court of Cook County, Illinois, No. 2020-CH-05354 |
| Loving v. Belhaven Nursing & Rehabilitation Center, LLC | Circuit Court of Cook County, Illinois, No. 2020-CH-04176 |
| Lyons v. Harri (US), LLC | Circuit Court of Cook County, Illinois, No. 2022-CH-03207 |
| Marquez v. North Riverside Golf Club | Circuit Court of Cook County, Illinois, No. 2020-CH-05895 |
| Mazya v. Northwestern Lake Forest Hospital | Circuit Court of Cook County, Illinois, No. 2018-CH-07161 |
| McAdams v. Design Toscano, Inc. | Circuit Court of Cook County, Illinois, No. 2022-CH-05387 |
| McGraw v. Lakeshore Beverage | Circuit Court of Cook County, Illinois, No. 2020-CH-00343 |
| Measaw v. Heritage Operations Group, LLC | Circuit Court of Cook County, Illinois, No. 2019-CH-08321 |
| Meegan v. NFI Industries, Inc. | Northern District of Illinois, No. 2020-cv-00465 |
| Mendenhall v. Burger King | Circuit Court of Cook County, Illinois, No. 2019-CH-10636 |
| Michaels v. Continental Nursing and Rehabilitation Center, LLC | Circuit Court of Cook County, Illinois, No. 2022-CH-02591 |



# STEPHANZOURAS, LLP

222 W. Adams Street, Suite 2020
Chicago, IL 60606
312-233-1550
stephanzouras.com

| CASE | COURT |
|---|---|
| Michaels v. Infinity Healthcare Management of Illinois, LLC | Circuit Court Cook County, Illinois, No. 2021-CH-05859 |
| Mitchell v. Bottled Blonde Chicago, LLC | Northern District of Illinois, No. 2020-cv-06460 |
| Mitchell v. Electrolux Home Products, et al. | Circuit Court of Cook County, Illinois, No. 2022-CH-08926 |
| Molina v. Mercyhealth System, Corp. | Circuit Court of Winnebago County, Illinois, No. 2020-L-00002 |
| Morgan v. Ruler Foods, Inc. | Southern District of Illinois, No. 2020-cv-01270 |
| Morris v. Nextep Systems, Inc. | Northern District of Illinois, No. 2021-cv-2404 |
| Morris v. Wow Bao, LLC | Circuit Court of Cook County, Illinois, No. 2017-CH-12029 |
| Mosby v. The Ingalls Memorial Hospital | Circuit Court of Cook County, Illinois, No. 2018-CH-05031 |
| Nordstrom v. Dial Senior Management, Inc. | Northern District of Illinois, No. 2019-cv-07183 |
| Nosal v. Rich Products Corporation | Northern District of Illinois, No. 2020-cv-4972 |
| Peaks-Smith v. Saint Anthony Hospital | Circuit Court of Cook County, Illinois, No. 2018-CH-07077 |
| Peoples v. Wheaton Village Nursing and Rehabilitation Center, LLC | Circuit Court of DuPage County, Illinois, No. 2021-L-001234 |
| Pruitt v. Par-A-Dice Hotel Casino | Central District of Illinois, No. 2020-cv-01084 |
| Purnell v. Pure's Food Specialties, LLC | Circuit Court of Lake County, Illinois, No. 2021-CH-00991 |
| Quentere v. G.H. Cretors | Northern District of Illinois, No. 2020-cv-07306 |
| Quentere v. Staffing Network, LLC | Circuit Court of Lake County, Illinois, No. 2020-CH-00000654 |



# STEPHANZOURAS, LLP

222 W. Adams Street, Suite 2020
Chicago, IL 60606
312-233-1550
**stephanzouras.com**

| CASE | COURT |
|------|-------|
| Quentere v. Tablecraft Product Company | Circuit Court of Lake County, Illinois, No. 2020-CH-00000493 |
| Ramsey Daley's Medical Transportation, Inc. | Circuit Court of Cook County, Illinois, No. 2018-CH-01935 |
| Redd v. Amazon, Inc. | Northern District of Illinois, No. 2020-cv-06485 |
| Redd v. Amazon Web Services, Inc. | Circuit Court of Cook County, Illinois, No. 2022-CH-08721 |
| Robinson v. Taco Bell | Circuit Court of Cook County, Illinois, No. 2022-CH-04364 |
| Rogers v. Thorek Memorial Hospital | Circuit Court of Cook County, Illinois, No. 2021-CH-02304 |
| Sanchez v. Elite Labor Services | Circuit Court of Cook County, Illinois, No. 2018-CH-02651 |
| Sanchez v. Tide Cleaners | Circuit Court of Cook County, Illinois, No. 2020-CH-02640 |
| Seaton v. Atos Healthcare Services, LLC | Circuit Court of Cook County, Illinois, No. 2021-CH-00611 |
| Severinsen v. Menard, Inc. | Circuit Court of Peoria County, Illinois, No. 2022-CH-0000009 |
| Shird v. Snipes | Circuit Court of Cook County, Illinois, No. 2022-CH-05329 |
| Taitts v. Elior, Inc. | Circuit Court of Cook County, Illinois, No. 2020-CH-03664 |
| In Re: TikTok, Inc., Consumer Privacy Litigation | Northern District of Illinois, No. 2020-cv-04699 |
| Taitts v. Elior, Inc. | Circuit Court of Cook County, Illinois, No. 2020-CH-03664 |
| Thome v. Axis Insurance Company | Circuit Court of Cook County, Illinois, No. 2021-CH-03259 |
| Thornton v. Generations at Peoria, LLC | Circuit Court of Cook County, Illinois, No. 2021-CH-03481 |
| Tims v. Black Horse Carriers, Inc. | Circuit Court of Cook County, Illinois, No. 2019-CH-03522 |



# STEPHANZOURAS, LLP

222 W. Adams Street, Suite 2020
Chicago, IL 60606
312-233-1550
stephanzouras.com

| CASE | COURT |
|------|-------|
| Townsend v. The Estates of Hyde Park, LLC | Circuit Court of Cook County, Illinois, No. 2019-CH-11849 |
| Treadwell v. Power Solutions International, Inc. | Northern District of Illinois, No. 2018-cv-08212 |
| Trinidad v. Bridgeview Advisors, LLC | Circuit Court of Cook County, Illinois, No. 2020-CH-06600 |
| Trio v. Turing Video, Inc. | Circuit Court of Cook County, Illinois, No. 2021-CH-03264 |
| Trottier v. Attendance Demand, Inc. | Circuit Court of Cook County, Illinois, No. 2019-CH-13230 |
| Valenzuela v. Reliable Staffing Services, Inc. | Circuit Court of Cook County, Illinois, No. 2020-CH-06632 |
| Walker v. Pet Supplies Plus | Circuit Court of Cook County, Illinois, No. 2021-CH-03851 |
| Walton v. Roosevelt University | Circuit Court of Cook County, Illinois, No. 2019-CH-04176 |
| Webster v. South Holland Home, LLC | Circuit Court of Cook County, Illinois, No. 2019-CH-12365 |
| Webster v. Triad Senior Living, Inc. | Circuit Court of Cook County, Illinois, No. 2019-CH-10787 |
| Webster v. Windsor Estates Nursing & Rehab Centre, LLC | Circuit Court of Cook County, Illinois, No. 2019-CH-11441 |
| Wheeler v. EMCO Chemical Distributors, Inc. | Circuit Court of Cook County, Illinois, No. 2021-CH-05597 |
| Wheeler v. Ridgeview Rehab & Nursing Center, LLC | Circuit Court of Cook County, Illinois, No. 2019-CH-14577 |
| Williams v. Wing Stop | Circuit Court of Cook County, Illinois, No. 2022-CH-00326 |
| Wilson v. Magna Exteriors Belvidere | Circuit Court of Boone County, Illinois, No. 2020-L-0039 |
| Young v. International Precision Components Corp. | Circuit Court of Lake County, Illinois, No. 2020-CH-00000521 |

4/11/2023 10:54 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, II
2023CH03446
Calendar, 9
22236016

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| PATRICIA MAYER, *on behalf of herself and all others similarly situated*, <br><br> Plaintiff, <br><br> v. <br><br> MIDWEST PHYSICIAN ADMINISTRATIVE SERVICES, LLC d/b/a DULY HEALTH AND CARE, <br><br> Defendant. | Case No. 2023CH03446 <br><br> **JURY TRIAL DEMANDED** |

## NOTICE OF MOTION

PLEASE TAKE NOTICE that on_____ at _____ *(SEE COURT-STAMPED DATE ABOVE)* or as soon thereafter as counsel may be heard, I shall appear before the Honorable Judge Cecilia A. Horan, or any judge sitting in her stead, in the courtroom usually occupied by her at Room 2008 of the Richard J. Daley Center, 50 West Washington Street, Chicago, Illinois, 60602 or via Zoom and present **PLAINTIFF'S MOTION FOR CLASS CERTIFICATION AND REQUEST FOR DISCOVERY ON CERTIFICATION ISSUES.**

Respectfully Submitted,

*/s/ James B. Zouras*

James B. Zouras
Ryan F. Stephan
**STEPHAN ZOURAS, LLP**
222 W. Adams Street
Suite 2020
Chicago, Illinois 60606
(312) 233-1550
(312) 233-1560 *f*
Firm ID: 43734
jzouras@stephanzouras.com
rstephan@stephanzouras.com

**ALMEIDA LAW GROUP LLC**
David S. Almeida
849 W. Webster Avenue
Chicago, IL 60614
(312) 576-3024
Firm ID: 10053
david@almeidalawgroup.com

**ATTORNEYS FOR PLAINTIFF
AND THE PUTATIVE CLASS**

## CERTIFICATE OF SERVICE

I, the attorney, hereby certify that on April 11, 2023, I filed the attached with the Clerk of the Court using the electronic filing system and will send such filing to all attorneys of record.

*/s/ James B. Zouras*

This form is approved by the Illinois Supreme Court and is required to be accepted in all Illinois Circuit Courts.

| STATE OF ILLINOIS, CIRCUIT COURT | | |
|---|---|---|
| COOK COUNTY | **SUMMONS** | *For Court Use Only*<br>FILED<br>4/10/2023 3:11 PM<br>IRIS Y. MARTINEZ<br>CIRCUIT CLERK<br>COOK COUNTY, IL<br>2023CH03446<br>Calendar, 9<br>22224084 |

| **Instructions ▼** | | |
|---|---|---|
| Enter above the county name where the case was filed. | PATRICIA MAYER | Hearing Date: No hearing scheduled<br>Location: <<CourtRoomNumber>><br>Judge: Calendar, 9 |
| Enter your name as Plaintiff/Petitioner. | **Plaintiff / Petitioner** *(First, middle, last name)* | |
| Enter the names of all people you are suing as Defendants/Respondents. | v.<br>MIDWEST PHYSICIAN ADMINISTRATIVE SERVICES, LLC d/b/a DULY HEALTH AND CARE | **2023CH03446** |
| Enter the Case Number given by the Circuit Clerk. | **Defendant / Respondent** *(First, middle, last name)* | **Case Number** |

| | |
|---|---|
| In **1**, if your lawsuit is for money, enter the amount of money you seek from the Defendant/Respondent. | **1.** **Information about the lawsuit:**<br>Amount claimed: $ |
| In **2**, enter your contact information. If more than 1 person is bringing this lawsuit, attach an *Additional Plaintiff/Petitioner Contact Information* form. | **2.** **Contact information for the Plaintiff/Petitioner:**<br>Name *(First, Middle, Last):* Mohammed A. Rathur - Stephan Zouras, LLP.<br>Street Address, Apt #: 222 W Adams Street, Suite 2020<br>City, State, ZIP: Chicago, IL. 60606<br>Telephone: 312-233-1550<br>See attached for additional Plaintiff/Petitioner contact information |
| In **3**, enter the name of the person you are suing and their address.<br>If more than 1 person is being sued, attach an *Additional Defendant/Respondent Contact Information* form. | **3.** **Contact information for the Defendant/Respondent:**<br>Name *(First, Middle, Last):* Duly Health and Care - Registered Agent: Illinois Corporation Service<br>Street Address, Apt #: Company: 801 Adlai Stevenson Drive<br>City, State, ZIP: Springfield, IL. 62703<br>Telephone:<br>See attached for additional Defendant/Respondent contact information |

| | |
|---|---|
| **Important Information for the person receiving this form:** | You have been sued.<br>Follow the instructions on the next page on how to appear/answer.<br><br>• If you do not appear/answer the court may decide the case without hearing from you and enter a judgment against you for what the plaintiff/petitioner is asking.<br>• Your written appearance/answer must be filed on time and in the proper form.<br>• Forms for a written appearance/answer are available here:<br>http://www.illinoiscourts.gov/forms/approved/default.asp<br><br>If you cannot afford to pay the fee for filing your appearance/answer, ask the circuit clerk for an *application for waiver of court fees.*<br>You should read all of the documents attached. |

Enter the Case Number given by the Circuit Clerk: _____2023CH03446_____

| In **4**, the Circuit Clerk will give you the court date or appearance date, check any boxes that apply, and include the address of the court building and room where the Defendant/ Respondent must file their response. | **4.**    **Instructions for person receiving this form (Defendant/Respondent):** |
|---|---|

To respond to this *Summons* you must:

☐   Go to court:
     On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.
     Address: _____ Court Room: _____
     City, State, ZIP: _____

☐   File a written *Appearance* and *Answer/Response* with the court:
     On or before this date: _____ at this time: _____ ☐ a.m. ☐ p.m.
     Address: _____
     City, State, ZIP: _____

☒   File a written *Appearance* and *Answer/Response* with the court within 30 days from
     the day you receive this *Summons* (listed below as the "Date of Service").
     On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.
     Address:   50 W. Washington Street
     City, State, ZIP:   Chicago, IL. 60602

| **STOP!** The Circuit Clerk will fill in this section. | **Witness this Date:** _____ <br><br> **Clerk of the Court:**   4/10/2023 3:11 PM IRIS Y. MARTINEZ <br> _____ |
|---|---|

| **STOP!** The officer or process server will fill in the Date of Service. | **This *Summons* must be served within 30 days of its date, listed above.** <br><br> Date of Service: _____ <br> *(Date to be entered by an officer or process server on the copy of this Summons left with the Defendant/Respondent or other person.)* |
|---|---|

| **Plaintiff/Petitioner:** | To serve this *Summons*, you must hire the sheriff (or a private process server outside of Cook County) to deliver it and your Complaint/Petition to the Defendant/Respondent.  If the sheriff (or private process server outside of Cook County) tries but can't serve the *Summons*, fill out another summons and repeat this process. |
|---|---|

| **Attention:** | E-Filing is now mandatory for documents in civil cases with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit http://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider. If you need additional help or have trouble e-filing, visit http://www.illinoiscourts.gov/faq/gethelp.asp, or talk with your local circuit clerk's office. |
|---|---|

This form is approved by the Illinois Supreme Court and is required to be accepted in all Illinois Circuit Courts.

| STATE OF ILLINOIS, CIRCUIT COURT | AFFIDAVIT OF SERVICE OF SUMMONS AND COMPLAINT/PETITION | *For Court Use Only* |
|---|---|---|
| COOK COUNTY | | |

| **Instructions** | |
|---|---|
| Enter above the county name where the case was filed. | PATRICIA MAYER |
| | **Plaintiff / Petitioner** *(First, middle, last name)* |
| Enter your name as Plaintiff/Petitioner. | |
| Enter the name of the person you are suing as Defendant/Respondent. | v. MIDWEST PHYSICIAN ADMINISTRATIVE SERVICES, LLC d/b/a DULY HEALTH AND CARE |
| Enter the Case Number given by the Circuit Clerk. | **Defendant / Respondent** *(First, middle, last name)* |

2023CH03446

**Case Number**

**\*\*Stop. Do not complete the form. The sheriff will fill in the form.\*\***

<table>
<tr><td>DO NOT complete this section. The sheriff will complete it.</td><td>My name is _____ and I swear under oath<br><i>First, Middle, Last</i></td></tr>
</table>

that I served the *Summons* and Complaint/Petition on the Defendant/Respondent

_____ **as follows:**
*First, Middle, Last*

☐ Personally on the Defendant/Respondent:

Male: ☐   Female: ☐   Approx. Age: _____   Hair Color: _____

Height: _____   Weight: _____

On this date: _____   at this time: _____ ☐ a.m. ☐ p.m.

Address: _____

City, State, ZIP: _____

☐ At the Defendant/Respondent's home:

On this date: _____   at this time: _____ ☐ a.m. ☐ p.m.

Address: _____

City, State, ZIP: _____

And left it with: _____
*First, Middle, Last*

Male: ☐   Female: ☐   Approx. Age: _____

and by sending a copy to this defendant in a postage-paid, sealed envelope to the above address on _____ , 20 _____ .

☐ On the Corporation's agent, _____
*First, Middle, Last*

On this date: _____   at this time: _____ ☐ a.m. ☐ p.m.

Address: _____

City, State, ZIP: _____

Enter the Case Number given by the Circuit Clerk:_____

2023CH03446

| DO NOT complete this section. The sheriff, or private process server will complete it. |
|---|

**By:** _____

_____
*Signature*

_____
*Print Name*

**FEES**

By certified/registered    $ _____

Service and Return    $ _____

Miles: _____    $ _____

Total    $ _____

FILED
4/10/2023 12:31 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2023CH03446
Calendar, 9
22218884

## CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## CHANCERY DIVISION

PATRICIA MAYER, *on behalf of herself and all others similarly situated,*

    Plaintiff,

v.

MIDWEST PHYSICIAN ADMINISTRATIVE SERVICES, LLC d/b/a DULY HEALTH AND CARE,

    Defendant.

Case No.  **2023CH03446**

**JURY TRIAL DEMANDED**

---

## CLASS ACTION COMPLAINT

Plaintiff PATRICIA MAYER ("Plaintiff") brings this class action lawsuit in her individual capacity and on behalf of all others similarly situated against MIDWEST PHYSICIAN ADMINISTRATIVE SERVICES, LLC d/b/a DULY HEALTH AND CARE ("Duly" or "Defendant") and alleges, upon personal knowledge as to her own actions, her counsel's investigation and upon information and good faith belief as to all other matters, as follows:

1.      Duly boldly proclaims on its "Notice of Privacy Practices" the lengths it will *supposedly* go to protect its patients' personal and protected health information:

> Nothing is more important than [] ensuring your privacy. At Duly Health and Care, *we understand that your privacy is vitally important*. As your medical provider, we take proactive measures to safeguard your information. We understand that with each office visit, you are placing your trust in us. *We will make every effort to ensure this trust is not breached, and that your privacy is protected.*[1]

---

[1]    *See* https://www.dulyhealthandcare.com/hipaa-privacy-policy (last visited March 18, 2023) (emphasis added).

2.      As detailed herein, those statements are certainly suspect given Defendant's illegal and widespread practice of disclosing Plaintiff's and putative Class Members' confidential personally identifiable information ("PII") and protected health information ("PHI") (collectively referred to herein as "Private Information") to third parties, including, but not necessarily limited to, Meta Platforms, Inc. d/b/a Meta ("Facebook").

3.      Information about a person's physical and mental health is among the most confidential and sensitive information in our society and the mishandling of such information can have serious consequences, including, but certainly not limited to, discrimination in the workplace and/or denial of insurance coverage.[2]

4.      Simply put, if people do not trust that their sensitive Private Information will be kept private they may be less likely to seek medical treatment which can lead to much more serious health consequences down the road. In addition, protecting medical information and making sure it is kept confidential and not disclosed to anyone other than the person's medical providers is vitally necessary to maintain public trust in the healthcare system as a whole.

5.      Protected and highly sensitive medical information collected by healthcare entities includes many categories, from intimate details of an individual's treatment to any unique

---

[2]      *See* Lindsey Ellefson, *Telehealth Sites Put Addiction Patient Data at Risk: New research found pervasive use of tracking tech on substance-abuse-focused health care websites, potentially endangering users in a post-Roe world*, WIRED (Nov. 16, 2022), available at https://www.wired.com/story/substance-abuse-telehealth-privacy-tracking-tech/ (last visited March 8, 2023) ("While the sharing of any kind of patient information is often strictly regulated or outright forbidden, it's even more verboten in addiction treatment, as patients' medical history can be inherently criminal and stigmatized."); *see also* Tood Feathers, Simon Fondrie-Teitler, Angie Waller & Surya Mattu, *Facebook Is Receiving Sensitive Medical Information from Hospital Websites*, THE MARKUP (June 16, 2022), available at https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites (last visited March 18, 2023).

identifying code which can connect the individual to the collecting entity.

6.      Even IP addresses – which in theory could be connected to several members of the same household – are considered PHI *even when the individual does not have an existing relationship with the regulated healthcare entity* since when the medical provider collects this information through its website or mobile app, it is indicative that the individual has received or will receive health care services or benefits from the medical provider.[3]

7.      Defendant owns, controls and maintains a website, https://www.dulyhealthandcare.com/ (the "Website"), which it encourages patients to use for booking medical appointments, locating physicians and treatment facilities, communicating medical symptoms, searching medical conditions and treatment options, signing up for events and classes and more.

8.      Defendant also maintains a web-based portal called MyChart (the "Portal") and an application (the "App") whereby registered users can access their account to: (i) communicate with their doctors; (ii) access lab and test results; (iii) manage prescriptions and request refills and (iv) manage appointments, among other things.[4]

9.      The Website, the Portal and the App are referred to herein as the "Web Properties."

10.      Plaintiff and Class Members who visited and used (collectively, the "Users") Defendant's Web Properties understandably thought they were communicating *only* with their

---

[3]      HHS.gov, USE OF ONLINE TRACKING TECHNOLOGIES BY HIPAA COVERED ENTITIES AND BUSINESS ASSOCIATES, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaaonline-tracking/index.html (last visited March 18, 2023).

[4]      https://mychart.dupagemd.com/MyChart/Authentication/Login? (last visited March 18, 2023).

trusted healthcare provider.

11.    Unbeknownst to Plaintiff and Class Members, however, Defendant had embedded the Facebook Tracking Pixel (the "Pixel" or "Facebook Pixel") on its Web Properties which automatically transmits to Facebook every click, keystroke and detail about their medical treatment.[5]

12.    Operating as designed and as implemented by Duly, the Pixel allows the Private Information that Plaintiff and Class Members provide to Defendant to be unlawfully disclosed to Facebook alongside the individual's unique and persistent Facebook ID ("FID").[6]

13.    A pixel is a piece of code that "tracks the people and [the] type of actions they take"[7] as they interact with a website (or other digital property), including how long a person spends on a particular web page, which buttons the person clicks, which pages they view and the text or phrases they type into various portions of the website (such as a general search bar, chat feature or text box), among other things.

14.    The user's web browser executes the Pixel via instructions within the webpage to

---

[5]    Plaintiff's research shows that the Facebook Pixel is currently embedded in Defendant's Website (see discussion *infra*). While there is no way to confirm with certainty that Defendant has installed the Pixel in its other Web Properties without access to the host server, upon information and good faith belief, Defendant's Portal and the App are tracking Users' activities through the Facebook Pixel as well.

[6]    The Pixel forces the website user to share the FID for easy tracking via the "cookie" Facebook stores every time someone accesses their Facebook account from the same web browser. "Cookies are small files of information that a web server generates and sends to a web browser"; "[c]ookies help inform websites about the user, enabling the websites to personalize the user experience." *See* https://www.cloudflare.com/learning/privacy/what-are-cookies/ (last visited March 18, 2023).

[7]    FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting (last visited March 8, 2023).

communicate certain information based on parameters selected by the website's owner. The Facebook Pixel is thus customizable and programmable, meaning that the website owner controls which of its web pages contain the Pixel and which events are tracked and transmitted to Facebook.

15.     By installing the Facebook Pixel, Defendant effectively planted a bug on Plaintiff's and Class Members' web browsers and compelled them to unknowingly disclose their private, sensitive and confidential health-related communications with Defendant to Facebook.

16.     In addition to the Facebook Pixel, Defendant, upon information and good faith belief, also installed and implemented Facebook's Conversions Application Programming Interface ("CAPI") on its Website servers.[8]

17.     Unlike the Facebook Pixel, which coopts a website user's browser and forces it to disclose information to third parties in addition to the website owner, CAPI does not cause the User's browser to transmit information directly to Facebook. Rather, CAPI tracks the User's website interaction, including Private Information, records and stores that information on the website owner's servers and then transmits the data to Facebook from the website owner's servers.[9,10]

18.     Indeed, Facebook markets CAPI as a "better measure [of] ad performance and

---

[8]     CAPI "works with your Facebook pixel to help improve the performance and measurement of your Facebook ad campaigns." *See* https://www.fetchfunnel.com/how-to-implement-facebook-conversions-api-in-shopify/ (last visited March 18, 2023).

[9]     https://revealbot.com/blog/facebook-conversions-api/ (last visited March 18, 2023).

[10]    "Server events are linked to a dataset ID and are processed like events sent via the Meta Pixel.... This means that server events may be used in measurement, reporting, or optimization in a similar way as other connection channels." https://developers.facebook.com/docs/marketing-api/conversions-api (last visited March 18, 2023).

attribution across your customer's full journey, from discovery to conversion. This helps you better understand how digital advertising impacts both online and offline results."[11]

19.    Because CAPI is located on the website owner's servers and is not a bug planted onto the website User's browser, it allows website owners like Defendant to circumvent any ad blockers or other denials of consent by the User that would prevent the Pixel from sending website users' Private Information to Facebook directly.

20.    Defendant utilized the Pixel and CAPI data for marketing purposes in an effort to bolster its profits; that is, despite professing that "[n]othing is more important than[] ensuring your privacy,"[12] Duly put its own desires for profit over its patients' privacy rights.

21.    The Facebook Pixel and CAPI are routinely used to target specific customers by utilizing data to build incredibly fulsome and robust profiles for the purposes of retargeting and future marketing. Facebook also uses Plaintiff's and Class Members' Private Information to create targeted advertisements based on the medical conditions and other Private Information disclosed to Defendant.

22.    The information that Defendant's Tracking Pixel and CAPI sent to Facebook included the Private Information that Plaintiff and Class Members submitted to Defendant's Website, including, for example, patient status, the type of medical treatment sought, the individual's particular health condition and the fact that the individual attempted to or did book a medical appointment.

---

[11]    https://www.facebook.com/business/help/2041148702652965?id=818859032317965    (last visited March 18, 2023).

[12]    *See* https://www.dulyhealthandcare.com/hipaa-privacy-policy (last visited March 18, 2023).

23.     Such information allows a third party (*e.g.*, Facebook) to know that a specific patient was seeking confidential medical care. Facebook, in turn, sells Plaintiff's and Class Members' Private Information to third-party marketers who geo-target Plaintiff's and Class Members' Facebook pages based on communications obtained via the Facebook Pixel and CAPI.

24.     Facebook and any third-party purchasers of Plaintiff's and Class Members' Private Information also could reasonably infer from the data that a specific patient was being treated for a specific type of medical condition, such as cancer, pregnancy, dementia or HIV.

25.     Healthcare patients simply do not anticipate that their trusted healthcare provider will send personal health information or confidential medical information collected via its web pages to an undisclosed third party – let alone Facebook, which has a sordid history of privacy violations in pursuit of ever-increasing advertising revenue – without the patients' informed and express consent.

26.     Neither Plaintiff nor any other Class Member were provided, much less signed, a written authorization permitting Defendant to disclose their Private Information to Facebook.

27.     Despite willfully and intentionally incorporating the Facebook Pixel and CAPI into its Website and servers, Defendant has never disclosed to Plaintiff or Class Members that it shared their sensitive and confidential communications and Private Information with Facebook.[13]

---

[13]     In contrast to Defendant, in recent months several medical providers which have installed the Facebook Pixel on their web properties have provided their patients with notices of data breaches caused by the Pixel transmitting PHI to third parties. *See, e.g., Cerebral, Inc. Notice of HIPAA Privacy Breach*, available at https://cerebral.com/static/hippa_privacy_breach-4000c6eb21449c2ecd8bd13706750cc2.pdf (last visited March 28, 2023); *Advocate Aurora says 3M patients' health data possibly exposed through tracking technologies* (Oct. 20, 2022), available at https://www.fiercehealthcare.com/health-tech/advocate-aurora-health-data-breach-revealed-pixels-protected-health-information-3 (last visited March 28, 2023); *Novant Health notifies patients of potential data privacy incident* (Aug. 12, 2022), available at https://www.novanthealth.org/home/about-us/newsroom/press-

28.     Plaintiff and Class Members were unaware that their Private Information was being surreptitiously transmitted to Facebook as they communicated with their healthcare providers via the Website or that their information was stored on Defendant's servers to be later transmitted to Facebook so it could be used for targeted advertising and marketing purposes.

29.     As detailed below, Defendant owed common law, statutory and regulatory duties to keep Plaintiff's and Class Members' communications and medical information safe, secure and confidential.

30.     The disclosure of Plaintiff's and Class Members' Private Information via the Pixel contravenes the letter and spirit of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). As part of HIPAA, the United States Department of Health and Human Services ("HHS") established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") which governs how health care providers must safeguard and protect Private Information.

31.     Simply put, further to the HIPAA Privacy Rule, covered entities such as Duly are *not* permitted to use tracking technology tools (like pixels) in a way that exposes patients' Private Information to any third-party without express and informed consent from each patient.

32.     Lest there be any doubt of the illegal nature of Defendant's practice, the Office for Civil Rights (OCR) at HHS has made clear, in a recent bulletin entitled *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, that the unlawful transmission of such protected information violates HIPAA's Privacy Rule:

> Regulated entities [those to which HIPAA applies] are not permitted
> to use tracking technologies in a manner that would result in

releases/newsid33987/2672/novant-health-notifies-patients-of-potential-data-privacy-incident-.aspx ((last visited March 28, 2023).

impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[14]

33.     Defendant further made express and implied promises to protect Plaintiff's and Class Members' Private Information and maintain the privacy and confidentiality of communications that patients exchanged with Defendant. Furthermore, by obtaining, collecting, using and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendant assumed legal and equitable duties to those individuals to protect and to safeguard that information from unauthorized disclosure.

34.     Duly breached its statutory and common law obligations to Plaintiff and Class Members by, *inter alia*: (i) failing to adequately review its marketing programs and web based technologies to ensure the Website and its other Web Properties were safe and secure; (ii) failing to remove or disengage technology that was known and designed to share Users' Private Information; (iii) failing to obtain the written consent of Plaintiff and Class Members to disclose their Private Information to Facebook or others; (iv) failing to take steps to block the transmission of Plaintiff's and Class Members' Private Information through Facebook Pixels; (v) failing to warn Plaintiff and Class Members of sharing their Private Information with third parties and (vi) otherwise failing to design and monitor its Website and other Web Properties to maintain the confidentiality, security and integrity of patient Private Information.

35.     As a result, Plaintiff and Class Members have suffered numerous injuries,

---

[14]     *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates,* available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited March 8, 2023) (emphasis added).

including: (i) invasion of privacy; (ii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Pixel, (iii) loss of benefit of the bargain, (iv) diminution of value of the Private Information, (v) statutory damages and (vi) the continued and ongoing risk to their Private Information.

36.     Plaintiff therefore seeks, on behalf of herself and a class of similarly situated persons, to remedy these harms and asserts the following statutory and common law claims against Duly: (i) violations of Illinois Eavesdropping Statute, 720 ILCS 5/14-1, *et seq.*; (ii) violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.* ("ICFA"); (iii) violations of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS §§ 510/2, *et seq.* ("IUDTPA"); (iv) breach of confidence; (v) invasion of privacy; (vi) common law invasion of privacy – intrusion upon seclusion and (vi) breach of implied contract.

## PARTIES

37.     Plaintiff Patricia Mayer is a natural person and citizen of Illinois, residing in Arlington Heights, Illinois, where she intends to remain.

38.     Defendant Midwest Physician Administrative Services, LLC, doing business as Duly Health and Care, is an Illinois Limited Liability Company based in Downers Grove, Illinois.[15]

39.     Duly provides all manner of primary, specialty and multi-disciplinary care at over 150 locations throughout Illinois.[16] Defendant is a covered entity under HIPAA.

## JURISDICTION & VENUE

---

[15]     As of September 2021, DuPage Medical Group was renamed Duly Health and Care.

[16]     https://www.dulyhealthandcare.com/ (last visited March 18, 2023).

40.     This Court has personal jurisdiction over Defendant because its principal place of business is in this judicial district and a substantial portion of the acts and omissions giving rise to the claims asserted herein occurred in and emanated from this judicial district.

41.     Venue is proper under 750 ILCS 5/104 because Defendant's principal place of business is in Downers Grove, Illinois, which is in this judicial district.

## COMMON FACTUAL ALLEGATIONS

### A.      *Background: The Use of Tracking Technologies in the Healthcare Industry*

42.     Tracking tools installed on many hospitals', telehealth companies' and other healthcare providers' websites (and other digital properties) are collecting patients' and other visitors' confidential and private health information—including details about their medical conditions, prescriptions and appointments, among *many* other things—and sending that information to third party vendors without prior, informed consent.

43.     These pixels are snippets of code that tracks users as they navigate through a website, logging which pages they visit, which buttons they click and certain information they enter into forms. In exchange for installing the pixels, the third-party platforms (*e.g.,* Facebook and Google) provide website owners analytics about the advertisements they have placed as well as tools to target people who have visited their web properties.

44.     While the information captured and disclosed without permission may vary depending on the pixel(s) embedded, these "data packets" can be extensive, sending, for example, not just the name of the physician and her field of medicine, but also the first name, the last name, email address, phone number and zip code and city of residence entered into the booking form.

45.     That data is linked to a specific internet protocol ("IP") address. The Meta Pixel, for example, sends information to Facebook via scripts running in a person's internet browser so

11

each data packet comes labeled with an IP address that can be used in combination with other data to identify an individual or household.

46.     In addition, if the person is (or recently has) logged into Facebook when they visit a particular website when a Meta Pixel is installed, some browsers will attach third-party cookies—another tracking mechanism—that allow Meta to link pixel data to specific Facebook accounts.

47.     Investigative journalists have published several reports detailing the seemingly ubiquitous use of tracking technologies on hospitals', health care providers' and telehealth companies' digital properties to surreptitiously capture and to disclose their Users' personal health information.

48.     Specifically, and for example, The Markup reported that 33 of the largest 100 hospital systems in the country utilized the Meta Pixel to send Facebook a packet of data whenever a person clicked a button to schedule a doctor's appointment.[17]

---

[17]     *See, e.g.*, Todd Feathers, Simon Fondrie-Teitler, Angie Waller & Surya Mattu, *Facebook Is Receiving Sensitive Medical Information from Hospital Websites*, THE MARKUP (June 16, 2022), available at https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites (last visited March 18, 2023).

**B.**   ***Duly Utilized Tracking Technology for the Purpose of Disclosing Plaintiff's and Class Members' Private Information to Facebook.***

49.     Defendant purposely installed the Pixel and CAPI tools on its Web Properties and programmed the Web Properties to surreptitiously share its patients' private and protected communications with Facebook, including communications that contain Plaintiff's and Class Members' Private Information.

50.     On numerous occasions, with the most recent being in February 2023, Plaintiff Mayer accessed Defendant's Website and Portal on her mobile device and computer and used the Website and the Portal to look for providers, to arrange care and treatment, to make appointments, to check payment history and for other billing matters.

51.     Plaintiff has used and continues to use the same devices to maintain and to access an active Facebook account throughout the relevant period in this case.

52.     Further to the systematic process described herein, Duly assisted Facebook with intercepting Plaintiff's communications including those that contained personally identifiable information, protected health information and related confidential information.

53.     Defendant assisted these interceptions without Plaintiff Mayer's knowledge, consent or express written authorization. By failing to receive the requisite consent, Defendant breached confidentiality and unlawfully disclosed Plaintiff Mayer personally identifiable information and protected health information.

54.     Defendant uses the Website to connect Plaintiff and Class Members to Defendant's digital healthcare Properties with the goal of increasing profitability.

55.     In order to understand Defendant's unlawful data sharing practices, it is important to first understand basic web design and tracking tools.

13

### C.    *Facebook's Business Tools & the Pixel*

56.    Facebook operates the world's largest social media company and generated $117 billion in revenue in 2021, roughly 97% of which was derived from selling advertising space.[18]

57.    In conjunction with its advertising business, Facebook encourages and promotes entities and website owners, such as Defendant, to utilize its "Business Tools" to gather, identify, target and market products and services to individuals.

58.    Facebook's Business Tools, including the Pixel and CAPI, are bits of code that advertisers can integrate into their webpages, mobile applications and servers, thereby enabling the interception and collection of user activity on those platforms.

59.    The Business Tools are automatically configured to capture "Standard Events" such as when a user visits a particular webpage, that webpage's Universal Resource Locator ("URL") and metadata, button clicks, etc.[19]

60.    Advertisers, such as Defendant, can track other user actions and can create their own tracking parameters by building a "custom event."[20]

---

[18]    FACEBOOK, META REPORTS FOURTH QUARTER AND FULL YEAR 2021 RESULTS, https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx (last visited March 18, 2023).

[19]    FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited March 28, 2023); *see* FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142; FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/ (last visited March 18, 2023).

[20]    FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142; *see also* FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/

61.     One such Business Tool is the Pixel which "tracks the people and type of actions they take."[21]

62.     When a user accesses a web page that is hosting the Pixel, their communications with the host webpage are instantaneously and surreptitiously duplicated and sent to Facebook's servers—traveling from the user's browser to Facebook's server.

63.     Notably, this transmission only occurs on webpages that contain the Pixel. Thus, Plaintiff's and Class Members' Private Information would not have been disclosed to Facebook but for Defendant's decisions to install the Pixel on its Website.

64.     Similarly, Plaintiff's and Class Members' Private Information would not have been disclosed to Facebook via CAPI but for Defendant's decision to install and implement that tool.

65.     By installing and implementing both tools, Defendant caused Plaintiff's and Class Members' communications to be intercepted and transmitted to Facebook via the Pixel, and it caused a second improper disclosure of that information via CAPI.

66.     As explained below, these unlawful transmissions are initiated by Defendant's source code concurrent with communications made via the Website.

**D.     Defendant's method of transmitting Plaintiff's and Class Members' Private Information via the Tracking Pixel and/or CAPI (i.e., the interplay between HTTP Requests and Responses, Source Code & the Pixel)**

67.     Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the internet. Each "client device" (such as computer, tablet or smartphone) accessed web content through a web browser

---

(last visited March 18, 2023).

[21]     FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting (last visited March 28, 2023).

(*e.g.*, Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

68.     Every website is hosted by a computer "server" that holds the website's contents and through which the entity in charge of the website exchanges communications with Internet users' client devices via their web browsers.

69.     Web communications consist of HTTP Requests and HTTP Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

- **HTTP Request**: an electronic communication sent from the client device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests.  In addition to specifying a particular URL (*i.e.*, web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies.

- **Cookies**: a small text file that can be used to store information on the client device which can later be communicated to a server or servers.  Cookies are sent with HTTP Requests from client devices to the host server.  Some cookies are "third-party cookies" which means they can store and communicate data when visiting one website to an entirely different website.

- **HTTP Response**: an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.[22]

63.     A patient's HTTP Request essentially asks the Defendant's Website to retrieve certain information (such as a physician's "Book an Appointment" page), and the HTTP Response renders or loads the requested information in the form of "Markup" (the pages, images, words, buttons and other features that appear on the patient's screen as they navigate the Website).

---

[22]     One browsing session may consist of hundreds or thousands of individual HTTP Requests and HTTP Responses.

64. Every website consists of Markup and "Source Code."

65. Source Code is simply a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

66. Source code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user. Defendant's Pixel is source code that does just that. The Pixel acts much like a traditional wiretap.

67. When patients visit Defendant's website via an HTTP Request to Duly's server, that server sends an HTTP Response including the Markup that displays the Webpage visible to the user and Source Code including Defendant's Pixel.

68. Thus, Defendant is, in essence, handing patients a tapped device and once the Webpage is loaded into the patient's browser, the software-based wiretap is quietly waiting for private communications on the Webpage to trigger the tap, which intercepts those communications intended only for Defendant and transmits those communications to third-parties, including Facebook.

69. Third parties, like Facebook, place third-party cookies in the web browsers of users logged into their services. These cookies uniquely identify the user and are sent with each intercepted communication to ensure the third-party can uniquely identify the patient associated with the Personal Information intercepted.

70. With substantial work and technical know-how, internet users can sometimes circumvent this browser-based wiretap technology. This is why third parties bent on gathering Private Information, like Facebook, implement workarounds that cannot be evaded by savvy users.

71.     Facebook's workaround, for example, is called CAPI, which is an "effective" workaround because it does not intercept data communicated from the user's browser. Instead, CAPI "is designed to create a direct connection between [Web hosts'] marketing data and [Facebook]."

72.     Thus, the communications between patients and Defendant, which are necessary to use Defendant's Website, are actually received by Defendant and stored on its server before CAPI collects and sends the Private Information contained in those communications directly from Defendant to Facebook.

73.     Client devices do not have access to host servers and thus cannot prevent (or even detect) this transmission.

74.     While there is no way to confirm with certainty that a Web host like Defendant has implemented workarounds like CAPI without access to the host server, companies like Facebook instruct Defendant to "[u]se the CAPI in addition to the [] Pixel, and share the same events using both tools," because such a "redundant event setup" allows Defendant "to share website events [with Facebook] that the pixel may lose."[23]

75.     The third parties to whom a website transmits data through pixels and associated workarounds do not provide any substantive content relating to the user's communications. Instead, these third parties are typically procured to track user data and communications for marketing purposes of the website owner (i.e., to bolster profits).

76.     Thus, without any knowledge, authorization, or action by a user, a website owner like Defendant can use its source code to commandeer the user's computing device, causing the

---

[23]     *See*   https://www.facebook.com/business/help/308855623839366?id=818859032317965 (last visited March 18, 2023).

device to contemporaneously and invisibly redirect the Users' communications to third parties.

77.     In this case, Defendant employed the Tracking Pixel and CAPI to intercept, duplicate and re-direct Plaintiff's and Class Members' Private Information to Facebook.

78.     For example, when a patient visits https://www.dulyhealthandcare.com/services and selects "Gynecologic Oncology," the patient's browser automatically sends an HTTP Request to Defendant's web server. The Defendant's web server automatically returns an HTTP Response, which loads the Markup for that particular webpage as depicted below.



*Figure 1. Image taken from **https://www.dulyhealthandcare.org/gynecologic-oncology/***

79.     The patient visiting this particular web page only sees the Markup, not the Defendant's Source Code or underlying HTTP Requests and Responses.

80.     In reality, Defendant's Source Code and underlying HTTP Requests and Responses share the patient's personal information with Facebook, including the fact that the patient is looking for Gynecologic Oncology treatment – along with the patient's unique Facebook ID.

19

▼ Request Headers
   :authority: www.facebook.com
   :method: GET
   :path: /tr/?id=486716338266417? ev=PageView&fl=https%3A%2F%2Fwww.dulyhealthcare.com%2Fservices%2Fgynecologic-oncology:rl=&if=false&ts=1678677876451&sw=1664&sh=11
   10&v=2.9.98&r=stable&ec=0&o=30&cv_est=true&fbp=fb.1.1678147503296.1417099581&it=1678677876385&coo=false&rqm=GET
   :scheme: https
   accept: image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8
   accept-encoding: gzip, deflate, br
   accept-language: en-US,en;q=0.9
   cookie: sb=ViICZCGTcj6C7v_ZtcSiZyMa; datr=UCICZAI-Bh3l4L8R3fo_8PP8; c_user=          xs=56%3AAponUtzdKaaHr2w%3A2%3A1677861466%3A-1%3A3083%7%3A%3AActbar sv28CfEmVoq9ZVR
   GKC8FvXaUSQVKsLq8R1Vf8o; fr=0kd8Vi8hRIrkz3mve.AwUJbydmlcxAiCX-nLZHnLwjjT0.8kDfYo.gk.AAA.0.0.BkDf%o.AWv9aXL3qLi
   referer: https://www.dulyhealthcare.com/

*Figure 2. An HTTP single communication session sent from the device to Facebook that reveals the user's search results and the patient's FID (c_user field).[24]*

81.     In addition to controlling a website's Markup, Source Code executes a host of other programmatic instructions and can command a website visitor's browser to send data transmissions to third parties via pixels or web bugs,[25] effectively open a spying window through which the webpage can funnel the visitor's data, actions, and communications to third parties.

82.     Looking to the previous example, Defendant's Source Code manipulates the patient's browser by secretly instructing it to duplicate the patient's communications (HTTP Requests) and send those communications to Facebook.

83.     This occurs because the Pixel embedded in Defendant's Source Code is programmed to automatically track and transmit a patient's communications, and this occurs contemporaneously, invisibly and without the patient's knowledge.

84.     Thus, without its patients' consent, Defendant has effectively used its source code to commandeer patients' computing devices thereby re-directing their Private Information to third parties.

---

[24]     The user's Facebook ID is represented as the c_user ID highlight in the image above, and Plaintiff has redacted the corresponding string of numbers to preserve the user's anonymity.

[25]     These pixels or web bugs are tiny image files that are invisible to website users. They are purposefully designed in this manner, or camouflaged, so that users remain unaware of them.

85.     The information that Defendant's Pixel sends to Facebook may include, among other things, patients' PII, PHI and other confidential information.

86.     Consequently, when Plaintiff and Class Members visit Defendant's website and communicate their Private Information, it is transmitted to Facebook, including, but not limited to, appointment type and date, physician selected, specific button/menu selections, content typed into free text boxes, demographic information, email addresses, phone numbers and emergency contact information.

**E.**     ***Defendant's Pixel and/or CAPI Tracking Practices caused Plaintiff's & Class Members' PII & PHI to be sent to Facebook.***

85.     Defendant utilizes Facebook's Business Tools and intentionally installed the Pixel and CAPI on its Website to secretly track patients by recording their activity and experiences in violation of its common law, contractual, statutory and regulatory duties and obligations.

86.     Defendant's Web Pages contain a unique identifier which indicates that the Pixel is being used on a particular webpage, identified as 486716330266417 on www.dulyhealthandcare.com.

87.     The Pixel allows Defendant to optimize the delivery of ads, measure cross-device conversions, create custom audiences and decrease advertising and marketing costs.

88.     However, Defendant's Website does not rely on the Pixel in order to function.

89.     While seeking and using Defendant's services as a medical provider, Plaintiff and Class Members communicated their Private Information to Defendant via its Website.

90.     Defendant did not disclose to Plaintiff and Class Members that their Private Information would be shared with Facebook as it was communicated to Defendant.

91.     Plaintiff and Class Members never consented, agreed, authorized or otherwise

permitted Defendant to disclose their Private Information to Facebook, nor did they intend for Facebook to be a party to their communications with Defendant.

92.     Defendant's Pixel and CAPI sent non-public Private Information to Facebook, including but not limited to Plaintiff's and Class Members': (i) status as medical patients; (ii) health conditions; (iii) sought treatment or therapies; (iv) appointment requests and appointment booking information; (v) registration or enrollment in medical classes (such as breastfeeding courses); (vi) locations or facilities where treatment is sought; (vii) which web pages were viewed and (viii) phrases and search queries conducted via the general search bar.

93.     Importantly, the Private Information Defendant's Pixel sent to Facebook was sent alongside Plaintiff's and Class Members' Facebook ID (c_user cookie or "FID") thereby allowing individual patients' communications with Defendant, and the Private Information contained in those communications, to be linked to their unique Facebook accounts.[26]

94.     A user's FID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the user, including pictures, personal interests, work history, relationship status, and other details. Because the user's Facebook Profile ID uniquely identifies an individual's Facebook account, Meta—or any ordinary person—can easily use the Facebook Profile ID to quickly and easily locate, access, and view the user's corresponding Facebook profile.

95.     Defendant deprived Plaintiff and Class Members of their privacy rights when it: (i) implemented technology (i.e., the Facebook Pixel) that surreptitiously tracked, recorded and

---

[26]     Defendant's Website tracks and transmits data via first-party and third-party cookies. The c_user cookie or FID is a type of third-party cookie assigned to each person who has a Facebook account and it is composed of a unique and persistent set of numbers.

disclosed Plaintiff's and other online patients' confidential communications and Private Information; (ii) disclosed patients' protected information to Facebook—an unauthorized third-party and (iii) undertook this pattern of conduct without notifying Plaintiff or Class Members and without obtaining their express written consent.

**F.        *Defendant's Pixel Disseminates Patient Information via www.dulyhealthandcare.com***

96.        An example illustrates the point. If a patient uses www.dulyhealthandcare.com to look for a doctor, they may select the "Find a Provider" tab, which takes them to the "Find a Provider" page.



***Figure 3. Defendant directs patients to its "Find a Provider" webpage with embedded Pixels – which are invisible to the regular user.***

97.        On this page Defendant asks to user to narrow their search results by numerous from provider name to provider gender and specialties.

98.        If a user selects filters or enters keywords into the search bar on the "Find a Provider" webpage, the filters and search terms are transmitted via the Facebook Pixel. Similarly, if a patient uses the Website's general search bar or chat, the terms and phrases the patient types are transmitted to Facebook, even if they contain a patient's treatment, procedures, medical conditions, and related queries.

99.        This information is automatically sent from the patient's device to Facebook, and

it reveals the patient's FID (c_user field) along with each search filter the patient selected.

100.    Without alerting the user, Defendant's Pixel sends each and every communication the user made to the Defendant via the Webpage to Facebook, and the images below confirm that the communications Defendant sends to Facebook contain the user's Private Information.

101.    For example, a patient can search for a provider specializing in colonoscopy closest to patient's chosen address, with the option of using additional filters - from provider's gender to their additional specialties.



*Figure 4. Search results for a provider specializing in "colonoscopy" near "30 E Anthony Drive Champaign IL" as they appear to the user on Defendant's Find a Provider Search results webpage.*

102.    After taking any of these actions on the 'Find a Provider' page, patients are subsequently directed to the Provider Search Results page (see image above), and their selections or search parameters are automatically transmitted by the Pixel to Facebook along with the user's unique Facebook ID, as evidenced by the images below.

```
▼ Query String Parameters      view source      view URL-encoded
  id: 486716330266417
  ev: PageView
  dl: https://www.dulyhealthandcare.com/physicians?page=1&search_physician_attribute colonoscopy address=30+E+anthony+Driv
  champaign+IL IL service [5B%5D Radiation+Oncology language [5B%5D Spanish gender [5B%5D Male age [5B%5D Adults
  rl: https://www.dulyhealthandcare.com/services/gynecologic-oncology
  if: false
  ts: 1678806564999
  sw: 1664
  sh: 1110
  v: 2.9.98
  r: stable
  ec: 15
  o: 30
  cs_est: true
  fbp: fb.1.1677774635425.1225890027
  it: 1678767867169
  coo: false
  rqm: GET
```

*Figure 5. Defendant's transmission to Facebook of patient's search parameters showing search terms ("colonoscopy" and "30 E Anthony Drive Champaign IL") and filters used ("Male" provider who speaks "Spanish," specializes in "Radiation Oncology" and services "Adults").*

103.     The first line of highlighted text, "id: 486716330266417," refers to the Defendant's Pixel ID for this particular Webpage and confirms that the Defendant has downloaded the Pixel into its Source Code on this particular Webpage.

104.     The second line of text, "ev: PageView," identifies and categorizes which actions the user took on the Webpage ("ev:" is an abbreviation for event, and "Pageview" is the type of event). Thus, this identifies the user as having viewed the particular Webpage.

105.     The remaining lines of text identify: (i) the user as a patient seeking medical care from Defendant via www.dulyhealthandcare.com; (ii) who is in the process of searching for a male provider for adult patients; (iii) who specializes in colonoscopy and Radiation Oncology; (iv) speaks Spanish and (v) is located near the address entered into Defendant's Search bar.

106.     Finally, the last line of highlighted text ("GET"), demonstrates that Defendant's Pixel sent the user's communications, and the Private Information contained therein, alongside the

25

user's Facebook ID (c_user ID). This is further evidenced by the image below, which was collected during the same browsing session as the previous image.[27]

▼ Request Headers
  :authority: www.facebook.com
  :method: GET
  :path: /tr/?id=486716330266417 ev=SubscribedButtonClick dl=https%3A%2F%2Fwww.dulyhealthcare.com%2Fphysicians%3Fpage%
  3D1%2 search_physician_attribute? 3( colonoscopy!2( address '2( 3130 2( E '2( anthony 2F Drive '2( champaign '2( IL '2( BIL%2( service '25
  5B%255D%3( Radiation%2BOncology? 2( language '2558%255D%3( Spanish 2( gender '2558%255D%3( Male '2( age '2558%255D%3 Adults rl=ht
  tps%3A%2F%2Fwww.dulyhealthcare.com%2Fservices%2Fgynecologic-oncology&if=false&ts=1678806612362&cd[buttonFeatures]=%
  7B%22classList%22%3A%22dmgButton%20secondary1%20filter-btn-mobile%22%2C%22destination%22%3A%22%22%2C%22id%22%3A%22%22%22%
  2C%22imageUrl%22%3A%22%22%2C%22innerText%22%3A%22Filters%22%2C%22numChildButtons%22%3A0%2C%22tag%22%3A%22button%22%2C%
  22type%22%3Anull%2C%22name%22%3A%22%22%2C%22value%22%3A%22%22%7D&cd[buttonText]=Filters&cd[formFeatures]=%5B%5D&cd[pag
  eFeatures]=%7B%22title%22%3A%22Find%20a%20Primary%20Care%20or%20Specialty%20Doctor%20%7C%20Duly%20Health%20and%20Care%
  20-%20DuPage%20Medical%20Group%22%7D&sw=1664&sh=1110&v=2.9.98&r=stable&ec=17&o=30&cs_est=true&fbp=fb.1.1677774635425.1
  225890027&it=1678767867169&coo=false&es=automatic&tm=3&rqm=GET
  :scheme: https
  accept: image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8
  accept-encoding: gzip, deflate, br
  accept-language: en-US,en;q=0.9,ru;q=0.8
  cookie: datr=QtI1YllVd2UWOuuBmn2Mb8vC; sb=GrxtY1jj9lKWnpCg7UAhiJMv; c_user=5.        , dpr=1.5; xs=7%3A_7bqKp6sOg6FyQ%3A
  2%3A167788705O%3A-1%3A3037%3A3AAcUjUPuF7a0Pg1uFoZkdEJA2-sXICPnXEqXqnv0b7C0M; fr=0n0nya2GPw4JH1CM3.AWVLt8cYVqieGwqfTWtN
  pCS0gOk.BkD9C8.-f.AAA.0.0.BkD9jB.AWU3d_krcxo; usida=eyJ2ZXIiOjEsImlkIjoiQXJyaG8yMTFFocXNlZ3UiLCJ0aW1lIjoxNjc4NzYwNzEzfZf
  Q%3D%3D
  referer: https://www.dulyhealthcare.com/

***Figure 6. Defendant's transmission to Facebook of patient's search parameters showing search terms and the patient's c_user information from Defendant's "Find a Provider" webpage.***

107.   After searching for a colonoscopy specialist Defendant's Website brings the user to a page listing Defendant's colonoscopy providers, including Dr. Manuel F. Corrales.

108.   Once a patient chooses a doctor, all of the information that patient has submitted is automatically sent directly to Facebook. The information transmitted to Facebook includes: (i) the patient's unique and persistent Facebook ID (c_user ID), (ii) the fact that the patient clicked on a specific provider's profile page (Dr. Corrales in the example above and below), (iii) the patient's

---

[27]   This image shows yet another "event" recorded and shared by the Pixel, called "SubscribedButtonClick" – which reveals that the user clicked a button on Defendant's webpage to submit search parameters.

search parameters (demonstrating they specifically searched for a male doctor who speaks Spanish and treats adult patients, and their specialty) and (iv) the patient's location filter.



**Figure 7. An HTTP single communication session sent from the device to Facebook that reveals the user's search parameters, results and the patient's FID (c_user field).**

109.    Defendant's website also includes a feature that allows patients to book appointments through a particular doctor's profile page.

**Figure 8. Image from https://www.dulyhealthandcare.com/physicians/manuel-f-corrales-md-facs.**

110.    If the user decides to schedule an appointment, Defendant communicates every step of the process to Facebook.

111.    For example, if a patient enters their date of birth in the form shown in the image above and clicks "Next," Defendant shares this action with Facebook – along with the provider's name and patient's search parameters which were already shared with Facebook in previous interactions.

▼ Request Headers
    :authority: www.facebook.com
    :method: GET
    :path: /tr/?id=486716330266417&ev=SubscribedButtonClick&dl=https%3A%2F%2Fwww.dulyhealthandcare.com%2Fphysicians%2Fma
    nuel-f-corrales-md facs&rl=https%3A%2F%2Fwww.dulyhealthandcare.com%2Fphysicians%3Fpage%3D1%26search_physician_attri
    bute%3Fcolonoscopy 2 address%3D30%2BE%2Banthony%2BDrive%2Bchampaign%2BIL 2BIL%2 language 255B%255D%3 Spanish 26gend
    er%255B%255D%3 Male 2 age 255B%255D%3 Adults if=false&ts=1678826852181&cd buttonFeatures %7B%22classList%22%3A%22d
    mgButton%20primary1%22%2C%22destination%22%3A%22https%3A%2F%2Fwww.dulyhealthandcare.com%2Fphysicians%2Fmanuel-f-cor
    rales-md-facs%22%2C%22id%22%3A%22%22%2C%22imageUrl%22%3A%22%22%2C innerText 22%3A%22 Next 22%2C%22numChildButtons%
    22%3A0%2C%22tag%22%3A%22button%22%2C%22type%22%3Anull%2C%22name%22%3A%22%22%2C%22value%22%3A%22%22%7D&cd[buttonTex
    t]=Next&cd[formFeatures]=%5B%7B%22id%22%3A%22date_of_birth_month%22%2C%22name%22%3A%22date_of_birth_month%22%2C%22t
    ag%22%3A%22input%22%2C%22placeholder%22%3A%22MM%22%2C%22inputType%22%3A%22text%22%7D%2C%7B%22id%22%3A%22date_of_bir
    th_day%22%2C%22name%22%3A%22date_of_birth_day%22%2C%22tag%22%3A%22input%22%2C%22placeholder%22%3A%22DD%22%2C%22inpu
    tType%22%3A%22text%22%7D%2C%7B%22id%22%3A%22date_of_birth_year%22%2C%22name%22%3A%22date_of_birth_year%22%2C%22tag%
    22%3A%22input%22%2C%22placeholder%22%3A%22YYYY%22%2C%22inputType%22%3A%22text%22%7D%5D&cd[pageFeatures]=%7B%22titl
    e%22%3A%22Manuel%20F.%20Corrales%2C%20MD%2C%20FACS%20%7C%20Duly%20Health%20and%20Care%20-%20DuPage%20Medical%20Grou
    p%22%7D&sw=1664&sh=1110&v=2.9.98&r=stable&ec=2&o=30&cs_est=true&fbp=fb.1.1677774635425.1225890027&it=1678825890406&
    coo=false&es=automatic&tm=3&rqm=GET
    :scheme: https
    accept: image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8
    accept-encoding: gzip, deflate, br
    accept-language: en-US,en;q=0.9,ru;q=0.8
    cookie: datr=QtI1Y1lVd2UWOuuBmn2Mb8vC; sb=GrxtY1jj9lKWnpCg7UAhiJMv; c_user=5-           ; dpr=1.5; usida=eyJ2ZXIiOjEsIml
    kIjoiQXJyaG8yMTFocXNlZ3UiLCJ0aW1lIjoxNjc4NzYwNzEzfQ%3D%3D; xs=%3A_7bqKp6sOg6FyQ%3A2%3A1677887050%3A-1%3A3037%3A%3A
    AcVddgJMpRq79qEYuBZ7R4ajfU2rdran5L587wTJVqc; fr=0pyQTLs0lx68y5snn.AWU4YHXcuAMCpRNhJznkPTx9OeY.BkEKoB.-f.AAA.0.0.BkE
    KoB.AWXpsCnX30c
    referer: https://www.dulyhealthandcare.com/

***Figure 9. An HTTP single communication session sent from the device to Facebook that reveals the user's search parameters, results, the patient's FID (c_user field), and the fact that the "inner Text" of the button patient clicked ("Next").***

112.    Defendant's Pixel shares what time a patient is choosing for an appointment (in the example below, "3:15 PM") and the fact that the patient clicked on "Proceed to Patient Info"

button:

▼ Query String Parameters    view source    view URL-encoded

id: 486716330266417
ev: SubscribedButtonClick
dl: https://www.dulyhealthandcare.com/physicians/manuel-f-corrales-md-facs
rl:
if: false
ts: 1678828216631
cd[buttonFeatures]: {"classList":"","destination":"","id":"","imageUrl":"","innerTex
t" "3:15 PM","numChildButtons":0,"tag":"button","type":null,"name":"","value":""}
cd[buttonText]: 0:0 PM
cd[formFeatures]: []
cd[pageFeatures]: {"title":"Manuel F. Corrales, MD, FACS | Duly Health and Care - DuPage
Medical Group"}
sw: 1664
sh: 1110
v: 2.9.98
r: stable
ec: 3
o: 30
cs_est: true
fbp: fb.1.1677774635425.1225890027
it: 1678828167711
coo: false
es: automatic
tm: 3
exp: b3
rqm: GET

×  Headers   Payload   Preview   Response   Initiator   Timing   Cookies

▼ Query String Parameters    view source    view URL-encoded

id: 486716330266417
ev: SubscribedButtonClick
dl: https://www.dulyhealthandcare.com/physicians/manuel-f-corrales-md-facs
rl:
if: false
ts: 1678828360217
cd[buttonFeatures] {"classList":"dmgButton primary1","destination":"","id":"","imageUrl":"","innerText" "Continue
to Patient Info" "numChildButtons":0,"tag":"button","type":null,"name":"","value":""}
cd[buttonText]: Continue to Patient Info
cd[formFeatures]: []
cd[pageFeatures]: {"title":"Manuel F. Corrales, MD, FACS | Duly Health and Care - DuPage Medical Group"}
sw: 1664
sh: 1110
v: 2.9.98
r: stable
ec: 4
o: 30
cs_est: true
fbp: fb.1.1677774635425.1225890027
it: 1678828167711
coo: false
es: automatic
tm: 3
exp: b3
rqm: GET

*Figures 10 & 11. HTTP communication sessions sent by the Pixel to Facebook that reveal the*

*"inner text" of the buttons patient clicked in the process of making an appointment.*

113.    When the user proceeds to the Patient Information form, Defendant's Pixel communicates and shares this information with Facebook as well.

▼ Request Headers

  :authority: www.facebook.com

  :method: GET

  :path: /tr/?id=486716330266417&ev=Microdata&dl=https%3A%2F%2Fwww.dulyhealthandcare.com%2Fschedule%2Fbook&rl= https%3A%2F%2Fwww.dulyhealthandcare.com%2Fphysicians%2 manuel-f-corrales-md-facs&if=false&ts=1678830326664& cd[DataLayer]=%5B%5D&cd[Meta]=%7B%22title%22%3A%2 Patient 2 )Information 20%7C%20Duly%20Health%20and%20Care% 20-%20DuPage%20Medical%20Group%22%7D&cd[OpenGraph]=%7B%7D&cd[Schema.org]=%5B%5D&cd[JSON-LD]=%5B%5D&sw=1664& sh=1110&v=2.9.98&r=stable&ec=1&o=30&fbp=fb.1.1677774635425.1225890027&it=1678830324935&coo=false&es=automat ic&tm=3&rqm=GET

  :scheme: https

  accept: image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8

  accept-encoding: gzip, deflate, br

  accept-language: en-US,en;q=0.9,ru;q=0.8

  cookie: datr=QtI1Y1lVd2UWOuuBmn2Mb8vC; sb=GrxtY1jj9lKWnpCg7UAhiJMv; c_user=5     ; dpr=1.5; usida=eyJ2ZXI iOjEsImlkIjoiQXJyaG8yMTFocXNlZ3UiLCJ0aW1lIjoxNjc4NzYwNzEzfQ%3D%3D; xs=7%3A_7bqKp6sOg6FyQ%3A2%3A1677887050%3 A-1%3A3037%3A3AAcV7JjHXsLHCcRciOYtWKOtxoPr6F4ltNzzvzpJCtiA; fr=0yIH3VuDHxaXUDLOr.AWU89wEnKjpn-E1Fgn2j_J_GM 1k.BkEOo2.-f.AAA.0.0.BkEOo2.AWW9bWS7KhM

  referer: https://www.dulyhealthandcare.com/

***Figure 12. HTTP communication sessions sent by the Pixel to Facebook that reveal that the patient is using the "Patient Information" intake form.***

114.    If, after following these steps, a patient clicks on the "Schedule an Appointment" button, Defendant communicates and shares this action with Facebook via at least three "events," classified by Facebook as "Pageview" – which indicates the patient viewed the page confirming the appointment, "Microdata" – which sends certain information from the page viewed by the patient (in this case, the fact that patient scheduled an appointment), and "Schedule" – which, as its name reveals, also indicates that the patient scheduled an appointment with Defendant:

▼ **Request Headers**

:authority: www.facebook.com

:method: GET

:path: /tr/?id=486716330266417&ev=PageView&dl=https%3A%2F%2Fwww.dulyhealthandcare.com%2Fschedule%2Fbook%2Fsh
are&rl=https%3A%2F%2Fwww.dulyhealthandcare.com%2Fschedule%2Fbook&if=false&ts=1678831529931&sw=1664&sh=1110&
v=2.9.98&r=stable&ec=0&o=30&cs_est=true&fbp=fb.1.1677774635425.1225890027&it=1678831529802&coo=false&rqm=GE
T

:scheme: https

accept: image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8

accept-encoding: gzip, deflate, br

accept-language: en-US,en;q=0.9,ru;q=0.8

cookie: datr=QtI1Y1lVd2UWOuuBmn2Mb8vC; sb=GrxtY1jj9lKWnpCg7UAhiJMv; c_user=5      ; dpr=1.5; usida=eyJ2ZXI
iOjEsImlkIjoiQXJyaG8yMTFocXNlZ3UiLCJ0aW1lIjoxNjc4NzYwNzEzfQ%3D%3D; xs=7%3A_7bqKp6sOg6FyQ%3A2%3A1677887050%3
A-1%3A3037%3A3AAcV7JjHXsLHCcRciOYtWKOtxoPr6F4ltNzzvzpJCtiA; fr=0yIH3VuDHxaXUDL0r.AWU89wEnKjpn-E1Fgn2j_J_GM
1k.BkEOo2.-f.AAA.0.0.BkEOo2.AWW9bWS7KhM

referer: https://www.dulyhealthandcare.com/

▼ **Request Headers**

:authority: www.facebook.com

:method: GET

:path: /tr/?id=486716330266417&ev=Microdata&dl=https%3A%2F%2Fwww.dulyhealthandcare.com%2Fschedule%2Fbook%2Fs
hare&rl=https%3A%2F%2Fwww.dulyhealthandcare.com%2Fschedule%2Fbook&if=false&ts=1678831531457&cd[DataLayer]=%
5B%5D&cd[Meta]=%7B%22title%22%3A%22!Appointment%20(Confirmation)%20%7C%20Duly%20Health%20and%20Care%20-%20DuPa
ge%20Medical%20Group%22%7D&cd[OpenGraph]=%7B%7D&cd[Schema.org]=%5B%5D&cd[JSON-LD]=%5B%5D&sw=1664&sh=1110&v=
2.9.98&r=stable&ec=2&o=30&fbp=fb.1.1677774635425.1225890027&it=1678831529802&coo=false&es=automatic&tm=3&rq
m=GET

:scheme: https

accept: image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8

accept-encoding: gzip, deflate, br

accept-language: en-US,en;q=0.9,ru;q=0.8

cookie: datr=QtI1Y1lVd2UWOuuBmn2Mb8vC; sb=GrxtY1jj9lKWnpCg7UAhiJMv; c_user=5      ; dpr=1.5; usida=eyJ2ZXI
iOjEsImlkIjoiQXJyaG8yMTFocXNlZ3UiLCJ0aW1lIjoxNjc4NzYwNzEzfQ%3D%3D; xs=7%3A_7bqKp6sOg6FyQ%3A2%3A1677887050%3
A-1%3A3037%3A3AAcV7JjHXsLHCcRciOYtWKOtxoPr6F4ltNzzvzpJCtiA; fr=0yIH3VuDHxaXUDL0r.AWU89wEnKjpn-E1Fgn2j_J_GM
1k.BkEOo2.-f.AAA.0.0.BkEOo2.AWW9bWS7KhM

referer: https://www.dulyhealthandcare.com/

```
▼ Request Headers
  :authority: www.facebook.com
  :method: GET
  :path: /tr/?id=486716330266417 ev=Schedule dl=https%3A%2F%2Fwww.dulyhealthandcare.com%2 schedule 2 book 2Fsh
    are&rl=https%3A%2F%2Fwww.dulyhealthandcare.com%2Fschedule%2Fbook&if=false&ts=1678831529935&sw=1664&sh=1110&
    v=2.9.98&r=stable&ec=1&o=30&fbp=fb.1.1677774635425.1225890027&it=1678831529802&coo=false&rqm=GET
  :scheme: https
  accept: image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8
  accept-encoding: gzip, deflate, br
  accept-language: en-US,en;q=0.9,ru;q=0.8
  cookie: datr=QtI1Y1lVd2UWOuuBmn2Mb8vC; sb=GrxtY1jj9lKWnpCg7UAhiJMv; c user=5            ; dpr=1.5; usida=eyJ2ZXI
    iOjEsImlkIjoiQXJyaG8yNTFocXNlZ3UiLCJOaW1lIjoxNjc4NzYwNzEzfQ%3D%3D; xs=7%3A_7bqKp6s0g6FyQ%3A2%3A1677887050%3
    A-1%3A3037%3A%3AAcV7JjHXsLHCcRciOYtWKOtxoPr6F4ltNzzvzpJCtiA; fr=0yIH3VuDHxaXUDL0r.AWU89wEnKjpn-E1Fgn2j_J_GM
    1k.BkEOo2.-f.AAA.0.0.BkEOo2.AWW9bWS7KhM
  referer: https://www.dulyhealthandcare.com/
```

***Figures 13-15. This information is automatically sent from the patient's device to Facebook,
and it reveals the patient's FID (c_user field) along with the fact that the patient made an
appointment.***

85.     Similarly, if a patient searches for a provider who specializes in "Papillotomy" near

zip code 61820, selects Dr. Alan Wang from the search results provided by Defendant, and clicks

the telephone button to make an appointment with that provider, Defendant shares all of that

information with Facebook (including the phone number being called) as a

"SubscribedButtonClick" event.

▾ Request Headers
:authority: www.facebook.com
:method: GET
:path: /tr/?id=486716330266417&ev=SubscribedButtonClick&dl=https%3A%2F%2Fwww.dulyhealthandcare.com%2Fphysicians%2…alan-h-wang-md&rl=
https%3A%2F%2Fwww.dulyhealthandcare.com%2Fphysicians%3Fpage%3D10%2…search_physician_attribute%3DERCP%252…Papillotom
y%2…address%3…61820%2B1L&if=false&ts=1677783789256&cd[buttonFeatures]=%7B%22classList%22%3A%2…phone-number%22%2C%2…destination%22%3
A%2…tel%3A%2…1-630-717-2600%22%2C%22id%22%3A%22%22%2C%22imageUrl%22%3A%22%2C%2…innerText%22%3A%2…(630)%20717-2600%22%2C%22numChi
ldButtons%22%3A0%2C%22tag%22%3A%22a%22%2C%22type%22%3Anull%2C%22name%22%3A%22%22%7D&cd[buttonText]=(0)%200-0&cd[formFeatures]=%5B%5
D&cd[pageFeatures]=%7B%22title%22%3A%22Alan%20H.%20Wang%2C%20MD%20…%7C%20Duly%20Health%20and%20Care%20-%20DuPage%20Medical%20Group%2
2%7D&sw=1664&sh=1110&v=2.9.97&r=stable&ec=2&o=30&cs_est=true&fbp=fb.1.1677774635425.1225890027&it=1677783668168&coo=false&es=automa
tic&tm=3&rqm=GET
:scheme: https
accept: image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8
accept-encoding: gzip, deflate, br
accept-language: en-US,en;q=0.9,ru;q=0.8
cookie: c_user=5        ; datr=Qt1IY1lVd2UWOuuBmn2Mb8vC; dpr=1.5; usida=eyJ2ZXIiOjEsImlkIjoiQXJxdDZiYzE2YWc2MXQiLCJ0aWlljoxNjc3NjE4
NjYwfQ%3D%3D; xs=18d%3Awgt7jCKaF4RNPg%3A2%3A1597289338%3A-1%3A3037%3A%3AAcXlPGjIOJJMBDF4rEphlYEtEI8qYvPKmkyCFEVFHDU; fr=02l3w3T2bxc
F8YgcE.AmVPxsThK9OKrSZmYf8Hmm4VaNg.BkAƒ%M.-f.AAA.0.0.BkAƒ%M.AmXK8HdIIcc
referer: https://www.dulyhealthandcare.com/

*Figure 16. The information automatically sent to Facebook reveals the patient's FID (c_user field) along with the fact that the patient clicked a button with Defendant's telephone number to make an appointment with a specific provider for a specific procedure.*

    86.    If a user searches for treatment or a particular condition, Defendant's Pixel sends that information to Facebook as well.

    87.    The examples below demonstrate that, if a user searches for "colon cancer" or "annual screening mammogram" near the patient's address, Defendant's Pixel shares that information with Facebook as well:

Request Headers

:authority: www.facebook.com
:method: GET
:path: /tr/?id=486716330266417&ev=SubscribedButtonClick&dl=https%3A%2F%2Fwww.dulyhealthandcare.com%2Fphysicians%3Fpage%3D1%26per-pag
e%3D10%2&search physician attribute%3(&colon%2B&cancer%2&address%3(&1820%2BIL&rl=https%3A%2F%2Fwww.dulyhealthandcare.com%2Fimmediate-
care%3Futm_source%3Dhomepage%26utm_medium%3Dfeatures%26utm_campaign%3Dicc&if=false&ts=1677783613663&cd[buttonFeatures]=%78%22classL
ist%22%3A%22dmgButton%20secondary1%20physician-search-btn%22%2C%22destination%22%3A%22%22%2C%22id%22%3A%22%22%2C%22imageUrl%22%3A%2
2%22%2C%22innerText%22%3A%22search%22%2C%22numChildButtons%22%3A0%2C%22tag%22%3A%22button%22%2C%22type%22%3Anull%2C%22name%22%3A%2
2%22%2C%22value%22%3A%22%22%70&cd[buttonText]=Search&cd[formFeatures]=%58%5D&cd[pageFeatures]=%7B%22title%22%3A%22Find%20a%20Primar
y%20Care%20or%20Specialty%20Doctor%20%7C%20Duly%20Health%20and%20care%20-%20Oupage%20Medical%20Group%22%7D&sw=1664&sh=1110&v=2.9.97
&r=stable&ec=6&o=30&cs_est=true&fbp=fb.1.1677774635425.1225890027&it=1677776674730&coo=false&es=automatic&tm=3&rqm=GET
:scheme: https
accept: image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8
accept-encoding: gzip, deflate, br
accept-language: en-US,en;q=0.9,ru;q=0.8
cookie: c_user=5        ; datr=QtI1Y1lVd2UWOuuBmn2Mb8vC; dpr=1.5; usida=eyJ2ZXIiOjEsImlkIjoiQXJxdDZ1Y2E2YWc2MXQiLCJ0aWlIjoxNjc3NjE4
NjYwfQ%3D%3D; xs=188%3AWgt7jCKaF4RhPg%3A2%3A1597289338%3A-1%3A3037%3A%3AAcXlPGjIOJJMBDF4rEpNlYEtEI8qYvPKmkyCFEVFhDU; fr=02l3w3T2bxc
F8YgcE.AWVPxsThK9OKrSZmYf8Hmm4Vahg.BkAWwM.-f.AAA.0.0.BkAWwM.AWXK8HdT1cc
referer: https://www.dulyhealthandcare.com/

▼ Request Headers

:authority: www.facebook.com
:method: GET
:path: /tr/?id=486716330266417&ev=PageView&dl=https%3A%2F%2Fwww.dulyhealthandcare.com%2Fphysicians%3Fpage%3D1%26sear
ch_physician_attribute%3(&Annual%2BScreening%2BMammogram%2(&address%3(&3301%2)NE%2)Washington%23St%252C%2)Naperville%25
2C%2)IL%2&60540%2BL&rl=https%3A%2F%2Fwww.dulyhealthandcare.com%2Fschedule&if=false&ts=1679341699902&sw=1664&sh
=1110&v=2.9.99&r=stable&ec=3&o=30&cs_est=true&fbp=fb.1.1677774635425.1225890027&it=1679341603761&coo=false&rqm=GE
T
:scheme: https
accept: image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8
accept-encoding: gzip, deflate, br
accept-language: en-US,en;q=0.9,ru;q=0.8
cookie: datr=QtI1Y1lVd2UWOuuBmn2Mb8vC; sb=GrxtY1jj9lKWnpCg7UAhiJNv; c_user=5        ; dpr=1.5; usida=eyJ2ZXIiOjEsIm
lkIjoiQXJybXdrMTE3djJMxdmoiLCJ0aWlIjoxNjc5MDA1MDA5fQ%3D%3D; xs=7%3A_7bqKp6s0g6FyQ%3A2%3A1677887050%3A-1%3A3037%3A%
3AAcXs_TRdB-zSabqgEaL5BTftqq4BwKrjoezILjz63Nk; fr=0Rdj2MFZVTrsY26tM.AWW9uQHCeM1ztKfIM1Vzh3a1Hcg.BkGIn9.-f.AAA.0.0.
BkGIn9.AWWCLQ0yiCO; presence=EDvF3EtimeF1679330879EuserFA2540643061A2EstateFDutFOCEchF_7bCC
referer: https://www.dulyhealthandcare.com/

*Figures 17 & 18. Examples of data from search results being shared with Facebook.*

88.     To make matters worse, the text and phrases that patients type into the search bar

are also sent to Facebook.

89.     The images below demonstrate that when a user types the phrase "I have dementia"

into the general search bar, that exact phrase is sent to Facebook alongside the user's Facebook ID

(and address), thereby allowing the phrase and medical condition contained therein to be attributed

34

and associated with their individual Facebook account.



**Request Headers**

:authority: www.facebook.com

:method: GET

:path: /tr/?id=486716330266417&ev=PageView&dl=https%3A%2F%2Fwww.dulyhealthandcare.com%2Fphysicians%3Fpage%3D1%2_search_physician_attribute%3_I_have_dementia_address_301_N_Washington_St_252C%2_Naperville_252C%2_IL_60540_2BIL&rl=&if=false&ts=1679343753913&sw=1664&sh=1110&v=2.9.99&r=stable&ec=6&o=30&cs_est=true&fbp=fb.1.1677774635425.1225890027&it=1679342657206&coo=false&rqm=GET

:scheme: https

accept: image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8

accept-encoding: gzip, deflate, br

accept-language: en-US,en;q=0.9,ru;q=0.8

cookie: datr=QtI1Y1Vd2UNOuuBmn2Mb8vC; sb=GrxtY1jj9lKWnpCg7UAhiJMv; c_user=5          ; dpr=1.5; usida=eyJ2ZXIiOjEsImlkIjoiQXJybXdrMTE3djMxdmoiLCJ0aW1lIjoxNjc5MDA1MDA5fQ%3D%3D; xs=7%3A_7bqKp6s0g6FyQ%3A2%3A1677887050%3A-1%3A3037%3A%3AAcXs_TRdB-zSabqgEaL5BTftqq4BwKrjoezILjz63Nk; fr=0Rdj2MFZVTrsY26tM.AWW9uQHCeM1ztKfIM1Vzh3a1Hcg.BkGIn9.-f.AAA.0.0.BkGIn9.AWWCLQ0yiC0; presence=EDvF3EtimeF1679330879EuserFA2540643061A2EstateFDutFOCEchF_7bCC

referer: https://www.dulyhealthandcare.com/

***Figures 19 & 20. Example of exact text and phrases being shared with Facebook.***

112.    Each time Defendant sends this activity data, it also discloses a patient's personally identifiable information alongside the contents of their communications.

113.    A user who accesses Defendant's website while logged into Facebook will transmit the c_user cookie to Facebook, which contains that user's unencrypted Facebook ID.

114.    When accessing dulyhealthandcare.com, for example, Facebook receives as many as eight cookies:

| Name | V... | Domain | P. | Expires ... |  |
|---|---|---|---|---|---|
| datr | Q... | .facebook.com | / | 2024-0... |  |
| sb | G... | .facebook.com | / | 2024-0... |  |
| c_user | 5... | .facebook.com | / | 2024-0... |  |
| dpr | 1.5 | .facebook.com | / | 2023-0... |  |
| usida | e... | .facebook.com | / | Session |  |
| xs | 7... | .facebook.com | / | 2024-0... |  |
| fr | 0... | .facebook.com | / | 2023-0... |  |
| presence | E... | .facebook.com | / | 2023-0... |  |

*Figure 21.*

115.    When a visitor's browser has recently logged out of an account, Facebook compels the visitor's browser to send a smaller set of cookies[28]:

| fr | 00Zp... | .facebook.com |
|---|---|---|
| wd | 1156... | .facebook.com |
| sb | qqAz... | .facebook.com |
| datr | Malz... | .facebook.com |

*Figure 22.*

116.    The fr cookie contains, at least, an encrypted Facebook ID and browser identifier.[29] Facebook, at a minimum, uses the fr cookie to identify users.[30]

117.    At each stage, Defendant also utilized the _fbp cookie, which attaches to a browser

---

[28]    The screenshot below serves as an example and demonstrates the types of data transmitted during an HTTP single communication session. Not pictured here and in the preceding image is the _fbp cookie, which is transmitted as a first-party cookie.

[29]    Data Protection Commissioner, *Facebook Ireland Ltd: Report of Re-Audit* (Sept. 21, 2012), p. 33, http://www.europe-v-facebook.org/ODPC_Review.pdf (last visited March 18, 2023).

[30]    *Cookies & other storage technologies*, FACEBOOK.COM, https://www.facebook.com/policy/cookies/ (last visited March 18, 2023).

as a first-party cookie, and which Facebook uses to identify a browser and a user:[31]

| Name | Value | Domain |
|------|-------|--------|
| _fbp | fb.1.1677774635425.1225890027 | .dulyhealthandcare.com |

***Figure 22.***

118. The fr cookie expires after 90 days unless the visitor's browser logs back into Facebook.[32] If that happens, the time resets, and another 90 days begins to accrue.

119. The _fbp cookie expires after 90 days unless the visitor's browser accesses the same website.[33] If that happens, the time resets, and another 90 days begins to accrue.

120. The Facebook Tracking Pixel uses both first- and third-party cookies. A first-party cookie is "created by the website the user is visiting"—*i.e.*, Defendant.[34]

121. A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—i.e., Facebook.[35]

122. The _fbp cookie is always transmitted as a first-party cookie. A duplicate _fbp cookie is sometimes sent as a third-party cookie, depending on whether the browser has recently logged into Facebook.

---

[31]    *Id.*

[32]    *Id.*

[33]    *Cookies & other storage technologies*, FACEBOOK.COM, https://www.facebook.com/policy/cookies/ (last visited March 18, 2023).

[34]    *First-Party Cookie*, PCMAG.COM, https://www.pcmag.com/encyclopedia/term/first-party-cookie (last visited March 18, 2023). This is confirmable by using developer tools to inspect a website's cookies and track network activity.

[35]    *Third-Party Cookie*, PCMAG.COM, https://www.pcmag.com/encyclopedia/term/third-party-cookie (last visited March 18, 2023). This is also confirmable by tracking network activity.

123.    Facebook, at a minimum, uses the fr, _fbp, and c_user cookies to link to FIDs and corresponding Facebook profiles.

124.    As shown in the above figures, Defendant sent these identifiers with the event data.

125.    Plaintiff never consented, agreed, authorized, or otherwise permitted Defendant to disclose her personally identifiable information and protected health information nor did she authorize any assistance with intercepting her communications.

126.    Plaintiff was never provided with any written notice that Defendant disclosed its Website users' PHI nor was she provided any means of opting out of such disclosures.

127.    Despite this, Defendant knowingly and intentionally disclosed Plaintiff's PHI to Facebook.

128.    Although the full scope of Defendant's illegal data sharing practices is presently unknown, additional evidence demonstrates that Defendant is also sharing its patients' Private Information with Google via the Google Analytics tools, and the image below indicates that Defendant has failed to enable the "anonymize IP" feature.

129.    Resultantly, Google receives a patient's communications and data alongside their unique IP address, thereby creating an additional and distinct HIPAA violation and breach of confidentiality.

▼ Query String Parameters     view source     view URL-encoded
  v: 2
  tid: G-XW0KZBCGRH
  gtm: 45je33f0
  _p: 851814692
  cid: 2085003184.1677774637
  ul: en-us
  sr: 1664x1110
  uaa: x86
  uab: 64
  uafvl: Google%20Chrome;111.0.5563.65|Not(A%3ABrand;8.0.0|Chromium;111.0.5563.65
  uamb: 0
  uam:
  uap: Windows
  uapv: 10.0.0
  uaw: 0
  _eu: AEA
  _s: 3
  dl: https://www.dulyhealthandcare.com/physicians?page=1&search_physician_attribute=I+have+dementia&addr
  ess=301+N+Washington+St%2C+Naperville%2C+IL+60540+IL
  dr: https://www.dulyhealthandcare.com/physicians
  sid: 1679341602
  sct: 17
  seg: 1
  dt: Find a Primary Care or Specialty Doctor | Duly Health and Care - DuPage Medical Group
  en: page_view
  _et: 194

▼ Request Headers
  :authority: analytics.google.com
  :method: POST
  :path: /g/collect?v=2&tid=G-XW0KZBCGRH&gtm=45je33f0&_p=851814692&cid=2085003184.1677774637&ul=en-us&sr=1664x1110&uaa=x86&uab=6
  4&uafvl=Google%2520Chrome%3B111.0.5563.65%7CNot(A%253ABrand%388.0.0.0%7CChromium%3B111.0.5563.65%uamb=0&uap=Windows&uapv
  =10.0.0&uaw=0&_eu=AEA&_s=3&dl=https%3A%2F%2Fwww.dulyhealthandcare.com%2Fphysicians%3Fpage%3D1%2Bsearch_physician_attribute%3D
  I%2Bhave%2Bdementia%2Baddress%3B+301+2+N%2BWashington%2BSt%2C%2BNaperville%252C%2BIL+%2B60540%2BIL&dr=https%3A%2F%2Fwww.duly
  healthandcare.com%2Fphysicians&sid=1679341602&sct=17&seg=1&dt=Find%20a%20Primary%20Care%20or%20Specialty%20Doctor%20%7C%20Dul
  y%20Health%20and%20Care%20-%20DuPage%20Medical%20Group&en=page_view&_et=194
  :scheme: https
  accept: */*
  accept-encoding: gzip, deflate, br
  accept-language: en-US,en;q=0.9,ru;q=0.8
  content-length: 0
  cookie: __Secure-3PSID=Twjxem_LGt_U1AEZrWr9OOybmUwevqYyIU-3Gx2m2QkBQzEKadVFxR8ML63sON1HYLv6CQ.; __Secure-3PAPISID=i3IluFlqWdaV
  z-ur/AMwmJ7ifeUDk6wpwO; NID=511=Slj7MEPsxA9Ysk26y6he94iasDKcmbpyLDOFwZZWuB-SOzmolPWafXLUkXy6p2cBhgYxFpLDtLMhXCLobT1vOWr2an0T0

*Figures 23 and 24. Images of the data that is sent to Google, which contains the exact phrase and medical condition the user communicated via Defendant's website, along with their address.*

130.    By law, Plaintiff is entitled to privacy in her protected health information and confidential communications.

131.    Defendant deprived Plaintiff and Class Members of their privacy rights when it: (i)

implemented a system that surreptitiously tracked, recorded and disclosed Plaintiff's and Class Members' confidential communications, personally identifiable information and protected health information to a third party; (ii) disclosed patients' protected information to Facebook – an unauthorized third-party eavesdropper and (iii) undertook this pattern of conduct without notifying Plaintiff and Class Members and without obtaining their express written consent.

132.    Plaintiff did not discover that Defendant disclosed her personally identifiable information and protected health information to Facebook and assisted Facebook with intercepting is communications until March 2023.

**G.    *Defendant's Privacy Policy & Promises***

133.    Defendant's Privacy Policy provides that it does not apply to any Protected Health Information and that Users of the Web Properties should visit a separate page for its HIPAA Notice of Privacy Practices:

> PLEASE NOTE THAT THIS PRIVACY POLICY DOES NOT APPLY TO YOUR PROTECTED HEALTH INFORMATION.
>
> We may receive your Protected Health Information when you, for example, schedule an appointment, provide your Protected Health Information through the Epic MyChart portal, the online bill pay portal, or while you are receiving treatment from us. Protected Health Information is treated in accordance with our Notice of Privacy Practices, which are available here. If you have any questions about DMG's use or disclosure of your Protected Health Information, please review the Notice of Privacy Practices. Alternatively, you may contact us using the information below. We may link Usage Information and/or Personal Information to your Protected Health Information. In such circumstances, we will treat such linked information as Protected Health Information on a going-forward basis.[36]

134.    On a web page titled HIPAA Privacy Practices & Forms, Duly sets forth its Notice

---

[36]    *See* https://www.dulyhealthandcare.com/privacy-policy (last visited March 18, 2023).

of Privacy Practices, which begins by stating that:

> **Your Information. Your Rights. Our Responsibilities.**
>
> Nothing is more important than[] ensuring your privacy. At Duly Health and Care, we understand that your privacy is vitally important. As your medical provider, we take proactive measures to safeguard your information. We understand that with each office visit, you are placing your trust in us. We will make every effort to ensure this trust is not breached, and that your privacy is protected.
>
> This Notice was developed to provide you with information regarding your rights to privacy and confidentiality. It contains our policies regarding privacy according to the Health Insurance Portability and Accountability Act (HIPAA) rules and regulations. We encourage you to read this information thoroughly so that you are fully informed about our policies and procedures. We welcome any questions you may have regarding this information.[37]

135.    That web page includes a hyperlink to a document titled Notice of Privacy Practices (the "HIPAA Notice"), which purports to describe for patients and Users how Duly will handle PHI.[38]

136.    Defendant represents to patients and visitors to its Website that it will keep PHI information confidential and that it will only use and disclose PHI provided to it under certain circumstances, ***none of which apply here***:

> OUR USES & DISCLOSURES We typically use or share your health information in the following ways: Treatment, Payment, and Operations (TPO).
>
> To treat you · We can use your health information and share it with other professionals that have a treatment relationship with you. · Example: A doctor treating you for an injury may ask another doctor who treated you about your overall health condition. · We may use and disclose medical information about you to contact you about health-related benefits and services that may be of interest to you,

---

[37]    https://www.dulyhealthandcare.com/hipaa-privacy-policy (last visited March 18, 2023).

[38]    On information and belief, the current version of the Notice (as of January 2023) is attached as **Exhibit A** hereto.

including: - To describe a health-related product or service that is provided by us. - For case management or your care coordination. - To direct or recommend alternative treatments, therapies, health care providers or settings of care. · We may communicate with you about our products and services through face-to-face communication. We may also communicate about products or services in the form of a promotional gift of nominal value.

Operate our organization · We can use or share your health information to operate our practice, improve your care, and contact you when necessary. · Example: We use your health information to manage your treatment and services, such as appointment reminders, and to train our staff. · We can share your health information with "business associates" – individuals or companies that provide services to Duly. This may include a survey vendor, a software vendor, a billing vendor, or a collection agency. We require our business associates to protect your information.

To bill for our services · We can use and share your health information to bill and receive payment from health plans and other entities responsible for the payment of your care. · Example: we provide information about you to your health insurance plan so it will pay for services provided to you.

135. Defendant's Notice does *not* permit it to use and to disclose Plaintiff's and Class Members' Private Information for marketing purposes without prior express consent:

In these cases, we never share your information unless you give us written permission · We must obtain your authorization for the following purposes (and for all other uses and disclosures) not described in this Notice: - *Marketing* - Sale of your information - Most sharing of psychotherapy notes, alcohol treatment and drug dependence treatment, unless otherwise required by law.[39]

136. Defendant violated their own HIPAA Notice by unlawfully intercepting and disclosing Plaintiff's and Class Members' Private Information to Facebook and third parties without adequately disclosing that Defendant shared Private Information with third parties and without acquiring the specific patients' consent or authorization to share the Private Information.

---

[39]    *See* Ex. A (emphasis added).

**H.     Federal Warning on Tracking Codes on Healthcare Websites.**

137.    Beyond Defendant's own policies, the U.S. government has issued guidance warning that tracking code like Meta Pixel may come up against federal privacy law when installed on healthcare websites.

138.    The statement, titled *Use of Online Tracking Technologies By HIPAA Covered Entities And Business Associates* (the "Bulletin"), was recently issued by the Department of Health and Human Services' Office for Civil Rights ("OCR").[40]

139.    Healthcare organizations regulated under the Health Insurance Portability and Accountability Act (HIPAA) may use third-party tracking tools, such as Google Analytics or Meta Pixel, in a limited way, to perform analysis on data key to operations. They are not permitted, however, to use these tools in a way that may expose patients' protected health information to these vendors.

140.    The Bulletin explains:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[41]

141.    The bulletin discusses the types of harm that disclosure may cause to the patient:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible

---

[40]    HHS.gov, USE OF ONLINE TRACKING TECHNOLOGIES BY HIPAA COVERED ENTITIES AND BUSINESS ASSOCIATES, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaaonline-tracking/index.html (last visited March 18, 2023).

[41]    *Id.* (Emphasis added).

disclosure of PHI may result in identity theft, financial loss, *discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI.* Such disclosures can reveal incredibly sensitive information about an individual, *including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment.* While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, *because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.*[42]

142.    Plaintiff and Class Members face just the risks about which the government expresses concern. Defendant has passed along Plaintiff's and Class Members' search terms about health conditions for which they seek doctors; their contacting of doctors to make appointments; the names of their doctors; the frequency with which they take steps relating to obtaining healthcare for certain conditions; and where they seek medical treatment.

143.    This information is, as described by the OCR in its bulletin, "highly sensitive." The Bulletin goes on to make clear how broad the government's view of protected information is as it explains:

> This information might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, medical device IDs, *or any unique identifying code.*[43]

144.    Crucially, that paragraph in the government's Bulletin continues:

> *All such [individually identifiable health information ("IIHI")] collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship*

---

[42]    *Id.* (emphasis added).

[43]    *Id.* (emphasis added).

*with the regulated entity and even if the IIHI, such as IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services.* This is because, ***when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (i.e., it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present, or future health or health care or payment for care.***[44]

145.    This is further evidence that the data that Defendant chose to disclose is protected Private Information, and the disclosure of that information was a violation of Plaintiff's and Class Members' rights.

*I.      Defendant's Violation of HIPAA*

146.    Defendant's disclosure of Plaintiff's and Class Members' Private Information to entities like Facebook also violated HIPAA, which provided Plaintiff and Class Members with another reason to believe that the information they communicated to Defendant through its Website would be protected rather than shared with third-parties for marketing purposes.

147.    HIPAA's Privacy Rule defines "individually identifiable health information" as "a subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health care provider;" (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual;" and either (i) "identifies the individual;" or (ii) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

148.    HIPAA prohibits health care providers from "us[ing] or disclos[ing] 'protected

---

[44]     *Id.* (emphasis added).

health information' except as permitted or required by" the HIPAA Privacy Rule. 45 C.F.R. § 164.502.

149.    "A covered entity may determine that health information is not individually identifiable health information only if" either "a person with appropriate knowledge of and experience with generally accepted statistical and scientific methods for rendering information not individually identifiable: a) applying such principles" determines that the risk is "very small" that the information could be used alone, or in combination with other information, to identify individuals, and documents the methods that justifies such a determination, or identifiers are removed that include: Internet Protocol (IP) address numbers; account numbers; URLs, device identifiers, and "any other unique identifying number, characteristic or code," except codes assigned by the healthcare organization to allow itself to reidentify information from which it has removed identifying information.

150.    Even the fact that an individual is receiving a medical service, *i.e.*, is a patient of a particular entity, can be Protected Health Information.

151.    The Department of Health and Human Services has instructed health care providers that, while identifying information alone is not necessarily PHI if it were part of a public source such as a phonebook because it is not related to health data:

> If such information was listed with health condition, health care provision or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[45]

---

[45]    HHS.gov, GUIDANCE REGARDING METHODS FOR DE-IDENTIFICATION OF PROTECTED HEALTH INFORMATION IN ACCORDANCE WITH THE HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT (HIPAA) PRIVACY RULE, https://www.hhs.gov/hipaa/forprofessionals/privacy/special-topics/de-identification/index.html (last visited March 18, 2023).

152.    Consistent with this restriction, the HHS has issued marketing guidance that provides that: "[w]ith limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list."[46]

153.    Here, Defendant provided PHI to third parties in violation of this rule.

154.    Commenting on a June 2022 report discussing the use of the Meta Pixel by hospitals and medical centers, David Holtzman, a health privacy consultant and a former senior privacy adviser in HHS OCR, which enforces HIPAA, stated, "I am deeply troubled by what [the hospitals] are doing with the capture of their data and the sharing of it…It is quite likely a HIPAA violation."[47]

155.    Defendant's placing of the third-party tracking code on its Web Properties is a violation of Plaintiff's and Class Members' privacy rights under federal law. While Plaintiff does not bring a claim under HIPAA itself, this violation evidences Defendant's wrongdoing as relevant to other claims.

---

[46]    HHS.gov,            MARKETING,            https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html (last visited March 18, 2023).

[47]    HHS.gov, Advisory Board, 'DEEPLY TROUBLED': SECURITY EXPERTS WORRY ABOUT FACEBOOK TRACKERS ON HOSPITAL SITES, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html (last visited March 18, 2023).

**J.   *Plaintiff's & Class Members' Private Information Has Financial Value.***

156.   Plaintiff's and Class Members' Private has financial and economic value.

157.   Indeed, Meta's, Google's and others' practices of using such information to package groups of people as "Lookalike Audiences" and similar groups and selling those packages to advertising clients demonstrates the financial worth of that data.

158.   Data harvesting is the fastest growing industry in the nation.

159.   As software, data mining and targeting technologies have advanced, the revenue from digital ads and the consequent value of the data used to target them have risen rapidly.

160.   Consumer data is so valuable that some have proclaimed that data is the new oil.

161.   Between 2016 and 2018, the value of information mined from Americans increased by 85% for Facebook and 40% for Google.

162.   Overall, the value internet companies derive from Americans' personal data increased almost 54%.

163.   Conservative estimates suggest that in 2018, Internet companies earned $202 per American user.

164.   In 2022, that value is expected to be $200 billion industry wide, or $434 per user, also a conservative estimate.

165.   As to health data specifically, as detailed in an article in Canada's National Post:

> As part of the multibillion-dollar worldwide data brokerage industry, health data is one of the most sought-after commodities. De-identified data can be re identified (citing https://www.nature.com/articles/s41467-019-10933-3/ ) and brazen decisions to release records with identifiable information (citing https://www.wsj.com/articles/hospitals-give-tech-giants-access-todetailed-medical-records-11579516200?mod=hp_lista_pos3 ) are

becoming commonplace).[48]

166.    Further demonstrating the financial value of Class Members' medical data, CNBC

has reported that hospital executives have received a growing number of bids for user data:

> Hospitals, many of which are increasingly in dire financial straits,
> are weighing a lucrative new opportunity: selling patient health
> information to tech companies. Aaron Miri is chief information
> officer at Dell Medical School and University of Texas Health in
> Austin, so he gets plenty of tech start-ups approaching him to pitch
> deals and partnerships. Five years ago, he'd get about one pitch per
> quarter. But these days, with huge data-driven players like Amazon
> and Google making incursions into the health space, and venture
> money flooding into Silicon Valley start-ups aiming to bring
> machine learning to health care, the cadence is far more frequent.
> "It's all the time," he said via phone. "Often, once a day or more."
>
> * * *
>
> [H]ealth systems administrators say [the data] could also be used in
> unintended or harmful ways, like being cross-referenced with other
> data to identify individuals at higher risk of diseases and then raise
> their health premiums, or to target advertising to individuals.[49]

167.    The CNBC article also explained:

> De-identified patient data has become its own small economy:
> There's a whole market of brokers who compile the data from
> providers and other health-care organizations and sell it to buyers.
> Just one company alone, IQVIA, said on its website that it has access
> to more than 600 million patient records globally that are
> nonidentified, much of which it accesses through provider
> organizations. The buyers, which include pharma marketers, will
> often use it for things like clinical trial recruiting But hospital execs
> worry that this data may be used in unintended ways, and not always

---

[48]    *See* National Post, IRIS KULBATSKI: THE DANGERS OF ELECTRONIC HEALTH
RECORDS, February 26, 2020, https://nationalpost.com/opinion/iris-kulbatski-the-dangers-of-
electronichealth-records (last visited March 18, 2023).

[49]    CNBC, HOSPITAL EXECS SAY THEY ARE GETTING FLOODED WITH REQUESTS
FOR YOUR HEALTH DATA, https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-
flooded-with-requests-for-your-health-data.html (last visited March 18, 2023).

in the patient's best interest.

* * *

168.     Tech companies are also under particular scrutiny because they already have access to a massive trove of information about people, which they use to serve their own needs. For instance, the health data Google collects could eventually help it micro-target advertisements to people with particular health conditions. Policymakers are proactively calling for a revision and potential upgrade of the health privacy rules known as HIPAA, out of concern for what might happen as tech companies continue to march into the medical sector.[50]

169.     Time Magazine similarly, in an article titled, *How your Medical Data Fuels A Hidden Multi-Billion Dollar Industry*, referenced the "growth of the big health data bazaar," in which patients' health information is sold. It reported that:

> [T]he secondary market in information unrelated to a patient's direct treatment poses growing risks, privacy experts say. That's because clues in anonymized patient dossiers make it possible for outsiders to determine your identity, especially as computing power advances in the future.[51]

170.     Duly gave away Plaintiff's and Class Members' communications and transactions on its Website without permission.

171.     The unauthorized access to Plaintiff's and Class Members' Private Information has diminished the value of that information, resulting in harm.

---

[50]     *Id.*

[51]     Time, HOW YOUR MEDICAL DATA FUELS A HIDDEN MULTI-BILLION DOLLAR INDUSTRY, https://time.com/4588104/medical-data-industry/ (last visited March 18, 2023).

**K.**     ***Defendant Violated Industry Standards***

172.    A medical provider's duty of confidentiality is embedded in the physician-patient and hospital-patient relationship, it is a cardinal rule.

173.    The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

174.    AMA Code of Ethics Opinion 3.1.1 provides that "[p]rotecting information gathered in association with the care of the patient is a core value in health care… Patient privacy encompasses a number of aspects, including, … personal data (informational privacy)[.]

175.    AMA Code of Medical Ethics Opinion 3.2.4 provides:

> Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (A) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

176.    AMA Code of Medical Ethics Opinion 3.3.2 provides:

> Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically…must: (c) Release patient information only in keeping ethics guidelines for confidentiality.[52]

---

[52]     https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/code-of-medical-ethics-chapter-3.pdf (last visited March 20, 2023).

**L.      *Plaintiff's & Class Members' Expectation of Privacy***

177.    Plaintiff and Class Members were aware of Defendant's duty of confidentiality when they sought medical services from Defendant.

178.    Indeed, at all times when Plaintiff and Class Members provided their PII and PHI to Defendant, they each had a reasonable expectation that the information would remain private and that Defendant would not share the Private Information with third parties for a commercial purpose, unrelated to patient care.

**M.      *IP Addresses are Personally Identifiable Information***

179.    In addition to patient status, medical conditions, treatment, specific providers, appointment information and patient's unique and persistent Facebook ID, Defendant improperly disclosed patients' computer IP addresses to Facebook through the use of the Pixel.

180.    An IP address is a number that identifies the address of a device connected to the Internet.

181.    IP addresses are used to identify and route communications on the Internet.

182.    IP addresses of individual Internet users are used by Internet service providers, Websites, and third-party tracking companies to facilitate and track Internet communications.

183.    Facebook tracks every IP address ever associated with a Facebook user.

184.    Google also tracks IP addresses associated with Internet users.

185.    Facebook, Google and other third-party marketing companies track IP addresses for use in tracking and targeting individual homes and their occupants with advertising by using IP addresses.

186.    Under HIPAA, an IP address is considered personally identifiable information.

187.    HIPAA defines personally identifiable information to include "any unique

52

identifying number, characteristic or code" and specifically lists the example of IP addresses. *See* 45 C.F.R. § 164.514 (2).

188.    HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); See also, 45 C.F.R. § 164.514(b)(2)(i)(O).

189.    Consequently, Defendant's disclosure of patients' IP addresses violated HIPAA and industry privacy standards.

*N.*     ***Defendant was Enriched & Benefitted from the Use of The Pixel & Unauthorized Disclosures.***

190.    The sole purpose of the use of the Facebook Pixel on Defendant's Web Properties was marketing and profits.

191.    In exchange for disclosing the Personal Information of its patients, Defendant is compensated by Facebook in the form of enhanced advertising services and more cost-efficient marketing on Facebook.

192.    Upon information and belief, Defendant was advertising its services on Facebook, and the Pixel was used to "help [Defendant] understand the success of [its] advertisement efforts on Facebook."

193.    Retargeting is a form of online marketing that targets users with ads based on their previous Internet communications and interactions.

194.    Upon information and belief, Defendant re-targeted patients and potential patients to get more patients to use its services. By utilizing the Pixel, the cost of advertising and retargeting was reduced, thereby benefiting Defendant.

## REPRESENTATIVE PLAINTIFF PATRICIA MAYER'S EXPERIENCES

195.   As a condition of receiving Defendant's services, Plaintiff Mayer disclosed her Private Information to Defendant on numerous occasions, and most recently in February 2023.

196.   Plaintiff Mayer accessed Defendant's Website and Patient Portal on her phone, computer and tablet to receive healthcare services from Defendant and at Defendant's direction.

197.   Plaintiff Mayer researched providers, specific health conditions and treatments, looked for Defendant's locations close to her address, and scheduled doctor's appointments for herself via the Defendant's Website and Portal.

198.   Plaintiff Mayer also utilized Defendant's Portal to refill prescriptions, look at her bills and payments and to see her test results.

199.   Plaintiff Mayer has used and continues to use the same devices to maintain and access an active Facebook account throughout the relevant period in this case.

200.   Plaintiff Mayer reasonably expected that her communications with Defendant via the Web Properties were confidential, solely between herself and Defendant, and that such communications would not be transmitted to or intercepted by a third party.

201.   Plaintiff Mayer provided her Private Information to Defendant and trusted that the information would be safeguarded according to Defendant's policies and state and federal law.

202.   As described herein, Defendant worked along with Facebook to intercept Plaintiff Mayer's communications, including those that contained her Private Information.

203.   Defendant willfully facilitated these interceptions without Plaintiff Mayer's knowledge, consent or express written authorization.

204.   Defendant transmitted to Facebook Plaintiff Mayer's Facebook ID, computer IP address and information such as appointment type, physician selected, button/menu selections

and/or content typed into free text boxes.

205. By doing so without her consent, Defendant breached Plaintiff Mayer's privacy and unlawfully disclosed her Private Information.

206. Defendant did not inform Plaintiff Mayer that it had shared her Private Information with Facebook.

207. Plaintiff Mayer is diagnosed with a specific medical condition and submitted information to Defendant's Website and Portal about scheduling medical appointments for her condition.

208. Plaintiff Mayer suffered damages in form of (i) invasion of privacy; (ii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iii) loss of benefit of the bargain; (iv) diminution of value of the Private Information; (v) statutory damages and (vi) the continued and ongoing risk to her Private Information.

209. Plaintiff Mayer has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future unauthorized disclosure.

## TOLLING

210. Any applicable statute of limitations has been tolled by the "delayed discovery" rule. Plaintiff did not know (and had no way of knowing) that her Private Information was intercepted and unlawfully disclosed because Defendant kept this information secret.

## CLASS ACTION ALLEGATIONS

211. Plaintiff Mayer brings this action on behalf of herself and on behalf of all other persons similarly situated (the "Class") pursuant to 735 ILCS 5/2-801.

212. The Nationwide Class that Plaintiffs seek to represent is defined as follows:

> All individuals residing in the State of Illinois whose Private Information was disclosed to a third party without authorization or consent through the Pixel on Defendant's Web Properties.

213. Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

214. Plaintiff reserves the right to modify or amend the definition of the proposed classes before the Court determines whether certification is appropriate.

215. **Numerosity:** The Nationwide Class Members are so numerous that joining all members is impracticable. Upon information and belief, there are hundreds of thousands (if not millions) of individuals whose PII and PHI may have been improperly disclosed by Duly, and the Class is identifiable within Defendant's records.

216. **Commonality & Predominance:** Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual Class Members. These include:

    a. Whether and to what extent Defendant had a duty to protect the PII and PHI of Plaintiff and Class Members;

    b. Whether Defendant had duties not to disclose the PII and PHI of Plaintiff and Class Members to unauthorized third parties;

    c. Whether Defendant violated its privacy policy by disclosing the PII and PHI of Plaintiff and Class Members to Facebook, Meta and/or additional third parties.

    d. Whether Defendant adequately, promptly and accurately informed Plaintiff and Class Members that their PII and PHI would be disclosed to third parties;

    e. Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their PII and PHI had been compromised;

f.  Whether Defendant adequately addressed and fixed the practices which permitted the disclosure of patient PHI and PII;

g.  Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII and PHI of Plaintiff and Class Members;

h.  Whether Defendant violated the consumer protection statutes invoked herein;

i.  Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

j.  Whether Defendant knowingly made false representations as to it data security and/or privacy policy practices;

k.  Whether Defendant knowingly omitted material representations with respect to its data security and/or privacy policy practices and

l.  Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of Defendant's disclosure of their PII and PHI.

208.  **Typicality & Adequacy:** Plaintiff's claims are typical of those of other Class Members because all had their PII and PHI compromised as a result of Defendant's incorporation of the Facebook Pixel. Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

209.  **Superiority and Manageability:** Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other

available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

210.    The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since it would be able to exploit and to overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

211.    The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

212.    **Policies Generally Applicable to the Class:** This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole not on facts or law applicable only to Plaintiff.

213.    **Class-wide Injunctive Relief:** Unless a class-wide injunction is issued, Defendant may continue in its failure to properly secure the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the practices complained of herein and Defendant may continue to act unlawfully as set forth in this Complaint as Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate.

214.    Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a.    Whether Defendant owed a legal duty to not disclose Plaintiff's and Class Members' Private Information;

    b.    Whether Defendant owed a legal duty to not disclose Plaintiff's and Class Members' Private Information with respect to Defendant's privacy policy;

    c.    Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

d.     Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

e.     Whether Defendant adequately and accurately informed Plaintiff and Class Members that their Private Information would be disclosed to third parties;

f.     Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties and

g.     Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.[53]

## COUNT I

**VIOLATION OF ILLINOIS EAVESDROPPING STATUTE**
**720 ILCS 5/14-1, *et seq.***
***(On Behalf of Plaintiff & the Class)***

217.    Plaintiff repeats and realleges each and every allegation contained in the Complaint as if fully set forth herein.

218.    Defendant violated 720 ILCS 5/14-2(a)(2), which provides that a person or entity violates the Illinois Eavesdropping Statute "when he or she knowingly and intentionally . . . [u]ses an eavesdropping device, in a surreptitious manner, for the purpose of transmitting or recording all or any part of any private conversation to which he or she is a party unless he or she does so with the consent of all other parties to the private conversation." 720 ILCS 5/14-2(a)(2).

219.    Defendant also violated 720 ILCS 5/14-2(a)(5) which provides that a person or entity violates the Illinois Eavesdropping Statute when they "[u]se[] or disclose[] any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of this Article, unless he or she does so with the

---

[53]     Plaintiff reserves the right to amend or modify the Class definition as this case progresses.

consent of all of the parties."

220.    The Illinois Eavesdropping Statute broadly defines "Private electronic communication," as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or part by a wire, radio, pager, computer, electromagnetic, photo electronic or photo optical system, when the sending or receiving party intends the electronic communication to be private under circumstances reasonably justifying that expectation." 720 ILCS 5/14-1(e).[54]

221.    The Pixel, as configured by Defendant and as described herein, constitutes an "eavesdropping device" as that term is defined in the Illinois Eavesdropping Statute, which provides, in pertinent part, that "[a]n eavesdropping device is any device capable of being used to hear or record oral conversation *or intercept, or transcribe electronic communications whether such conversation or electronic communication is conducted in person, by telephone, or by any other means."* 720 ILCS 5/14-1(e) (emphasis added).

222.    Defendant used the Pixel in a surreptitious manner as the use of the Pixel, which is not visible to Users, was *not* disclosed in any manner to patients and/or visitors to Defendants' web properties.

223.    Defendant installed the Pixel on its Web Properties in order to record and/or to transmit all or parts of Plaintiff's and the putative Class Members' private conversations to third parties for marketing and analytics purposes.

224.    The Illinois Eavesdropping Statute defines "private conversation" as "any oral

---

[54]    According to the statute, a "reasonable expectation shall include any expectation recognized by law, including, but not limited to, an expectation derived from a privilege, immunity, or right established by common law, Supreme Court rule, or the Illinois or United States Constitution."

communication between 2 or more persons, whether in person or transmitted between the parties by wire or other means, when one or more of the parties intended the communication to be of a private nature under circumstances reasonably justifying that expectation. A reasonable expectation shall include any expectation recognized by law, including, but not limited to, an expectation derived from a privilege, immunity, or right established by common law, Supreme Court rule, or the Illinois or United States Constitution." 720 ILCS 5/14-1(d).

225. The private conversations recorded and transmitted by Defendant to undisclosed third-parties included, but were not necessarily limited to, Plaintiff and Class Members' communications concerning their patient status and past, present or future medical conditions, including requests for information about specific providers and locations, and information about specific health conditions, treatments, appointments and services.

226. Defendant, who maintained the Web Properties, was a party to those private conversations.

227. Defendant did not have the consent of Plaintiff nor the putative Class Members to transmit or record all or any part of those private conversations.

228. Plaintiff and the putative Class Members intended and believed that the information they provided to Defendant via its Web Properties would be kept private, confidential and secure.

229. Indeed, those private conversations contained extremely sensitive and personal health information including, but not necessarily limited to, symptoms, treatments, diagnoses and other protected health information.

230. Defendant did not notify or inform Plaintiff and the putative Class Members that it was recording and transmitting their private electronic communications to third parties.

231. As a result, Plaintiff and the putative Class Members are entitled to: (i) "an

injunction by the circuit court prohibiting further eavesdropping;"; (ii) "all actual damages against the eavesdropper or his principal or both" and (iii) "any punitive damages which may be awarded by the court or by a jury" *See* 720 ILCS 5/14-6(a), (b) & (c).

**COUNT II**

**VIOLATION OF THE ILLINOIS CONSUMER FRAUD
AND DECEPTIVE BUSINESS PRACTICES ACT, 815 ILCS 505/1,** *et seq.*
(*On behalf of Plaintiff & the Class*)

232. Plaintiff repeats and realleges each and every allegation contained in the Complaint as if fully set forth herein.

233. Duly is a "person" as defined by ILCS § 505/1(c).

234. Plaintiff and the other Class Members are "consumers" as defined by 815 ILCS § 505/1(e).

235. Duly's conduct as described herein was in the conduct of "trade" or "commerce" as defined by 815 ILCS. § 505/1(f).

236. Duly's unfair acts and practices against Plaintiff and the other Class Members occurred in the course of trade or commerce in Illinois, arose out of transactions that occurred in Illinois and/or harmed individuals in Illinois.

237. Plaintiff and Class Members received and paid for health care services from Duly.

238. Plaintiff and Class Members used Duly's Web Properties, including the Website and the MyChart patient portal, in connection with receiving health care services from Duly.

239. Plaintiff and other Class Members' payments to Duly for health care services were for household and personal purposes.

240. Duly's practice of disclosing Plaintiff's and other Class Members' personally identifiable data and re-directing their communications to third parties without authorization,

consent or knowledge is a deceptive, unfair and unlawful trade act or practice in violation of 815 ILCS § 505/2.

241.    Duly's unfair business practices were targeted at all Duly patients, including Plaintiff and other Class Members.

242.    Duly's representations and omissions were material because they were likely to deceive reasonable consumers about the privacy, security, and use of their personally identifiable patient data and communications when using the Duly web property, including the MyChart patient portal.

243.    Duly intended to mislead Plaintiff and other Class Members and induce them to rely on its misrepresentations and omissions.

244.    Duly's surreptitious collection and disclosure of Plaintiff' and other Class Members' personally identifiable data and communications to third parties involves important consumer protection concerns.

245.    The relief requested by Plaintiffs and other Class Members would provide redress for the harms Duly caused not just to Plaintiff but to all other Class Members.

246.    Plaintiff and other Class Members were injured and have suffered damages as a direct and proximate result of Duly's unfair acts and practices.

247.    Plaintiff's and other Class Members' injuries were proximately caused by Duly's unfair and deceptive business practices.

248.    Duly's acts caused substantial injury that Plaintiff and other Class Members could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

249.    Duly acted intentionally, knowingly and maliciously to violate Illinois's Consumer

Fraud and recklessly disregarded Plaintiff's and Class Members' rights.

250.    As a direct and proximate result of Duly's unfair, unlawful and deceptive acts and practices, Plaintiff and other Class Members have suffered and will continue to suffer injury, ascertainable losses of money or property and monetary and non-monetary damages including overpaying for Duly's health care services and loss of value of their personally identifiable patient data and communications.

251.    As a direct and proximate result of Duly's unfair, unlawful and deceptive acts and practices, Plaintiff and other Class Members were also damaged by Duly's conduct in that:

a.    Duly harmed Plaintiff's and other Class Members' interest in privacy;

b.    Sensitive and confidential information that Plaintiff and other Class Members intended to remain private is no more;

c.    Duly eroded the essential confidential nature of the provider-patient relationship;

d.    Duly took something of value from Plaintiff and other Class Members and derived benefit therefrom without Plaintiff's and other Class Members' authorization, informed consent or knowledge and without sharing the benefit of such value.

e.    Plaintiff and other Class Members did not get the full value of the medical services for which they paid, which included Duly's duty to maintain confidentiality and

f.    Duly's actions diminished the value of Plaintiff and other Class Members' personal information.

252.    Plaintiff, individually and on behalf of the Illinois Class Members, seeks all monetary and non-monetary relief allowed by law.

## COUNT III

### VIOLATION OF THE ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT, 815 ILCS §§ 510/2, *et seq.* *(On behalf of Plaintiff & the Class)*

253.    Plaintiff repeats and realleges each and every allegation contained in the Complaint as if fully set forth herein.

254.    Duly is a "person" as defined by 815 ILCS § 510/1(5).

255.    Duly engaged in deceptive trade practices in the conduct of its business, in violation of 815 ILCS § 510/2(a), including: (i) representing that goods or services have characteristics that they do not have; (ii) representing that goods or services are of a particular standard, quality or grade if they are of another; (iii) advertising goods or services with intent not to sell them as advertised and (iv) engaging in other conduct that creates a likelihood of confusion or misunderstanding.

256.    Duly's practice of disclosing Plaintiff's and other Class Members' personally identifiable data and re-directing their communications to third parties without authorization, consent or knowledge is a deceptive trade practice in violation of 815 ILCS § 510/2(a).

257.    Duly's practice of disclosing Plaintiff's and other Class Members' personally identifiable data and re-directing their communications to third parties without authorization, consent or knowledge was willful and/or intentional.

258.    Duly's representations and omissions were material because they were likely to deceive reasonable consumers about the privacy, security and use of their personally identifiable patient data and communications when using the Duly web property, including the MyChart patient portal.

259.    The above unfair and deceptive practices and acts by Duly were immoral, unethical,

oppressive and unscrupulous.

260.     These acts caused substantial injury to Plaintiff and other Class Members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

261.     As a direct and proximate result of Duly's unfair, unlawful and deceptive trade practices, Plaintiff and other Class Members have suffered and will continue to suffer injury, ascertainable losses of money or property and monetary and non-monetary damages, including overpaying for Duly's health care services and loss of value of their personally identifiable patient data and communications.

262.     As a direct and proximate result of Duly's unfair, unlawful and deceptive acts and practices, Plaintiff and other Class Members were also damaged by Duly's conduct in that:

a.     Duly harmed Plaintiff's and other Class Members' interest in privacy;

b.     Sensitive and confidential information that Plaintiff and other Class Members intended to remain private is no more;

c.     Duly eroded the essential confidential nature of the provider-patient relationship;

d.     Duly took something of value from Plaintiff and other Class Members and derived benefit therefrom without Plaintiff's and other Class Members' authorization, informed consent, or knowledge and without sharing the benefit of such value;

e.     Plaintiff and other Class Members did not get the full value of the medical services for which they paid which included Duly's duty to maintain confidentiality and

f.     Duly's actions diminished the value of Plaintiff and other Class Members' personal information.

263.     Plaintiff and other Class Members are patients of Duly and need access to Duly's

Web Properties, including the Website and the MyChart Portal, in connection with receiving health care from Duly.

264.     Because Plaintiff and other Class Members need to and so will continue to use Duly's Web Properties in the future, if Duly's unfair, unlawful and deceptive trade practices are allowed to continue, Plaintiff and other Class Members are likely to suffer continuing harm in the future.

265.     Plaintiff and other Class Members seek all monetary and non-monetary relief allowed by law, including injunctive relief and reasonable attorney's fees.

## COUNT IV

### BREACH OF CONFIDENCE
### *(On behalf of Plaintiff & the Class)*

266.     Medical providers have a duty to their patients to keep non-public medical information confidential.

267.     Plaintiff and other Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on Defendant's Website and the MyChart Portal, which were further buttressed by Defendant's express promises in its privacy policy.

268.     Contrary to its duties as a medical provider and its express promises of confidentiality, Defendant installed its Pixel and CAPI to disclose and to transmit to third parties Plaintiff's and other Class Members' communications with Defendant including Private Information and the contents of such information.

269.     These disclosures were made without Plaintiff's or other Class Members' knowledge, consent or authorization.

270. The third-party recipients included, but were not limited to, Facebook.

271. The harm arising from a breach of provider-patient confidentiality includes erosion of the essential confidential relationship between the healthcare provider and the patient.

272. As a direct and proximate cause of Defendant's unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiff and other Class Members were damaged by Defendant's breach in that:

    a. Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

    b. Plaintiff and Class Members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;

    c. Defendant eroded the essential confidential nature of the provider-patient relationship;

    d. General damages for invasion of their rights in an amount to be determined by a jury;

    e. Nominal damages for each independent violation;

    f. Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensation for such data;

    g. Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality;

    h. Defendant's actions diminished the value of Plaintiff's and Class Members' Private Information; and

    i. Defendant's actions violated the property rights Plaintiff and Class Members have in their Private Information.

## COUNT V

### INVASION OF PRIVACY
### *(On Behalf of Plaintiff & the Class)*

273. Plaintiff repeats and realleges each and every allegation contained in the Complaint as if fully set forth herein.

274. Plaintiff and other Class Members had a reasonable expectation of privacy in their communications with Defendant via its Website and the communications platforms and services therein.

275. Plaintiff and other Class Members communicated sensitive and protected medical information and individually identifiable information that they intended for only Defendant to receive and that they understood Defendant would keep private.

276. Defendant's disclosure of the substance and nature of those communications to third parties without the knowledge and consent of Plaintiff and other Class Members is an intentional intrusion on Plaintiff's and other Class Members' solitude or seclusion.

277. Plaintiff and other Class Members had a reasonable expectation of privacy given Defendant's representations, HIPAA Notice of Privacy Practices and Privacy Policy.

278. Moreover, Plaintiff and Class Members have a general expectation that their communications regarding healthcare with their healthcare providers will be kept confidential.

279. Defendant's disclosure of private medical information coupled with individually identifying information is highly offensive to the reasonable person.

280. As a result of Defendant's actions, Plaintiff and other Class Members have suffered harm and injury including, but not limited to, an invasion of their privacy rights.

281. Plaintiff and other Class Members have been damaged as a direct and proximate

result of Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

282.    Plaintiff and other Class Members seek appropriate relief for that injury including, but not limited to, damages that will reasonably compensate Plaintiff and other Class Members for the harm to their privacy interests as a result of its intrusions upon Plaintiff's and other Class Members' privacy.

283.    Plaintiff and other Class Members are also entitled to punitive damages resulting from the malicious, willful and intentional nature of Defendant's actions, directed at injuring Plaintiff and other Class Members in conscious disregard of their rights.

284.    Such damages are needed to deter Defendant from engaging in such conduct in the future.

285.    Plaintiff also seeks such other relief as the Court may deem just and proper.

## COUNT VI

### COMMON LAW INVASION OF PRIVACY – INTRUSION UPON SECLUSION
### *(On Behalf of Plaintiff & the Class)*

286.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Class.

287.    Plaintiff and Class Members had a reasonable expectation of privacy in their communications with Defendant via its Web Properties and the communication platforms and services therein.

288.    Plaintiff and Class Members communicated sensitive and protected medical information and individually identifiable information that they intended for only Defendant to receive and that they understood Defendant would keep private.

289.    Defendant's disclosure of the substance and nature of those communications to third parties without the knowledge and consent of Plaintiff and Class Members is an intentional intrusion on Plaintiff's and Class Members' solitude or seclusion.

290.    Plaintiff and Class Members had a reasonable expectation of privacy because Defendant's Web Properties Notice of Privacy Practices states that they can expect such privacy.

291.    Moreover, Plaintiff and Class Members have a general expectation that their communications regarding healthcare with their healthcare providers will be kept confidential. Defendant's disclosure of private medical information coupled with individually identifying information is highly offensive to the reasonable person.

292.    As a result of Defendant's actions, Plaintiff and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

293.    Plaintiff and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

294.    Plaintiff and Class Members seek appropriate relief for these injuries, including but not limited to damages that will reasonably compensate Plaintiff and Class Members for the harm to their privacy interests as a result of the intrusion(s) upon Plaintiff's and Class Members' privacy.

295.    Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

296.    Plaintiff seeks all other relief as the Court may deem just and proper.

<u>**COUNT VII**</u>

**BREACH OF IMPLIED CONTRACT**
*(<u>On Behalf of Plaintiff & the Class</u>)*

297.     Plaintiff re-alleges and incorporates by reference all prior paragraphs as if fully set forth herein.

298.     When Plaintiff and Class Members provided their Private Information to Defendant in exchange for services, they entered into an implied contract pursuant to which Defendant agreed to safeguard and not disclose their Private Information without consent.

299.     Plaintiff and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

300.     Plaintiff and Class Members would not have entrusted Defendant with their Private Information in the absence of an implied contract between them and Defendant obligating Defendant to not disclose Private Information without consent.

301.     Defendant breached these implied contracts by disclosing Plaintiff's and Class Members' Private Information to third parties, including Facebook.

302.     As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiff and Class Members sustained damages as alleged herein. Plaintiff and Class Members would not have used Defendant's services, or would have paid substantially for these services, had they known their Private Information would be disclosed.

303.     Plaintiff and Class Members are entitled to compensatory and consequential damages as a result of Defendant's breach of implied contract.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff PATRICIA MAYER, on behalf of herself and all those similarly situated, respectfully prays for judgment in her favor and against MIDWEST PHYSICIAN ADMINISTRATIVE SERVICES, LLC d/b/a DULY HEALTH AND CARE as follows:

- For an Order certifying this action as a Class action and appointing Plaintiff as Class Representative and Plaintiff's counsel as Class Counsel;

- For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and other Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and other Class Members;

- For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage and safety, and to disclose with specificity the type of PII and PHI disclosed to third parties;

- For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

- For an award of actual damages, compensatory damages, statutory damages and statutory penalties, in an amount to be determined as allowable by law;

- For an award of punitive damages as allowable by law;

- For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

- Pre- and post-judgment interest on any amounts awarded and

- All such other and further relief as this court may deem equitable and just.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands that this matter be tried before a jury.

Date: April 10, 2023                    Respectfully submitted,

**ALMEIDA LAW GROUP LLC**
Firm ID 100530
David S. Almeida (ARDC 6285557)
Elena A. Belov (*Pro Hac Vice forthcoming*)
849 W. Webster Avenue
Chicago, Illinois 60614
(312) 576-3024 (phone)
david@almeidalawgroup.com
elena@ almeidalawgroup.com

James B. Zouras
Ryan F. Stephan
Teresa M. Becvar
Michael Casas
**STEPHAN ZOURAS, LLP**
222 W. Adams St, Suite 2020
Chicago, Illinois 60606
312.233.1550
312.233.1560 *f*
Firm ID: 43734
jzouras@stephanzouras.com
rstephan@stephanzouras.com
tbecvar@stephanzouras.com
mcasas@stephanzouras.com

*Attorneys for Plaintiff & the Putative Class*

**CERTIFICATE OF SERVICE**

I, the attorney, hereby certify that on April 10, 2023, I filed the attached with the Clerk of the Court using the Court's electronic filing system, and will send such filing to all attorneys of record.

*/s/ James B. Zouras*

# EXHIBIT A

FILED
4/10/2023 12:31 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2023CH03446
Calendar, 9
22218884

2023CH03446

Get Care ⌄

# HIPAA Privacy Practices & Forms

**Notice of Privacy Practices**

---

# Your Information. Your Rights. Our Responsibilities.

Nothing is more important thank ensuring your privacy. At Duly Health and Care, we understand that your privacy is vitally important. As your medical provider, we take proactive measures to safeguard your information. We understand that with each office visit, you are placing your trust in us. We will make every effort to ensure this trust is not breached, and that your privacy is protected.

This Notice was developed to provide you with information regarding your rights to privacy and confidentiality. It contains our policies regarding privacy according to the Health Insurance Portability and Accountability Act (HIPAA) rules and regulations. We encourage you to read this information thoroughly so that you are fully informed about our policies and procedures. We welcome any questions you may have regarding this information.

Notice of Privacy Practices

# Phone/Verbal Consent

Use this form to document the preferred phone numbers to contact you and whether or not our staff can leave detailed messages. Complete the below form to update your contact numbers.

Consent for Verbal Release of Information Form

# Patient Amendment Requests

You have the right to request a change or amendment to your protected health information Duly Health and Care maintains in your medical record. To exercise your right to request an amendment, please complete the below form. *If you need to update your demographic information, please log in to MyChart or contact customer service at 866-734-7680.*

Patient Amendment Request Form

Get Care ˅

You have the right to request restrictions as to how your protected health information (PHI) may be used and/or disclosed to carry out payment. To exercise your right to request a restriction on the disclosure of your PHI, please complete the below form.

Patient Requested Restriction Form

# Care Everywhere Opt-Out

Duly Health and Care participates in Epic's Care Everywhere to share your medical record via secure, encrypted connections. This enables your treating provider(s) to access your health information when you are receiving care outside of Duly Health and Care. This information shared includes your medical history, previous diagnoses, test results (i.e. labs and imaging), current medications, allergies, and progress notes. This connection allows for real-time access without having to wait for records to be transferred between facilities.

You may opt out if you do not want your record shared with your treating provider(s) through Care Everywhere. If you
opt out, you also have the right to opt back in at any time. To opt-out of Care Everywhere, please complete the below form.

Care Everywhere Opt-Out Form

DULY HEALTH AND CARE

**About Duly**

**Locations**

**Careers**

**Media Center**

**Medical Records Requests**

Get Care ∨

CONTACT US

## Need Help?

Corporate Mailing Address

**1100 W 31st Street**

**Downers Grove, Illinois 60515**

Main Line – **(630) 469-9200**

Billing Customer Service – **(866) 734-7680**

STAY CONNECTED

Sign up for Duly e-Newsletters

**Subscribe Now!**

© 2023 by Duly Health and Care

Terms of Use

Privacy Policy

Accountable Care Organization (ACO)

Also of Interest:

What is Head and Neck Cancer?

New Patient Medical Forms

Are Your Ears Ringing?